# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **LATONYA THORNHILL,** | ) | **CASE NO. 2:16-cv-00962-ALM-KAJ** |
| **Plaintiff,** | ) | |
| | ) | **JUDGE ALGENON L. MARBLEY** |
| **v.** | ) | |
| | ) | |
| **WALDEN UNIVERSITY, LLC, et al.,** | ) | |
| | ) | **DEFENDANTS' MEMORANDUM IN** |
| **Defendants.** | ) | **SUPPORT OF MOTION TO DISMISS** |
| | | **AMENDED COMPLAINT** |

Date: February 9, 2017

Sanford E. Watson (0040862), Trial Attorney
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113
Telephone: 216-592-5000
Facsimile: 216-592-5009
E-mail: sanford.watson@tuckerellis.com

Brian Laliberte (0071125)
Scott J. Stitt (0073943)
TUCKER ELLIS LLP
175 South Third Street, Suite 520
Columbus, OH 43215
Telephone: 614-358-9717
Facsimile: 614-358-9712
E-mail: brian.laliberte@tuckerellis.com
scott.stitt@tuckerellis.com

*Of counsel:*

Kathleen Pontone (*pro hac vice*)
Anthony Walter Kraus (*pro hac vice*)
Stephanie Kaye Baron (*pro hac vice*)
MILES & STOCKBRIDGE PC
100 Light Street
Baltimore, MD 21202
Telephone:     410-727-6464
Facsimile:     410-385-3700
E-mail:     kpontone@milesstockbridge.com
            akraus@milesstockbridge.com
            sbaron@milesstockbridge.com

*Counsel for Defendants Walden University, LLC
and Laureate International Universities d/b/a
Laureate Education Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iii

LOCAL RULE 7.2(3) SUMMARY OF MEMORANDUM ......................................... xi

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ........................................................................................... 3

    I.    Thornhill's Alleged Experience At Walden (2011-2015) ....................................... 3

    II.    Allegations Regarding the Experiences of the Class and Ohio Sub-Class. ............ 8

        A.    Statements Appearing on Defendants' Websites (2012-2015). .................. 8

        B.    Alleged Statements Made by Walden "Recruiters" to Others. ................. 10

        C.    Walden's Alleged Engagement in a Vague and Undefined "Scheme" to Prolong the Dissertation Process "Systemically." ................................... 11

    III.    Allegations Challenging Walden's Status as an Educational Institution and a Purported "Fiduciary Relationship" between the Parties...................................... 13

STANDARD OF REVIEW .......................................................................................... 14

ARGUMENT ............................................................................................................... 15

    I.    The Amended Complaint's First through Sixth Causes of Action, Specifically and Exclusively Alleging Claims under Minnesota Law, Fail to State Valid Claims Because Minnesota Law is Inapplicable under the Governing Choice-of-Law Rules .............................................................................................................. 15

        A.    The First Cause of Action For Fraud Fails For Its Invalid Reliance on Minnesota Law.......................................................................................... 16

        B.    The Third Cause of Action For Breach of Contract Fails For Its Invalid Reliance on Minnesota Law.................................................................... 23

        C.    The Fourth Cause of Action For Consumer-Protection Act Violations Fails For Its Invalid Reliance on Minnesota Law.............................................. 27

        D.    The Second Cause of Action For Unjust Enrichment Fails For Its Invalid Reliance on Minnesota Law.................................................................... 29

        E.    The Fifth Cause of Action For Breach of the Implied Covenant of Good Faith and Fair-Dealing Fails For Its Invalid Reliance on Minnesota Law. ................................................................................................................. 31

i

F. The Sixth Cause of Action For Breach of Fiduciary Duty Fails For Its Invalid Reliance on Minnesota Law. ......................................................... 31

II. The Complaint's Seventh through Twelfth Causes of Action, Alleging Claims for Fraud, Breach of Contract, Consumer-Protection Act Violations, Unjust Enrichment, Violation of the Covenant of Good Faith and Fair Dealing, and Breach of Fiduciary Duty, Brought on Behalf of the Ohio-Based Plaintiff and a Subclass of Ohio-Resident Former Walden Students, Fail to State Valid Claims Under the Applicable Pleading Rules and Requirements of Ohio Law............... 33

A. Plaintiff Has Failed to State a Claim for Fraudulent Inducement in her Seventh Cause of Action............................................................... 33

B. Plaintiff Has Failed to State a Claim for Breach of Contract in her Ninth Cause of Action............................................................................ 58

C. Plaintiff Has Failed to Allege and Show Compliance with the Prerequisites for a Class-Action Claim under the Ohio Consumer Sales Practices Act in Her Eleventh Cause of Action. ............... 64

D. Plaintiff Has Failed to State a Substantive Claim for Violation of the Ohio Consumer Sales Practices Act in Her Eleventh Cause of Action. ............ 65

E. Plaintiff Has Failed to State a Claim for Unjust Enrichment in Her Eighth Cause of Action............................................................................ 67

F. Plaintiff Has Failed to State a Claim for Breach of the Covenant of Good Faith and Fair Dealing in Her Tenth Cause of Action. ............................ 69

G. Plaintiff Has Failed to State a Claim for Breach of Fiduciary Duty in Her Twelfth Cause of Action............................................................... 69

H. Thornhill's Claims Also Would Fail Substantively Under Minnesota Law. ...................................................................................... 73

CONCLUSION.................................................................................................... 74

## TABLE OF AUTHORTIES

### CASES

ABM Farms, Inc. v. Woods, 81 Ohio St. 3d 498 (1998) .................................................. 34

Abrams v. Mary Washington Coll., 1994 WL 1031166 (Va. Cir. Ct. Apr. 27, 1994) ................ 70

Alligood v. Procter & Gamble Co., 72 Ohio App. 3d 309 (1st Dist. 1991) ................................ 58

Alsides v. Brown Inst., Ltd., 592 N.W. 2d 468 (Minn. Ct. App. 1999) ...................................... 71

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ................................................................... passim

Ass'n Ben. Servs., Inc. v. Caremark Rx, Inc., 493 F.3d 841 (7th Cir. 2007) ............................... 68

Baker v. Or. City School, 2011 Ohio Misc. LEXIS 16063 (Apr. 13, 2011) ................................ 59

Bank of America Corp. v. Superior Court, 198 Cal. App. 4th 862(2011) ................................... 57

Basch v. George Washington University, 370 A.2d 1364 (D.C.1977) ....................................... 26

Becker v. Wells Fargo Bank, No. 2:10-cv-02799 LKK KJN PS, 2011 WL 1103439 (E.D. Cal. March 22, 2011) ...................................................................................... 36, 66

Bell Atlantic v. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007) .......................................... passim

Bentley v. Equity Trust, 2015 Ohio 4735 (2015) ......................................................... 31

Bittle v. Oklahoma City Univ., 6 P.3d 509 (Okl. App. 2000) ............................................... 68, 69

Blane v. Alabama Commercial Coll., Inc., 585 So. 2d 866 (Ala. 1991) ..................................... 71

Blystra v. Fiber Tech Grp., Inc., 407 F. Supp. 2d 636 (D.N.J. 2005) ...................................... 68

Caldas v. Affordable Granite & Stone, Inc., 820 N.W. 2d 826 (2012) ..................................... 74

Camboni v. MGM Grand Hotel, LLC, No. CV11-1784-PHX-DGC, 2012 U.S. Dist. LEXIS 98039 (D. Ariz. July 16, 2012) ......................................................................... 1

Carr v. Bd. of Regents of Univ. Sys. of Georgia, 249 Fed. Appx. 146 (11th Cir. 2007) ............. 42

Casa Orlando Apts. Ltd. v. Fed. Nat. Mortg. Ass'n, 624 F. 3d 185 (5th Cir. 2010) ............. 30, 32

Castano v. Tobacco Co., 84 F.3d 734 (5th Cir. 1996) .................................................. 23

CenCor, Inc. v. Tolman, 868 P.2d 396 (Colo. 1994) ...................................................... 71

Clayton v. Trustees of Princeton Univ., 519 F. Supp. 802 (D.N.J. 1981) .................................... 26

Cohen v. Lamko, Inc., 10 Ohio St. 3d 167 (1984)........................................................................ 34

Colley v. Procter & Gamble Co., No. 1:16-cv-918, 2016 WL 5791658 (S. D. Ohio, Oct. 4, 2016) ............................................................................................................................................... 30

Combs v. Int'l Ins. Co., 354 F.3d 568 (6th Cir. 2004)................................................................. 52

Cooper v. Peterson, 164 Misc. 2d 878 (Sup. Ct. 1995) ..................................................... 40, 47, 59

Cowit v. CitiMortgage, Inc., No. 1:12-cv-869, 2013 WL 940466 (S. D. Ohio, Mar. 8, 2013)……………………………………………………………………………..23, 28, 30

Craighead v. E.F. Hutton & Co., 899 F.2d 485 (6th Cir. 1990) ................................................... 35

Davis v. George Mason Univ., 395 F. Supp. 2d 331 (E.D. Va. 2005); aff'd 193 F. Appx. 248 (4th Cir. 2006), cert. denied 549 U.S. 1208 (2007) ................................................................. 43

Davis Wetlands Bank, LLC v. United States, 114 Fed. Cl. 113 (2013) ....................................... 64

De Simone v. Siena Coll., 663 N.Y.S. 2d 701 (N.Y. App. 1997) ................................................ 62

Definitive Solutions Co., Inc. v. Sliper, 2016 Ohio 533; appeal not allowed, 2016-Ohio-4606, 52 N.E.3d 1204 (2016) ............................................................................................................ 62

Delahunt v. Cytodyne Techs., 241 F. Supp. 2d 827 (S.D. Ohio 2003)............................ 23, 34, 70

Denson v. Steubenville Bd. of Educ., No. 85-J-31, 1986 Ohio App. LEXIS 7716 (July 29, 1986) ................................................................................................................................................... 46

Doe v. Town of Framingham, 965 F. Supp. 226 (D. Mass, 1997) ............................................... 51

Doherty v. S. Coll. of Optometry, 862 F. 2d 570 (6th Cir. 1988), cert. denied, 493 U.S. 810 (1989)................................................................................................................................. passim

Dupont Heights Ltd. P'ship v. Riggs Nat. Bank of Washington, D.C., 949 F. Supp. 383 (D. Md. 1996) .......................................................................................................................................... 27

Eiland v. Wolf, 764 S.W. 2d 827 (Tex. App. 1989) writ denied (May 10, 1989) ........................ 42

Episcopal Ret. Homes, Inc. v. Ohio Dept. Indus. Relations, 61 Ohio St. 3d 366 (1991) ............ 58

Erickson v. Pardus, 551 U.S. 89 (2007)...................................................................................... 14

Evans v. Ohio State Univ., 112 Ohio App. 3d 724 (1996) .......................................................... 71

Fimon v. Knerol Drywall Supplies, C7-02-1588, 2003 WL 1220240 (Minn. Ct. App. Mar. 18, 2003) .......................................................................................................................................... 73

iv

_Finsterwald-Maiden v. AAA S. Cent. Ohio_, 115 Ohio App. 3d 442 (1996) ......................... 42, 43

_GAF Corp. v. Heyman_, 724 F.2d 727 (2d Cir.1983) ..................................................... 57

_Gally v. Columbia Univ._, 22 F. Supp. 2d 199 (S.D.N.Y 1998)................................... 62

_Garofalo v. Chicago Title Ins. Co._, 661 N.E.2d 218 (Ohio App. 1995)....................... 58

_Gen. Tel. Co. of Sw. v. Falcon_, 457 U.S. 147 (1982)........................................... 23, 27

_Gianino v. Alacer Corp._, 846 F. Supp. 2d 1096 (C.D. Cal. 2012).......................... 23, 28

_Gibson v. Walden Univ., LLC_, 66 F. Supp. 3d 1322 (D. Or. 2014)........................... 17, 42, 43, 61

_Glorvigen v. Cirrus Design Corp._, 796 N.W. 2d 541 (Minn. App. 2011), _aff'd, on other grounds_
    816 N.W.2d 572 (Minn. 2012) .................................................................. 74

_Gordon v. Chase Home Fin., LLC_, No. 8:11-CV-2001-T-33EAJ, 2013 WL 436445 (M.D. Fla.
    Feb. 5, 2013) ....................................................................................... 32

_Gourdine v. Felician Coll._, No. A-5248-04T3, 2006 WL 2346278 (N.J. Super. Ct. App. Div.
    Aug. 15, 2006) .................................................................................... 28

_Grandon v. Merrill Lynch & Co., Inc._,  No. 95 CIV 10742 (SWK), 2003 WL 22118979
    (S.D.N.Y. Sept. 10, 2003)...................................................................... 32

_Gupta v. New Britain Gen. Hosp._, No. CV92 517506S, 1995 WL 216835 (Conn. Super. Ct. Apr.
    3, 1995), _aff'd_, 239 Conn. 574, 687 A.2d 111 (1996)................................... 26

_Gustafson v. BAC Home Loans Servicing, LP_, 294 F.R.D. 529 (C.D. Cal. 2013)............... 26, 30

_Hale v. Enerco Grp._, 288 F.R.D. 139 (N.D. Ohio 2012) ............................................ 23

_Harwood v. Johns Hopkins Univ._,130 Md. App. 476 (2000), _cert. denied_, 360 Md. 486 (2000)
    ……………………………………………………………………………………………...25

_Ho v. Univ. of Texas at Arlington_, 984 S.W.2d 672  (Tex. App. 1998)....................... 70

_Horowitch v. Diamond Aircraft Indus._, 526 F. Supp. 2d 1236 (M.D. Fla.  2007) ...................... 18

_Hunter v. Bd. of Educ._, 292 Md. 481 (1982) ......................................................... 46, 51

_In re MRU Holdings Securities Litigation_, 769 F. Supp. 2d 500 (S.D.N.Y. 2011)...................... 57

_In re Porsche Cars N. Am., Inc._, 880 F. Supp. 2d 801 (S.D. Ohio 2012)..................... 30

_In re Revco D.S., Inc._, 118 B.R. 468 (Bankr. N.D. Ohio 1990) ................................. 22

*Infocision Mgmt. Corp. v. Found. for Moral Law Inc.*, No. 5:08cv1342, 2009 WL 2244166 (N.D. Ohio July 27, 2009) ............................................................................................................... 39

*Ins. Dist. Network v. Mariano*, No. 1:04-CV-466, 2008 WL 520915 (S.D. Ohio Feb. 26, 2008) 22

*Jamieson v. Vetterott Educ.Centers, Inc.*, 259 F.R.D. 520 (D. Kan. 2009) ................................... 71

*Johnson v. Walden Univ.*, 839 F. Supp. 2d 518 (D. Conn. 2011) ………………………………73

*Keefe v. N. Y. Law Sch.*, 71 A.D. 3d 569 (2010) .................................................................... 43, 69

*Keles v. New York Univ.*, 1994 WL 119525, (S.D.N.Y. Apr. 6, 1994), *aff'd*, 54 F.3d 766 (2d Cir. 1995) .......................................................................................................................................... 26

*Kellogg Co. v. Sabhlok*, 471 F.3d 629 (6th Cir. 2006) ................................................................. 62

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) ....................................................... 16

*Knight v. State of Ala.*, 900 F. Supp. 272 (N.D. Ala. 1995) ........................................................ 17

*Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9-11-cv-81373-DMM, 2013 WL 139913 (S.D. Fla. Jan. 10, 2013) ................................................................................................................................ 30

*Lawrence v. Loraine Cty. Cmty. Coll.*, 127 Ohio App. 3d 546 (1998) .............................. passim

*Leiby v. Univ. of Akron*, 2005 Ohio 6315, *aff'd* 2006 Ohio 2831 (2006) ................................... 47

*Love v. Duke University*, 776 F. Supp. 1070 (M.D.N.C. 1991), *aff'd* 959 F.2d 231 (4th Cir. 1992) .......................................................................................................................................... 25

*Lynx Ser., Ltd. v. Horstman*, 182 F. Supp. 3d 757 (N.D. Ohio 2016) ......................................... 39

*Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818 (6th Cir. 1990) ................................................... 16

*Mahne v. Ford Motor Co.*, 900 F.2d 83 (6th Cir. 1990) .............................................................. 16

*Marchese v. Nelson*, 809 F. Supp. 880 (D. Utah 1993) ............................................................... 32

*Marone v. Philip Morris USA, Inc.*, 110 Ohio St. 3d 5 (2006) ................................................... 64

*Marquez v. Univ. of Wash.*, 32 Wn. App. 302 (1982) .......................................................... passim

*Marshall v. H & R. Block Tax Servs., Inc.*, 270 F.R.D. 400 (S.D. Ill. 2010) .............................. 32

*Martens v. Minnesota Min. & Mfg. Co.*, 616 N.W. 2d 732 (Minn. 2000) ............................ 44, 73

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ............................................ 28, 30

McClinton v. Walden Univ., No. CA 3:13-0942-MBS, 2014 WL 992780 (D.S.C. Mar. 12, 2014), *aff'd*, 581 F. App'x 262 (4th Cir. 2014) ................................................................................... 21

McDade v. Cleveland State Univ., 2014 -Ohio- 4026, 2014 WL 4557015 (Ohio App. 10 Dist., 2014) ...................................................................................................................................... 67

Middlebrooks v. Univ. of Maryland at Coll. Park, 980 F. Supp. 824 (D. Md. 1997); *aff'd sub nom*. Univ. of Maryland, 166 F.3d 1209 (4th Cir. 1999)................................................. 38, 64

Miller v. Citizens Sec. Grp., Inc., 116 F. 3d 343 (8th Cir. 1997) ............................................... 74

Mizell v. Sara Lee Corp., No. CIV.A. 2:05CV129, 2005 WL 1668056 (E.D. Va. June 10, 2005); *aff'd*. 158 Fed. App'x. 242 (4th Cir. 2005) .............................................................. 44

Morgan v. Biro Mfg. Co., 15 Ohio St. 3d 339 (1984) .................................................. 16, 27, 28

Mosby-Nickens v. Howard University, 864 F. Supp. 2d 93 (D.D.C. 2012), *app. dismd*., 2012 WL 5896831 (D.C. Cir. 2012) .......................................................................................... 25

Murphy v. Capella Educ. Co., 589 Fed. Appx. 646 (4th Cir. 2014)...................................... 38, 51

Neminsky v. Bank of Am. Corp., No. CV14-01196-PHX-GMS, 2014 Dist. LEXIS 187534 (D. Ariz. Oct. 9, 2014) ............................................................................................................. 1

New England Health Care Employees Pension Fund v. Ernst & Young, LLP, 336 F.3d 495 (6th Cir. 2003)……………………………………………………………………………………...13

Noble Sys. Corp. v. Alorica Cent., LLC, 543 F.3d 978 (8th Cir. 2008)...................................... 68

Ohio Univ. Bd. of Trustees v. Smith, 132 Ohio App. 3d 211 (1999).......................................... 70

Olive v. Columbia/HCA Healthcare Corp., No. 75249, 2000 WL 263261 (Ohio Ct. App. Mar. 9, 2000) ................................................................................................................................. 42, 43

O'Shea v. Epson Am. Inc., No. CV-09-8063, 2011 WL 3299936 (C.D. Cal. July 29, 2011)......................................................................................................................................57, 67

Pasqualetti v. Kia Motors of America, Inc., 663 F. Supp. 2d 586 (N.D. Ohio 2009)............. 71, 72

Pearson v. Walden Univ., 144 F. Supp. 3d 503 (S.D.N.Y. 2015) .......................................... 12, 44

Perkins v. Silverstein, 939 F.2d 463 (7th Cir. 1991) ..................................................................... 1

Peter W. v. San Francisco Unified Sch. Dist., 60 Cal. App. 3d 814 (1976)................................. 46

Phillips v. Philip Morris Companies Inc., 290 F.R.D. 476 (N.D. Ohio 2013)............................. 65

Pilgrim v. Universal Health Card, LLC, 660 F.3d 943 (6th Cir. 2011)........................... 21, 27, 28

*Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629 (7th Cir. 2007).......................................... 74

*Poe v. Hamilton*, 56 Ohio App. 3d 137 (1990)............................................................... 45

*Ramthan v.  Bryan Career Coll., Inc.*, 93 F. Supp. 3d 1011 (W.D. Ark. 2015)............................ 23

*Rikos v. Procter & Gamble Co.*, No. 1:11-cv-226, 2012 WL 641946 (S. D. Ohio Feb. 28, 2012) ............................................................................................................ 28

*Roe v. Saint. Louis Univ.*, 2012 WL 6757558 (E.D. Mo. Dec. 31, 2012), *aff'd sub nom.* Roe v. St. Louis Univ., 746 F.3d 874 (8th Cir. 2014)......................................................... 25

*Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330 (N.D. Ill. 1997) ................................................... 32

*Ruegsegger v. W. N.M. Univ. Bd. of Regents*, 154 P.3d 681 (N.M. App. 2006), *cert. denied*, 149 P.3d 942 (N.M. 2006) ............................................................... 25, 40, 47, 59

*Ryan v. Royal Ins. Co. of Am.*, 916 F. 2d 731 (1st Cir. 1990)...................................... 52

*S & M Homes, LLC v. Chi Title Ins. Co.*, No. 2:12-cv-03057-JPM-tmp, 2014 U.S. Dist. LEXIS, 158754 (W.D. Tenn., March 14, 2014) ............................................................ 74

*Sanderson v. HCA - the Healthcare Co.*, 447 F.3d 873 (6th Cir. 2006); *cert. denied*, 549 U.S. 889 (2006)................................................................................. 33

*Sanford v. Howard Univ.*, 415 F. Supp. 23 (D.D.C. 1976) *aff'd*, 549 F.2d 830 (D.C. Cir. 1977) ............................................................................................................ 49

*Sateriale v. R J Reynolds, Tobacco Co.*, No. 2:09-CV-08394-CAS, 2014 WL 7338877 (C.D. Cal. Dec. 19, 2014)................................................................................ 27

*Scalzi v. Mead Sch. for Human Dev.*, No. XO5CV 950148213S, 1999 WL 391917 (Conn. Super. Ct. June 4, 1999) ................................................................................ 68

*Shapiro v. Butterfield*, 921 S.W.2d 649 (Mo. Ct. App. 1996).................................... 70

*Signal Peak Energy, LLC v. E. Montana Minerals, Inc.*, 922 F. Supp. 2d 1142 (D. Mont. 2013) ...............................................................................................56

*Sky Techs. Partners, LLC v. Midwest Research Inst.*, 125 F. Supp. 2d 286 (S.D. Ohio 2000) .............................................................................................21, 22

*Slaughter v.  Bringham Young Univ.*, 514 F.2d 622 (10th Cir. 1975); *cert. denied* 423 U.S. 898 (1975)................................................................................. 25

*Steamfitters Local Union 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3d Cir.1999); *cert. denied*, 528 U.S. 1105 (2000)......................................................... 68

*Sullivan v. Boston Architectural Center*, 2000 WL 35487586 (Mass. Super, April 3, 2000)...... 69

viii

Tesema v. Lake Washington Tech. Coll., No. C04-2533JLR, 2006 WL 408237 (W.D. Wash. Feb. 17, 2006) ............................................................................................ 62

Thompson v. Jiffy Lube Intern., Inc., 250 F.R.D. 607 (D. Kan. 2008) ...................................... 30

Thornton v. Harvard Univ., 2 F. Supp. 2d 89 (D. Mass. 1998) .................................... 43

Tibbs v. Nat'l Homes Constr. Corp., 369 N.E.2d 1218 (Ohio Ct. App. 1977)...................... 37, 65

Travis v. Walden Univ., LLC, No. MJG-15-235, 2015 U.S. Dist. LEXIS 147246 (D. Md. Oct. 30, 2015) ................................................................................ 2, 15, 56, 66

Trutschel v. Kettering Medical Center, 2009 -Ohio- 3302, 2009 WL 1914549 (Ohio App. 2 Dist., 2009) ................................................................................ 45, 47

Ullmo ex rel. Ullmo v. Gilmour Acad., 273 F.3d 671 (6th Cir. 2001) .................................. passim

United States ex rel. Bledsoe v. Cmty. Health Sys.,Inc., 501 F.3d 493 (6th Cir 2007)............... 35

Video Software Dealers Ass'n, v. Schwarzenegger, 556 F.3d 950 (9th Cir. 2006); *aff'd sub nom.* Brown v. Entm't Merchants Ass'n, 564 U.S. 786 (2011)........................................................ 57

Wasserman v. Kay, 197 Md. App. 586 (2011) .............................................................. 32

Watiti v. Walden University, No. 07-4782 (JAP), 2008 U.S. Dist. LEXIS 43217 (D.N.J. May 30, 2008) ................................................................................ 17, 20

Weisbarth v. Geauga Park Dist., 499 F.3d 538 (6th Cir. 2007)........................................ 14

Williams v. Aetna Finance Co., 83 Ohio St. 3d 464 (1998), *cert. denied,* 562 U.S. 1051 (1999) ............................................................................................ 49

Wood v Carpenter, 101 U.S. 135 (1879) ...................................................................... 57

Woodard v. Fid. Nat. Title Ins. Co., No. Civ. 06-1170 RB/WDS, 2008 WL 5737364 (D.N.M. Dec. 8, 2008)....................................................................... 26

Zinter v. Univ. of Minn., 799 N.W. 2d 243, 247 (Minn. Ct. App. 2011) ............................... 68, 74

## **STATUTES**

Higher Education Opportunity Act of 2008, 20 U.S.C. § 1001, *et. seq*........................................ 50

34 C.F.R. § 668.6(b) ................................................................................................ 53

Ohio Annotated Code § 3301-35-01(9)………………………………………………………….48

Ohio's Consumer Sales Practices Act ("OCSPA"), O.R.C. § 1345.02 .................................. 64, 65

## OTHER AUTHORITIES

Calamari & Perillo, The Law of Contracts § 2-6(b) at 33 (3d ed. 1987)..................................... 64

*Restatement* (Second) of Conflicts of Law § 196 .................................................. 24, 31

*Restatement* (Second) of Conflicts of Law § 145 ................................................. 27, 31

*Restatement* (Second) of Conflicts of Law § 146 ................................................. 28, 31

*Restatement* (Second) of Conflicts of Law § 221 ...................................................... 29

*Restatement* (Second) of Conflicts of Law § 148 .............................................. passim

## RULES

Federal Rule of Civil Procedure Rule 9(b) .......................................................... passim

Federal Rule of Civil Procedure Rule 12(b)(6)........................................................ 14

Federal Rule of Civil Procedure Rule 8(a)(2).......................................................... 14

## LOCAL RULE 7.2(3) SUMMARY OF MEMORANDUM

**Background**.  Plaintiff Thornhill, a former PhD dissertation student at Walden University, is seeking to assert claims against the school on behalf of herself and either a nationwide class of all other Walden PhD students, or a subclass of Ohio residents who have been Walden PhD students. The first six counts of her 117-page Complaint assert claims under Minnesota law both personally and on behalf of a nationwide class for (1) fraud in the inducement, (2) unjust enrichment, (3) breach of contract, (4) violation of Minnesota's consumer-protection act, (5) breach of the implied covenant of good faith and fair dealing, and (6) breach of fiduciary duty.  The second six counts, pled as a fallback if Minnesota law is inapplicable, are claims under Ohio law both for her personally and for an Ohio subclass alleging (7) fraud in the inducement, (8) unjust enrichment, (9) breach of contract, (10) breach of the covenant of good faith and fair dealing, (11) violation of the Ohio Consumer Sales Practices Act, and (12) breach of fiduciary duty.  Her claims are based on statements that allegedly prompted her to expect that the writing portion of her PhD dissertation program would be shorter, involve faster and additional forms of faculty feedback, provide her greater control of timing and be conducted more efficiently and reasonably, rather than allegedly being systematically delayed and having an undisclosed low graduation rate.  [PP. 2-13]

**Minnesota Law Claims**. Thornhill's first six counts, dependent upon Minnesota law, fail to state actionable claims because under Ohio's choice-of-law rules, Minnesota law is inapplicable. [PP. 15-34]  Any such claims would be governed by the law of the various states in which Walden's students reside.  Walden is an accredited on-line university, providing education principally to working adults, who take courses typically during nonworking hours by computer at home or occasionally at work.  [P. 18-19]  The nature of the parties' resultant relationship

dictates that a student's home-state law governs the four asserted claims, under the "most significant relationship" tests of the *Restatement (Second) of Conflicts of Law,* applicable in Ohio.

For **the fraud claim**, *Restatement* § 148 dictates that the law of a student's home state would apply because it is where the student suffered any pecuniary harm from reliance on alleged fraudulent communications by Walden, was the place where any such misrepresentations were received, and would have been included in the global situs where the representations were made in cyberspace over the internet. [PP. 16-24]. These home-state contacts are augmented by the fact that the students are resident in those jurisdictions, that Walden is generally regulated as an educational institution by home states of its students, and it is also where any tangible thing that was relevant to the transaction was situated at the time, such as the necessary computer terminal and textbooks that the student used in the program. For **the contract claim**, *Restatement* § 196 dictates that the law of the state where services rendered under the contract were performed governs, which would be the students' states of residence where they took the online courses. [PP. 24- 28] For **the consumer-protection act claim**, under *Restatement* § 145, the law of the place where the consumer is harmed and is principally intended to protected by applicable consumer protection laws, is controlling. [PP. 28-30]. For the **"unjust enrichment" claim**, Restatement § 221 prescribes application of the law of a student's residence, since it was there that the relationship began by marketing and communication addressed to the student, the relationship was carried out there, it was where the student was domiciled and Walden was subject to regulation as an educational provider, and the enrollment and payment was initiated from the home state. [PP. 30-31]. For **the implied covenant of good faith and fair dealing claim**, the same analysis relating to the breach of contract claim is applicable. [P. 32]. For the

**breach of fiduciary duty claim**, Restatement §§ 145 and 146 dictate that the controlling law is of students' home states, which have the primary contacts and are the place of injury.  [PP. 32]

     **Ohio Law Claims**. The subsequent sections of the memorandum show that the seventh through twelfth counts, pled under Ohio law, fail to state cognizable claims for relief in view the necessary elements for a claim and the requirement of facial plausibility, rather than simple possibility, under the Twombly/Iqbal pleading requirements.

     **The claim for fraud** fails (1) because of its failure to allege actionable damages aside from the cost of the services rendered [P. 35-6], (2) because its assertions on "information and belief" are inadequate [P. 36], (3) because its contentions about false program "completion" times fail to identify required specifics under F.R.C.P. Rule 9(b), involve conflicting and fatally inconsistent allegations, and is based on non-actionable generalities and or future predictions and encouragement that could not have reasonably relied upon as fact [PP. 36-39], (4) because its contentions about misrepresentations of available academic feedback concern statements about future events and not present facts, involve no inducements collateral to the contract, do not allege any fraudulent intent when alleged misstatements were made, were subject to contractual disclaimers precluding reliance, and are barred by the "educational malpractice" doctrine precluding suit based assessments of program quality [PP. 39-48], (5) because its contentions about the misstated "control" students would have over timing in their programs is based on unreasonable misconstruction of statements that truthfully represent the flexibility of online programs [PP. 48-49]; (6) because its contention that Walden's program was less efficient and involved more delay than represented is based on no sufficiently specific statements to be actionable and is actually just a restated and impermissible claim for educational malpractice [PP. 49-50] (7) because its complaint about concealment of graduation rates and "program

design" times state no basis for a duty to disclose, misunderstand the nature and terms of federal disclosure programs and would involve this federal court in creating pioneering state common-law obligations on educational matters already subject to and better suited for regulatory action [PP. 50-57], and (8) because its allegations of an intentional "scheme" to conceal systematic delay in its programs were rejected last year by another Maryland federal court, fail to alleged necessary Rule 9(b) specifics, and are circular and illogical [PP. 57-59]..

**The claim for breach of contract** fails (1) because what limited contractual obligations have been recognized in the graduate-student/university relationship do not encompass the alleged breaches [PP. 59-61], (2) because several of the alleged breaches only affected class members and not Thornhill [P. 61], (3) because the assertions about lack of reasonable stability in faculty and other inefficiency and unreasonableness are an impermissible claim for "educational malpractice" and based on assertions too vague to support an implied contract [PP. 61-62], (4) because the 14-day response time to students was aspirational by its terms, subject to express contractual disclaimer and a subject of judicially-acknowledged academic discretion [PP. 62-64 ] (5) because statements about teaming and control were too vague and aspirational and without standards to form a contract, involved procedures subject to academic discretion and not judicial second guessing, and were subject to contractual disclaimer [PP. 64], and (5) because statements about program "completion time" were subject to contractual disclaimer and right to amend, were a matter of opinion and not assumed obligation, and implied no contract but merely aspiration. [P. 65].

**The claim for violation of the Ohio Consumer Sales Practices Act** fails as a basis for a class action because Thornhill has failed to plead satisfaction that defendants had notice of the alleged violation as required in O.R.C. § 1345.09(B) [P. 54].  The count further fails to state

sufficient claims for violation of the Act for the same reasons that the asserted bases on which the fraud claim rests are inadequate. [PP. 65-68].

**The count for unjust enrichment** is deficient on its face because the parties' relationship is allegedly contractual, which displaces any quasi-contractual remedy. [P. 68] The bases Thornhill asserts for the claim are also the same as those that underlie her fraud, contract, and Consumer Sales Practices claims, and fail to state cognizable "unjust" action for the same reasons that they fail to support the earlier claims. [PP. 68-69]. Her claims are largely in the nature of education malpractice, which is not actionable in the form of alleged unjust enrichment. [P. 69]. Moreover, an unjust enrichment claim cannot survive as a standalone claim upon dismissal of the preceding claims. [PP. 69-70] She also admittedly received value in exchange for her tuition, precluding such relief. [P. 70].

The claim for **breach of the covenant of good faith and fair dealing** fails because no such claim is recognized in the university setting under Ohio law and for the same reasons that under the breach of contract claim. [PP. 70-71].

The claim for **breach of fiduciary duty** is defective because no such duty is recognized by universities to their students in Ohio and because the necessary elements for establishing such a relationship are missing. [PP. 71-75].

While **Minnesota law** is inapplicable, as the initial sections of the memorandum show, Thornhill's claims also would be subject to dismissal under Maryland law for the same substantive deficiencies which undermine them under Ohio law if the Court were to find that Maryland law would apply [PP.75-76].

## INTRODUCTION

Plaintiff Latonya Thornhill has filed a 117-page Amended Complaint, including an additional 210 pages of supporting material in Exhibits, alleging various claims individually and purportedly on behalf of a nationwide class against Walden University, LLC ("Walden"), and its corporate parent, Laureate Education, Inc. ("Laureate"). Walden is an accredited online university in whose PhD program she enrolled and began trying to write a defensible doctoral dissertation, and she now seeks to attack the school's procedures after dropping out.

Thornhill's Amended Complaint commences with thirty-five pages (pp. 12-47) of protracted delving into various Walden publications and attempts to infer misrepresentations about features of the PhD programs, focusing on terms about program "completion" and "design" that her counsel contend are undefined and that they admit to not understanding. In trying to conjure up accusations based on these materials, the Amended Complaint relies upon no less than 59 different instances of theorizing "on information and belief," rather than asserting actual facts. There are also extended anonymous accusations about purported mistreatment of class members based on quotes from various websites (Am. Comp. at pp. 71-80), which are unauthenticated, unverified, incomplete, hearsay, improper for consideration in support of a complaint, and which should be struck under FRCP Rule 12(f). *See, e.g.,* Camboni v. MGM Grand Hotel, LLC, No. CV11-1784-PHX-DGC, 2012 U.S. Dist. LEXIS 98039, at * 17-18 (D. Ariz. July 16, 2012) (refusing to consider emails and contentions from websites attached to complaint); Neminsky v. Bank of Am. Corp., No. CV14-01196-PHX-GMS, 2014 Dist. LEXIS 187534, at *7 - 8 (D. Ariz. Oct. 9, 2014) (striking list from webpage). There is also a news article and an announcement of an investigation without findings (¶ 16 and Am. Comp. Ex. 9) that likewise must be stricken. Perkins v. Silverstein, 939 F.2d 463, 467 n. 2 (7th Cir. 1991) (attached newspaper article improper).

1

When one finally reaches the accusations pertaining to Thornhill herself (pp. 61-71), her actual grievances, once distilled, are substantially more limited than the Complaint's introductory ruminations suggest. On analysis, they (1) fail to involve several practices claimed to have been unlawfully directed at the anonymous class members, (2) are erroneously and fatally predicated on Minnesota law in the first six counts, which is inapplicable to her and the class as a proper choice of law, and (3) otherwise fail to state cognizable claims satisfying the applicable pleading requirements and well-settled limitations underlying the remaining counts.

In fact, Thornhill's Complaint is largely a rehash of another attempted class action brought in 2015 in Travis v. Walden Univ., LLC, No. MJG-15-235, 2015 U.S. Dist. LEXIS 147246, (D. Md. Oct. 30, 2015). In that case, another federal judge dismissed consumer-protection act claims involving identical allegations of an alleged improper "scheme" in Walden's dissertation process, and questioned the applicability of the law of a single state to other common law claims like those of the Plaintiffs when they were not residents. *See* Travis, 2015 U.S. Dist. LEXIS 147246 at *7. (Copy attached as Exhibit 1). The case then was voluntarily resolved by the three named plaintiffs in the wake of the court's inquiries about the maintainability of a class action, particularly concerning the potential predominance of individual issues.

Like the Travis Plaintiffs before her, Thornhill attempts to ignore her own key role in this process, namely writing an original PhD dissertation, something Walden cannot control. As shown below, Thornhill's attempted follow-on claims against Walden are similarly defective as a matter of law and should be dismissed in their entirety.

2

## STATEMENT OF FACTS[1]

### I.    Thornhill's Alleged Experience At Walden (2011-2015)

1.    **Alleged Dissertation Period**.  In 2011 Thornhill allegedly enrolled as a student at Walden to pursue a Doctor of Philosophy of Management, specializing in Leadership and Organizational Change. (Comp., ¶¶ 206-07).[2]  Thornhill contends the program was attractive because once her doctoral course work was completed, "Walden recruiters promised that she *could* finish her dissertation in 18 months, if she listened to her advisers . . . . ." (¶ 242). In contrast to the purported representation of what "could" occur, Thornhill elsewhere obscures matters by inconsistently further alleging that "about one month before enrolling" she was told by a single Walden Enrollment Advisor (Wajoili Ward-Jiggets) that after her doctoral coursework was completed, "it *would* take *only* 18 months to complete the dissertation . . . . ." (¶¶ 213, 246, 254) (emphasis added).

Thornhill claims that the 18-month period for completion of her dissertation allegedly promised her by Ms. Ward-Jiggets is consistent with "the webpages for her chosen program from 2010 and 2011." (¶ 208).  While acknowledging that she "is unsure which of Walden's prior webpages she visited" at the time, Thornhill nevertheless claims to have relied on webpages that allegedly "represented that the dissertation process would take a specific number of credits (or time period)." (¶ 208, fn. 28).  Without being able to verify that they are, in fact, the webpages

---

[1]  The Complaint alleges no separate misconduct by Laureate, independent of the alleged wrongful actions of its subsidiary, Walden; and Laureate is included as a defendant based on Thornhill's apparent belief that it can be found liable for the acts of, or acts in aid of, its subsidiary. For simplicity's sake, references to "Walden," and the inadequacy of claims against it, as discussed *infra,* should be taken as also encompassing Laureate on the assumption, for purposes of this motion, that it can be responsible for, or for aiding, Walden's actions.  Because the claims against Walden are defective and should be dismissed for the reasons shown, the claims against Laureate similarly fail and should be dismissed.

[2]   Plaintiff's First Amended Class Action Complaint is referred to as "Am. Comp." and all ¶ references are to it unless otherwise specifically indicated.   "Comp." refers to the original Complaint.

she allegedly relied upon, Thornhill attaches as Am. Comp. Ex. 49 documents that she describes as Walden's "webpages for her chosen program from 2010 and 2011, [in which] the 'Proposal, dissertation and oral presentation' are described as lasting 30 credit hours (*i.e.*, five six-credit-hour classes)." *Id.* (citing Am. Comp., Ex. 49). While equating the referenced 30 credit hours to the 18-month period allegedly promised to her by Ms. Ward-Jiggets, (¶ 156), Thornhill neglects to mention that the 2010-11 webpages to which she refers expressly state, in part, "**Time to completion may vary by student,** depending on individual progress and credits transferred, if applicable." (Am. Comp. Ex. 49) (emphasis in original).

Thornhill further claims this 18-month representation was effectively endorsed and, indeed, even improved upon in the following statement in Walden's Student Handbook:

**Dissertation Timing**

Doctoral students who want to graduate in a specific quarter must plan their program carefully as follows or their graduation date will be delayed:

☐    Begin planning for program completion *at least* 13 months *in advance of the anticipated graduation date*

*See* ¶ 155 (emphasis added); *see also*, ¶¶ 242, fn. 31, 334, 347, 405, 424.   From this simple Handbook advice to plan ahead, Thornhill purportedly infers a promise that she and all others, no matter *what* the program or dissertation topic, *really* could complete their dissertations in just 13 months, despite the 13-month period being explicitly open-ended ("at least") and being linked to an unspecified "anticipated graduation date," not guaranteed as occurring at any particular time. Moreover, she alleges the time period prediction she relied upon was 18 months, not 13 months, so her supposed "interpretation" of the Handbook is beside the point. (¶ 214) ("Thornhill relied on . . . statements that it would take 18 months to complete her dissertation.").

2.      **Three-Year Program Period**. Thornhill claims that Ms. Ward-Jiggets also told her that "it ***would*** take ***only*** . . . 3½ years to complete her program." (¶ 213) (emphasis added). Elsewhere in her Complaint, she contends there was some implied representation by Walden that her PhD doctoral program would take "roughly three years" (¶ 71), but her inference arises from a webpage excerpt from February 9, 2014 (*id.,* Ex. 14 thereto) several years <u>after</u> she enrolled; and that she nowhere alleges she saw, nor could have relied upon.  Thornhill further cites to a 2012 Senate Report which found that prior to July 2011, Walden recruiters used "scripts" to talk to prospective students that covered topics including, among others, "cost" and "time to completion." (¶¶ 50-53) (citing Am. Comp., Ex. 10 at 712-13).  In light of Thornhill's vague allegation that she enrolled in the "summer of 2011" (¶ 215), it is unclear whether such alleged scripts were even in use at the time she allegedly spoke to Ms. Ward-Jiggets, and there is no specific allegation that Ms. Ward-Jiggets actually used such a script.

3.      **Dissertation Problems**.  Between the summer of 2011 and the spring of 2014, Thornhill finished coursework necessary for completing her degree, allegedly receiving As and Bs in all of her courses. (¶¶ 215-16).  Thornhill makes no complaint regarding the courses she took at Walden or their duration.  As Thornhill neared completion of the required coursework, she allegedly embarked on the Walden Dissertation Process on September 3, 2013.  (¶ 217). In connection with her dissertation, Thornhill alleges that she took 12 dissertation courses over "seven quarters" (or 21 months) – "not the promised 18 months total or five dissertation classes." (¶¶ 217-218, fn. 29; 246).

Her preliminary Prospectus topic was submitted to Dr. David K. Banner (her dissertation supervisory committee chair and content expert) who allegedly approved it on September 15, 2013. (¶ 223).  Although her topic was already approved by her committee chair, Thornhill

claims that during a four-day residency she attended in December of 2013, a Walden professor suggested that she narrow her topic to focus more on millennials. (¶ 243). After allegedly "wasting" an unspecified period of time creating a new topic at the suggestion of that person, Dr. Banner later advised Thornhill to stick with her initial topic. *Id.* In February of 2014, Dr. Banner was joined on Thornhill's dissertation committee by Dr. Steve Tippins, who together approved Thornhill's Prospectus based on her initial topic on June 4, 2014. (¶¶ 224-26).

At this point, Thornhill claims in conclusory terms that she "experienced innumerable delays and multiple instances of faculty members failing to fulfill their responsibilities as dissertation committee chair and members due to the hurdles Walden itself put in their way." (¶ 245). Although alleging them to be innumerable, Thornhill actually identifies only two such obstacles:

● **Restricting a Service From Walden's Writing Center**: Prior to her enrollment, Thornhill claims to have reviewed Walden's "Dissertation" webpage dated June 30, 2011. (¶¶ 229-30) (citing Am. Comp. Ex. 43). Among other resources, that webpage lists Walden's online Writing Center as a resource made available to Walden doctoral students. *Id.* Beginning on January 2, 2015, Thornhill and other doctoral students allegedly were no longer able to use one feature of the online Writing Center, critiquing sample submissions for compliance with APA writing guidelines (the "APA Feature"), which Thornhill claims was useful for mastering them (¶¶ 228, 235). Thornhill further alleges that in August of 2016 – after she left the program – Walden resumed allowing doctoral students the more complete access to the Writing Center that she claims originally to have enjoyed. (¶ 248). Significantly, while complaining that she was deprived access to one feature of the online Writing Center after January 2, 2015, Thornhill acknowledges that she was given access to the Writing Center (including the APA Feature) prior

to that date.  Furthermore, Thornhill does not allege (nor could she plausibly allege) that she was ever denied access to the Writing Center entirely. *See ¶¶* 228, 235.

- **Restricting the Use of the "MyDr" Application**:  As of October, 30, 2014, Thornhill and other doctoral students allegedly were required to utilize a computer application called "MyDr" for communicating with their supervisory committees.  Prior to that date, Thornhill claims that she was able to e-mail her committee members to check about "head[ing] in the correct direction" and for "general pointers" through Walden's Interactive Blackboard System.  (¶ 227).  From October 30, 2014 forward, however, Thornhill alleges that she and other doctoral students were required to communicate with their dissertation committee chair and members through MyDr, and could only use MyDr after they submitted draft Chapters 1-3 of their dissertation (¶ 236), and thus were limited to receiving only "the most general input" on their Proposals.  (¶¶ 237-38).  Thornhill claims that that this restriction violated representations in the Walden Student Handbook that students and committee members were supposed to work as a "team." (¶ 240).

Without access to the MyDr application and the Writing Center, Thornhill claims that she was impeded in writing her three-chapter Proposal, and took a leave of absence after the fall quarter of 2015.  (¶ 246).  Thornhill alleges that had she been informed in the summer of 2011 of Walden's "abysmally low completion rate" for doctoral degrees (which she claims, on information and belief, is 10% or less (¶ 8)), she would not have enrolled in Walden's doctoral program in the first instance.  (¶ 247).  However, Thornhill makes no factual allegations of a purported duty on the part of Walden to publicly report completion rates for its doctoral programs, and asserts that by 2012 (just six months after she enrolled and well before she began

7

the Walden Dissertation Process she complains about), Walden began providing such "meaningful data" and "information." (¶ 54).

## II.      Allegations Regarding the Experiences of the Class and Ohio Sub-Class.

Thornhill's personal averments about her own specific alleged mistreatment during the Walden Dissertation Process, as addressed above, are buried in the middle of the Complaint. They are preceded both by (1) lengthy preliminary theorizing by her counsel about how Walden's webpages after 2011 might be misread to understate program completion rates and times (¶¶ 55-140); and (2) protracted "class" allegations trying to demonstrate a broader "scheme" by Walden to overcharge all students who enrolled in a Walden doctoral program from 1999 to the present. (¶ 290).

### A.      Statements Appearing on Defendants' Websites (2012-2015).

While Thornhill alleges that she enrolled in Walden's doctoral program in the summer of 2011 (*id.*, ¶s 207, 215), the Complaint devotes dozens of initial pages to statements that appeared on school webpages at different subsequent times, from 2012 to 2016.  (¶¶ 55-140).  The Complaint does not allege that Thornhill saw, much less relied on any of these later statements.

Specifically, on some of these webpages, the Complaint references statements regarding "on-time completion rate," "normal completion time," and student costs for each doctoral degree program. (¶¶ 55-140).  The Complaint contends that that the relevant "completion" terms, such as "on-time completion rates" and "normal time to complete," were undefined and difficult to understand.  (¶¶ 59, 62, 69).  Nevertheless, on information and belief (¶58), Thornhill alleges that these statements on Walden's website were falsely understated because they supposedly conflicted with other information later made available in 2014 on an alleged Laureate website about length of "program design" – a term that Plaintiff baldly alleges should be interpreted as being synonymous to the undefined term "minimum time to complete."  (¶¶ 106-08).

Based on her purportedly "not unreasonable" inference about the supposed synonymy of such undefined terms, she further insists that Walden must have intended to mislead PhD students about when they would graduate, despite Walden's webpages containing explicit disclosure about the variability of "completion" times:

> **The program completion time may vary depending on transfer of credit and the pace at which a student chooses to complete the program.**  Because many of the students in this program are working adults and need to balance personal and professional commitments, our academic advisors can help establish an appropriate program of study that enables each student to complete this program in a time frame that works best for him or her.

(¶¶ 55, 59, 62) (emphasis added).  Thornhill tries to dodge this notice by mischaracterizing the reference to Walden's advisors, in helping "working adults" to balance their "personal and professional commitments, . . . enabl[ing them] to complete this program in a time frame that works best for [them,]" as falsely creating the "illusion" that students could generally "control" their completion time to be whatever they wanted (¶¶ 59-60), rather than simply accommodating their work and study time, as the whole sentence actually states.

With respect to the degree sought by Thornhill (*i.e.*, Doctor of Management), the Complaint references an undefined "on time completion rate" and "normal completion time" data appearing on Walden's website beginning in March of 2012 (¶¶ 55-66), after she enrolled, and references "program design" data appearing on an alleged Laureate website from 2014 to early 2016. (¶¶ 67-73).  The Complaint then cites to allegedly similar statements appearing on Walden's website from 2014-2016 regarding "on time completion rate" and "normal completion time" for other Walden doctoral programs. (¶¶ 74-140).

As readily acknowledged in the Complaint, the referenced website statements relating to the Doctor of Management program changed over time.  (¶¶ 55, 62, 67, 69).  Moreover, the referenced "on time completion rate" and "normal completion time" for other programs varied

9

from degree-to-degree. (¶¶ 74-140). Plaintiff further alleges that Defendants' webpage statements after 2011 relating to any "normal completion time" is inherently misleading given Walden's allegedly low graduation rates (¶¶ 150, 256), but cites no minimum threshold of graduates required by any authority whatsoever required for establishing such a benchmark rate. The Complaint also alleges that beginning in 2012 (*i.e.*, contemporaneously with the referenced website statements), Walden began to make "meaningful data regarding graduation rates of its various doctoral programs" publicly available. (¶ 54).

### B. Alleged Statements Made by Walden "Recruiters" to Others.

Against the backdrop of her own inconsistent recollection of alleged statements made to her by Ms. Ward-Jiggets, Thornhill makes a series of similarly inconsistent allegations about purported representations made by Walden recruiters to other students. The Complaint, as noted, interprets an excerpt from Walden's Student Handbook as a representation by Walden that "the dissertation process *could* be completed in as little as 13 months." (¶ 155) (emphasis added). She also alleges "the Walden recruiters promised that she **could** finish her dissertation in 18 months . . ." (¶ 242). Elsewhere in her Complaint, however, Thornhill alleges, upon information and belief, that "recruiters commonly explained to potential students that after the completion of doctoral classwork, it *would* take only 18 months (or 4-5 dissertation classes) to complete one's dissertation and that students would rely on such statements." (¶¶ 144, 156) (emphasis added).

To the extent Thornhill further alleges that prior to July of 2011 Walden recruiters used scripts of the type identified in the referenced Senate Report (¶¶ 50-53), the use of any such scripts would not have a bearing on alleged recruiter communications with prospective students that occurred after that date. Similarly, Thornhill points to an e-mail sent to another student in March of 2013 congratulating her on completing 5 dissertation courses and alerting her of "some resources that might be helpful as [she] complete[s] [her] DBA program this year." (¶ 157).

10

Thornhill, however, does not allege that she received any such e-mail. Nevertheless, she baldly speculates that the congratulatory sentiments expressed in an e-mail she did not receive were "enticements . . . necessary to keep students enrolled in the program beyond its promised end dates. And students relied on such representations." *Id.*

### C. Walden's Alleged Engagement in a Vague and Undefined "Scheme" to Prolong the Dissertation Process "Systemically."

After purportedly luring students into its doctoral programs by these allegedly misleading statements, Thornhill claims that Walden embarked on "an intentional knowing scheme . . . to prolong the dissertation process so that it could generate additional tuition revenue." (¶¶ 245, 249, 301-03), and "constructed and implemented a system which caused the dissertation process to last longer than represented so that Walden could generate additional revenue through tuition payments . . . ." (¶ 294(g)).

Throughout her Complaint, Thornhill alleges that a central feature of Walden's alleged "scheme" to deliberately delay its doctoral programs is faculty turnover based on a "systematic and institutional" inability to retain committee chairs and committee members. (¶¶ 181-85). While alleging that "[t]he turnover is intentional and part of Walden's policy to essentially hold its students captive to the tuition generating machine that Walden has constructed…" (¶ 185), such turnover is nowhere alleged to have posed a problem for Thornhill herself. To the contrary, during the course of her participation in the Walden Dissertation Process, Thornhill had just one committee chair (Dr. Banner) and one committee member (Dr. Tippins). (¶¶ 223-24).

Another practice allegedly designed to delay the Walden Dissertation Process is an alleged institutional failure of faculty promptly to respond to student communications. Thornhill alleges that in violation of a "formal policy," "Walden faculty serving in supervisory committee capacities regularly and routinely do not abide by its 14-day response requirement." (¶¶ 191-92).

In ¶ 193 of the Complaint, Thornhill references certain prior, now-resolved litigation brought by a pro se litigant against Walden in Pearson v. Walden Univ., 144 F. Supp. 3d 503 (S.D.N.Y. 2015).  Thornhill's characterization of the holding in that case is not only wrong (as explained Section II A, infra), but states a legal conclusion, not an averment of fact.

Thornhill cites to certain improperly attached e-mails[3] of others complaining about the failure to meet this alleged deadline.  (E.g., ¶ 250 (citing 6/7/16 e-mail stating "[t]here has also been instances where the 14-day review period took more than 20 days pushing me into another quarter. . . ."); (3/20/16 e-mail complaining that "My committee chair gives pitiful feedback and I usually have to request it be sent back after 14 days.").  Other e-mails she cites indicate faculty compliance with the 14-day deadline, and complain instead about the substance of the feedback. (¶ 250 (citing 5/29/16 e-mail stating "My chair takes all 14-days to provide feedback and the feedback is inconsistent")).  For her part, Thornhill baldly alleges that while at Walden she "experienced delays beyond the 14-days promised," but cites no specific instances of such delays or that they materially delayed her progression toward a degree. (¶ 244).  Rather, she cites to an instance in which her committee chair, Dr. Banner, affirmatively reached out to his mentees indicating that, "I have had so many requests for MyDr work lately that I have regrettably lost track of who needs what…  If I haven't responded to you in a timely way, PLEASE let me know what I need to do to help." (¶ 244).  Thornhill does not allege that she was one of the students whose MyDr requests Dr. Banner lost track of during this time.  To the contrary, Thornhill complains she was not entitled to use the MyDr email procedure (¶¶ 239-41) because she had not yet completed the first three draft sections of her dissertation. (¶ 246).

---

[3]  See cases cited and request to strike, supra, at p. 1.

III.     **Allegations Challenging Walden's Status as an Educational Institution and a Purported "Fiduciary Relationship" between the Parties.**

Based on her perception that Walden's graduation rate is too low and that Walden does not spend enough money to support its students, Thornhill alleges in wholly conclusory fashion that Walden is not an educational institution. (¶¶ 270-76). She further opines that Walden "should not be provided protections typically afforded actual institutions of higher learning." (¶ 276). Contrary to these bald legal conclusions, it is a matter of public record that Walden is generally approved as an institution of higher education in Ohio by Ohio's Department of Higher Education, and further authorized to offer specially-approved programs.

https://www.ohiohighered.org/sites/ohiohighered.org/files/Walden%20University_IR_approved_9.11.15.pdf. The same is true in other states in which it provides educational services. *See e.g.*, inclusion on Kentucky approved institution portal. http://dataportal.cpe.14ky.gov/acadprog.aspx Walden is also accredited by the Higher Learning Commission, and is recognized as such by the United States Department of Education. See Higher Learning Commission, available at www.hlcommission.org; U.S. Department of Education Database of Accredited Postsecondary Institutions and Programs, *available at* https://ope.ed.gov/accreditation/Search.aspx.[4] While insisting that Walden is nothing more than a for-profit corporation, Thornhill then inconsistently alleges in similarly conclusory fashion that Walden, as an online university, owes a fiduciary duty to it students. (¶¶ 277-87). Again, these allegations are not averments of fact, but legal conclusions, which as explained below, are simply wrong as a matter of law.

The twelve attempted causes of action that Thornhill seeks to base on these facts fail to state claims for which relief may be granted for the reasons addressed below.

_____

[4] This Court may take judicial notice of such matters of public record within the context of a Rule 12(b)(6) Motion. New England Health Care Employees Pension Fund v. Ernst & Young, LLP, 336 F.3d 495, 501 (6th Cir. 2003), *holding modified on other grounds by* Merck & Co. v. Reynolds, 559 U.S. 633 (2010) (citations omitted).

## **STANDARD OF REVIEW**

In deciding a motion to dismiss under Federal Rule of Civil Procedure ("FRCP") Rule

12(b)(6), the court must accept as true all of the factual allegations contained in the complaint.

Erickson v. Pardus, 551 U.S. 89, 94 (2007).  The court need not, however, accept conclusions of

law, or other conclusory statements  and labels, as true:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short
> and plain statement of the claim showing that the pleader is entitled to relief." As
> the Court held in [*Bell Atlantic v.] Twombly*, 550 U.S. 544, 127 S. Ct. 1955
> [(2007)], the pleading standard Rule 8 announces does not require "detailed
> factual allegations," but it demands more than an unadorned, the-Defendant
> unlawfully-harmed-me accusation. *Id.* at 555... A pleading that offers "labels and
> conclusions" or "a formulaic recitation of the elements of a cause of action will
> not do." *Id.* at 555. Nor does a complaint suffice if it tenders "naked assertion[s]"
> devoid of "further factual enhancement." *Id.* at 557. To survive a motion to
> dismiss, a complaint must contain sufficient factual matter, accepted as true, to
> "state a claim to relief that is plausible on its face." *Id.* at 570. A claim has facial
> plausibility when the Plaintiff pleads factual content that allows the court to draw
> the reasonable inference that the Defendant is liable for the misconduct alleged.
> *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but
> it asks for more than a sheer possibility that a Defendant has acted unlawfully.
> *Ibid.* Where a complaint pleads facts that are "merely consistent with" a
> Defendant's liability, it "stops short of the line between possibility and
> plausibility of 'entitlement to relief.'" *Id.* at 557.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

According to the Sixth Circuit, the standard described in Twombly and Iqbal "obliges a

pleader to amplify a claim with some factual allegations in those contexts where such

amplification is needed to render the claim *plausible.*" Weisbarth v. Geauga Park Dist., 499 F.3d

538, 541-42 (6th Cir. 2007) (quoting Iqbal v. Hasty, 490 F.3d 143, 157-58 (2nd Cir. 2007)). That

is, "Iqbal interpreted Twombly to require more concrete allegations only in those instances in

which the complaint, on its face, does not otherwise set forth a plausible claim for relief."

Weisbarth, 499 F.3d at 542.  A complaint should be dismissed when it fails to allege "enough

facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

## ARGUMENT

I.   **The Amended Complaint's First through Sixth Causes of Action, Specifically and Exclusively Alleging Claims under Minnesota Law, Fail to State Valid Claims Because Minnesota Law is Inapplicable under the Governing Choice-of-Law Rules**

Plaintiff Thornhill's Amended Complaint commences with six counts specifically pled under Minnesota law, based on the apparent belief that Minnesota law can be uniformly applied in this case on behalf of herself and former Walden students nationwide, enabling her to lead a nationwide putative class action. The same strategy was attempted in a class action against Walden brought in Maryland two years ago under Maryland law, prompting the federal district judge to raise questions about how there could be such a nationwide choice of a single state's law in a case when the plaintiffs (like Thornhill) had no significant connection to that state:

> In regard to the claims based on Maryland common law, Plaintiffs do not adequately present reasons why any of them would have a claim based upon Maryland common law. None of them alleges any connection with Maryland. . . . They do not explain . . . in their response to the motion [to dismiss], how it is that their claims would arise under Maryland common law rather than the law of another state, such as the state of their residence.

Travis, 2015 U.S. Dist. LEXIS 147246 at * 7 (dismissing consumer-protection act claims and ordering plaintiffs to brief their choice-of-law contentions for purposes of showing why their common law claims should not likewise be rejected).

As shown below, the Maryland judge was prescient because a single state's law -- now changed from Maryland to Minnesota in the Amended Complaint -- is inapplicable to either the claims of Thornhill, as an Ohio resident, or uniformly to claims of a nationwide class of former students scattered across over fifty jurisdictions. Rather, as the Travis court suggested, it is the law of Thornhill's state of residence (Ohio) and the law of the particular home states of other Walden students that would determine their claims in this Ohio federal court. In fact, the Amended Complaint fatalistically anticipates that result by re-pleading in the alterative, as its

15

seventh through twelfth counts, the same six causes of action under Ohio law on behalf of Thornhill and a subclass of those former Walden students who are Ohio residents.  As shown below, because the first six "Minnesota law" causes of action are predicated on an invalid choice of law, they fail to state cognizable claims.

### A.    The First Cause of Action For Fraud Fails For Its Invalid Reliance on Minnesota Law.

As a matter of choice of law, neither Thornhill nor a nationwide class of Walden students spread throughout the country can assert valid fraudulent inducement claims under Minnesota law, as alleged in her first count.   In diversity actions, federal courts must apply the choice of law rules of the forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). The applicable substantive law in this case is therefore determined under Ohio's choice-of law rules.  Mahne v. Ford Motor Co., 900 F.2d 83, 85 (6th Cir. 1990).  Under Ohio law, tort claims generally are governed by the *Restatement* (Second) of Conflicts of Law.   Morgan v. Biro Mfg. Co., 15 Ohio St. 3d  339, 341-42 (1984).  Section 148 of the *Restatement* (Second) of Conflicts of Law governs claims of fraud and fraud in the inducement.  Macurdy v. Sikov & Love, P.A., 894 F.2d 818, 820-21 (6th Cir. 1990).

*Restatement* § 148 provides

(1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicile, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance  under a contract which he has been induced to enter by the false representations of the defendant.

Section 6, which provides factors that can rebut the presumption established in subsection 1 when they weigh in favor of another state's law applying, includes as relevant considerations:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Like other online providers of "distance-learning" Walden markets and delivers its educational services over the internet. (Am. Comp. ¶ 25).  Gibson v. Walden Univ., LLC, 66 F. Supp. 3d 1322, 1323 (D. Or. 2014).  Its focus is on "working professionals." Watiti v. Walden University, No. 07-4782 (JAP), 2008 U.S. Dist. LEXIS 43217, at *1 - 2 (D.N.J. May 30, 2008), who must coordinate their education with other work commitments. (*See also* webpages in Am. Comp. ¶ 55, 92, 116) ("[M]any students in this program are working adults and need to balance personal and professional commitments.")).  Students accordingly receive their education by computer ordinarily in their state of residence, typically at home or sometimes at work, which gives Walden's programs their enhanced flexibility for fitting into students' schedules and locations.  *See, e.g.,* Knight v. State of Ala., 900 F. Supp. 272, 302 (N.D. Ala. 1995) (noting in opinion ¶s 211 -12 that "distance learning" is revolutionary in allowing people to "take courses

from home or work.").  Consistent with the nature of  distance learning, under the well-established criteria of *Restatement* § 148, the applicable law for claims of alleged fraud in the inducement is the law of the students' various states of residence rather than some uniform application of the law of Minnesota.

In fact, Thornhill concedes that the state of her residence -- Ohio -- has a substantial connection to her personal claims because "many of the acts complained of herein took place within this district."  (Am. Comp. ¶ 24).  By the same reasoning, the claims of the other student class- members would likewise have the same substantial connection to their home states.

Predictably, consistent with that heavy home-state orientation, subsection 1 of *Restatement* § 148 confirms that the law of the students' residences is controlling since such locations would be (a) where allegedly defrauded students suffer pecuniary harm by depletion of their funds, (b) where their actions in reliance occurred in enrolling, and (c) where allegedly false representations concerning Walden's services would have been primarily received.  With respect to the site where any misrepresentations were made, the principal means specified in the Complaint for making any misrepresentations was allegedly over the internet, (¶ 2, 3, 90), which communications are viewed as being made in cyberspace, or globally rather than in a particular state.  *See, e.g.,* Horowitch v. Diamond Aircraft Indus., 526 F. Supp. 2d 1236, 1249 (M.D. Fla. 2007) (website deemed global), *granting in part reconsideration on other ground*, 2009 U.S. Dist. LEXIS 46440 (June 2, 2009).  In their global sweep, such communications encompass the students' home states or, alternatively, render concern about where the statements were made either superfluous or unascertainable because no single jurisdiction is implicated.  In either case, the criteria of subsection 1 are effectively satisfied.  None of the factors in Section 6 would

override selection of the home state's law, which is specifically designed to protect students and consumers there.

While she also complains about misrepresentations from enrollment advisors by telephone, the documentation she attaches (*see* Am. Comp. Ex. 1, p. 2, 4, 6, 7) shows the enrollment advisor having a 602 area code, which is Phoenix, Arizona. The only other specific places where Thornhill alleges misrepresentations were initiated are in Barstow, California at a job fair (¶ 145), and, with respect to the alleged misrepresentations by "admissions officers" and "employees in the enrollment office" (¶s 2, 146 ), presumably at or from Walden's admissions office, which Plaintiff alleges are in Maryland. *See* Am. Comp. Ex. 1, p. 2, 4, 6 noting location of Office of Admissions in Baltimore.[5] Because of the multi-state initiation of such communications, the place of their origin is, at best, inconsequential.

Even assuming *arguendo* that the place where the alleged misrepresentations were made was not deemed to be the students' home state, but rather were some ascertainable single site elsewhere, the analysis is unaffected since as indicated in § 148, comment (g), the state where the plaintiff relied on the defendant's representations is of greater importance than where the defendant made them. In addition, the students' home state law would still be applicable under the tests of § 148(2). The student's home state would be (a) the place where the student acted in reliance, (b) the place where the student received the misrepresentations, (c) the domicile of one of the parties, *i.e.* the student, (d) the  place of the only tangible things relevant to the parties' transaction, which would be the computer terminal and text books used for the program, and (e)

---

[5] Walden's website, that Thornhill repeatedly incorporates as a critical document in various parts of her Complaint, confirms the Baltimore address. https://www.waldenu.edu/about/contact-us. Copy attached in pertinent part as Exhibit 2.

the place of the students' performance through authorizing and initiating transfer of funds and doing the course work.

Although neither Walden nor Laureate is legally domiciled in Ohio, it is also significant that Walden is generally approved to be an institution of higher education in Ohio by Ohio's Department of Higher Education, and further authorized to offer specially-approved programs, providing a further significant contact with the State.  *See* Exhibit 3 (Walden's various Ohio institutional reauthorizations and program approvals attached, along with their Ohio website addresses).  This is also generally true in other home states for Walden students, which likewise regulate education there.  *See, e.g.*, Exhibit 4 (Kentucky registration at http://dataportal.cpe.14ky.gov/acadprog.aspx. with search engine showing twenty-four approved programs offered by Walden when it is selected on dropdown menu).

The only contact by any of the parties with Minnesota is that Walden's academic offices are located there, despite Walden being incorporated in Florida and having its business offices in Maryland.  Watiti, 2008 WL 2280932 at *4. (*See also* Am. Comp. ¶ 19).  Laureate, in turn, has *no alleged relationship* to Minnesota and is incorporated in Delaware and has its business offices in Maryland.  (Am. Comp. ¶ 20).  While Walden is subject to regulation by Minnesota educational authorities due to location of its academic offices there, it is likewise subject to regulation by educational authorities in every jurisdiction and region in which it operates.  *See* Ex. 3 - 4.  Its operations are also necessarily subject to extensive business regulation by the states, respectively, where it is incorporated and its business offices are located (Florida and Maryland), as is Laureate (in Delaware and Maryland).   The multi-jurisdictional focus of regulatory jurisdiction pertaining to these defendants' eliminates any particular significance of Walden's one contact with Minnesota.  *See, e.g.*, Pilgrim v. Universal Health Care, LLC, 660

F.3d 943, 947 (6th Cir. 2011)(noting when no single state has regulatory hegemony over the defendants, including when claims are made "about the conduct of different companies located in separate states" as is true here, applying the law of the individual plaintiffs' various home states is especially warranted).

Falling back on her boundless store of conjecture, Plaintiff speculates "on information and belief" that Walden's Minnesota facility "stretches into all 50 states" because actions there "might give rise to harms in all 50 states." (¶ 41). Such actions include "interactions" with applicants possibly conducted there, classes possibly taught there, and academic decisions that may be made there. *Id*. The alleged "harms in all 50 states" at the heart of these allegations, however, dictates that the law of <u>those</u> states, and not Minnesota, applies, since those "harms" would include both adversely relying, and being injured, in those locations. *See Restatement* § 148(2)(a), listing the place of reliance as the first factor. *See also*, <u>Sky Techs. Partners, LLC v. Midwest Research Inst.</u>, 125 F. Supp. 2d 286, 296-97 (S.D. Ohio 2000) (stating that under *Restatement* § 145, for torts generally, that the law of the place of injury controls and noting application of that reasoning to fraud by some courts). And even if her speculations about Walden's actions in Minnesota were true, none of it would override the other multiple home-state contacts by class-members in their distance learning from Walden, or the multi-state regulation and presence of Walden and Laureate across the country.

Moreover, Plaintiff and her counsel know that Walden's teaching is <u>not</u> centered at its Minnesota facility, but occurs online by faculty spread across the country and residencies at many locations. *See, e.g.,* <u>McClinton v. Walden Univ.</u>, No. CA 3:13-0942-MBS, 2014 WL 992780 (D.S.C. Mar. 12, 2014), *aff'd*, 581 F. App'x 262 (4th Cir. 2014) (dismissing a suit by a Walden student in South Carolina, brought against professors who taught him online from their

residences in Tennessee and Arizona, and complaining about a residency held in Atlanta); *see also*, Am. Comp. ¶ 243, complaining of a residency held in Maryland.  Similarly, as already noted above, enrollment advisors are located throughout the country, including in Phoenix, at job fairs in California (¶ 145) and Walden's "admissions officers" are in Maryland, not Minnesota.

Overall, then, the factors pointing to the students' home states vastly predominate. Moreover, as indicated in § 148 comment (j), when any two factors (other than the defendant's residence and place where the defendant made the representations) occur in one state, that state "will usually be the state of applicable law."  In this case, there are more than two such "other factors" centered in the student's home state, including the place of reliance, the place of receipt of the alleged misrepresentation and the place of the plaintiff's domicile, not to mention the place of the plaintiff student's performance and the location of the tangible property -- the computer terminal and books -- implicated in the online transaction.  *See e.g.,* In re Revco D.S., Inc., 118 B.R. 468, 502 (Bankr. N.D. Ohio 1990) (applying the two-factor test in examiner's report); s*ee also*, Ins. Dist. Network v. Mariano, No. 1:04-CV-466, 2008 WL 520915, at *3 (S.D. Ohio Feb. 26, 2008) (place where corporate plaintiff relied, received misrepresentations and had its principal place of business was determinative of choice of law for fraud claim).  This analysis is reinforced by the *Restatement* provision applicable for torts generally, which is § 145, and under which the place of the injury, *i.e.* the students' loss of funds, is important.  Sky Techs. Partners, LLC, 125 F. Supp. 2d at 297.

Applying the law of students' individual home states is further necessitated because there is no uniform law of fraud, but instead, it varies substantially among the states, including with respect to scienter, the standard of proof ("clear and convincing" or preponderance), the need to prove intent to induce reliance, the need for and nature of any reliance, the duty to volunteer

disclosure, the scope of available damages and applicable limitations periods. *See, e.g.,* Hale v. Enerco Grp., 288 F.R.D. 139, 145-46 (N.D. Ohio 2012); Cowit v. CitiMortgage, Inc., No. 1:12-cv-869, 2013 WL 940466, at *6 (S. D. Ohio, Mar. 8, 2013); Gianino v. Alacer Corp., 846 F. Supp. 2d 1096, 1101-02 (C.D. Cal. 2012) (itemizing many differences and rejecting nationwide class). *See also, e.g.*, Castano v. Tobacco Co., 84 F.3d 734, 742 n. 15 (5th Cir. 1996) (differing rules of reliance and of the duty to disclose); Ramthan v. Bryan Career Coll., Inc., 93 F. Supp. 3d 1011, 1020 n.5 (W.D. Ark. 2015) (contrasting "clear and convincing" standard in Kansas and preponderance standard in Arkansas and Missouri). On the damages issue, Ohio does not permit recovery in fraudulent inducement claims of economic loss from the defectiveness of goods or services, which is deemed the exclusive province of contract law, Delahunt v. Cytodyne Techs., 241 F. Supp. 2d 827, 833-34 (S.D. Ohio 2003), while some states do.

Accordingly, no uniform application of the law of Minnesota or any other state law would be warranted for a nationwide class. The only students subject to Minnesota law would be those residing in Minnesota, whom Thornhill cannot represent because she is not a Minnesota resident and therefore would not be part of any proper class including them. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982) ("We repeatedly held that a class representative must be part of the class...").

### B. The Third Cause of Action For Breach of Contract Fails For Its Invalid Reliance on Minnesota Law.[6]

Thornhill's attempt to state nationwide class-claims for breach of contract under Minnesota law fares no better under the applicable choice-of-law rules than her fraudulent

---

[6] In her original Complaint, Thornhill pled her fraud counts first and her breach of contract counts next. Because those claims encompass virtually all her factual allegations and comprehensively illustrate legal deficiencies in all her theories, Walden has continued to address them as the initial sections of its motion to dismiss, even though Thornhill has changed their placement and inserted other claims in her Amended Complaint. All her counts are addressed, although in slightly different order.

inducement claim. Ohio has adopted the *Restatement* (Second) of Conflicts of Law to determine choice of law not only for tort claims but also contract claims. While contract claims generally are subject to the law of the state with the most significant relationship to the transaction and the parties under § 188, contracts for services are governed by the more specific provisions of § 196, Contracts For The Rendition Of Services, stating as follows:

> The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

In cases of online education, the services to be rendered are the delivery of educational and instructional assistance at the site of the student's computer terminal, which again, is normally the student's home state. In fact, it is that home-state location of the services provided that creates the special value and convenience of online education. No factor in *Restatement* § 6 affects the presumptive propriety of applying the students' home-state law, which was enacted locally to give those home-state residents precisely the protections they were perceived to need.

While the basic law of interpreting a uniform written contract can be similar from state to state, no such written contract is at issue. Rather, to the extent that any contract is alleged at all, it is a purported implied contract cobbled together from snippets of webpages, disclosure forms, handbooks and guides and alleged oral comments from enrollment advisors and others, with any particular contract depending on what each student individually took notice of, on what he or she personally relied, and what if any qualifying or clarifying information was known to or available to each. (Am. Comp. pp. 14-47, and Exs. 4-6, 22-49).

Importantly, there is also disagreement under state law about whether the relationship between student and university is contractual in nature and if so, how far any such contract extends.  *Compare, e.g.,* Love v. Duke University, 776 F. Supp. 1070,  1075 (M.D.N.C. 1991) (academic bulletin did not create a binding contract between student and school), *aff'd* 959 F.2d 231 (4th Cir. 1992); Ruegsegger v. W. N.M. Univ. Bd. of Regents, 154 P.3d 681, 688 (N.M. App. 2006), *cert. denied*, 149 P.3d 942 (N.M. 2006) (athlete failed to state contract claim based on provisions of student handbook, because handbook constituted policy guidelines); Mosby-Nickens v. Howard University, 864 F. Supp. 2d 93, 98-99 (D.D.C. 2012), *app. dismd.*, 2012 WL 5896831 (D.C. Cir. 2012) (no contract from Graduate School Rules and Regulations ); Roe v. Saint. Louis Univ., 2012 WL 6757558, at *11 (E.D. Mo. Dec. 31, 2012), *aff'd sub nom.* Roe v. St. Louis Univ., 746 F.3d 874 (8th Cir. 2014) ("policy manuals . . . do not constitute a contract") with such cases as, *e.g.,* Harwood v. Johns Hopkins Univ., 130 Md. App. 476, 483 (2000), *cert. denied*, 360 Md. 486 (2000) ("The relationship between a student and a private university is largely contractual in nature . . . and [t]he 'terms of the contract are contained in [its] brochures, course offering bulletins, and other official statements, policies and publications'").

Indeed, in Doherty v. S. Coll. of Optometry, 862 F. 2d 570, 577 (6th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989), the Sixth Circuit stressed that "courts have rejected a rigid application of contract law in this area;" and it noted the difficulty of determining what even the law of one state (Tennessee) was on this amorphous subject due to the impact of competing policies.  The patchwork of decisions addressing such contracts stress the variability of applicable factors, with many courts rejecting any strict doctrinal rules, and with some recognizing non-contractual legal influences in the relationship.  *See, e.g.,* Slaughter v. Bringham Young Univ., 514 F.2d 622, 626 (10th Cir. 1975); *cert. denied* 423 U.S. 898 (1975)

([T]he student-university relationship is unique, and it should not be and cannot be stuffed into one doctrinal category."). Some courts, for example, stress the factor of the common law of private associations in overseeing of private universities, some stress contractual principles, and some due process principles of fairness. *See, e.g.*, <u>Clayton v. Trustees of Princeton Univ.</u>, 519 F. Supp. 802 (D.N.J. 1981) (discussing all three and opting to apply private association law). Some courts also stress the need for special flexibility in graduate education, as is involved in this case, while some appear not to. *Compare* cases, stressing the need for special flexibility in attempting to regulate graduate education with contractual principles, <u>Doherty</u>, 862 F.2d at 578, <u>Basch v. George Washington University</u>, 370 A.2d 1364, 1368 (D.C.1977); <u>Gupta v. New Britain Gen. Hosp.</u>, No. CV92 517506S, 1995 WL 216835, at *6 (Conn. Super. Ct. Apr. 3, 1995), *aff'd*, 239 Conn. 574, 687 A.2d 111 (1996); <u>Marquez v. Univ. of Wash.</u>, 32 Wn. App. 302 (1982), with cases which do not purport to take it into account. *See, e.g.*, <u>Keles v. New York Univ.</u>, 1994 WL 119525, (S.D.N.Y. Apr. 6, 1994), *aff'd*, 54 F.3d 766 (2d Cir. 1995).

Even more importantly, a central aspect of Thornhill's attempted contract claims is the alleged violation of the implied covenant of good faith and fair dealing. (Am. Comp. ¶ 333). Although most states agree that there is such a covenant applicable to at least some contracts, they differ substantially with respect to the breadth and effect of the doctrine, what conduct triggers its application, and the nature of any claim that can be brought pursuant to it. *See, e.g.,* <u>Woodard v. Fid. Nat. Title Ins. Co.</u>, No. Civ. 06-1170 RB/WDS, 2008 WL 5737364, at *7 (D.N.M. Dec. 8, 2008) ("[T]he legal scope and requirements of a claim for breach of the duty of good faith and fair dealing differ markedly among the five states."); <u>Gustafson v. BAC Home Loans Servicing, LP</u>, 294 F.R.D. 529, 547 (C.D. Cal. 2013) (noting differences in state law with respect to whether a breach of an express term is also required, whether there can be a breach in

the absence of a special relationship among the parties, and whether a bad faith intent element is required); Sateriale v. R J Reynolds, Tobacco Co., No. 2:09-CV-08394-CAS, 2014 WL 7338877, at *12 (C.D. Cal. Dec. 19, 2014) (noting "material differences in state contract law, particularly with regard to the implied covenant of good faith . . ."); Dupont Heights Ltd. P'ship v. Riggs Nat. Bank of Washington , D.C., 949 F. Supp. 383, 389 (D. Md. 1996) ("To the extent that a duty of good faith and fair dealing exists in Maryland, it is of very narrow scope").

Consequently, no uniform application of Minnesota contract law would be warranted for a nationwide class; and Thornhill is not a member of any class for which Minnesota law is applicable. Falcon, 457 U.S. at 156.

### C. The Fourth Cause of Action For Consumer-Protection Act Violations Fails For Its Invalid Reliance on Minnesota Law.

Thornhill's initial attempted consumer-protection act count similarly fails to state a claim under Minnesota law on behalf of her or a nationwide class under the applicable choice-of-law rules.  In the absence of a statutory directive, Ohio courts look to *Restatement* § 145 to determine choice of law in tort claims, including for claims under state consumer-protection statutes. Pilgrim v. Universal Health Card, LLC, 660 F.3d 943 (6th Cir. 2011).  Under that section,

> the law of the place of injury controls unless another jurisdiction has a more significant relationship to the lawsuit." *Morgan v. Biro Mfg. Co.,* 15 Ohio St.3d 339, 474 N.E.2d 286, 289 (1984). In determining the State with the most significant relationship, Ohio courts consider: (1) "the place of the injury"; (2) the location "where the conduct causing the injury" took place; (3) "the domicile, residence,... place of incorporation, and place of business of the parties"; (4) "the place where the relationship between the parties ... is located"; and (5) any of the factors listed in Section 6 of the *Restatement* (Second) of Conflict of Laws "which the court may deem relevant to the litigation." *Id.* The Section 6 factors include: "the relevant policies of the [State in which the suit is heard]," "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," "the basic policies underlying the particular field of law," "certainty, predictability and uniformity of result" and "ease in the determination and application of law to be applied." *Id.* at 289 n. 6 (internal quotation omitted).

*Id.* at 946.  In accordance with such an analysis under Ohio choice-of-law principles, the relevant substantive law for claims seeking relief under consumer protection statutes  is the law of the place of the injury:

> Gauged by these factors, the consumer-protection laws of the potential class members' home States will govern their claims. As with any claim arising from an interstate transaction, the location-based factors point in opposite directions: injury in one State, injury-causing conduct in another; residence in one State, principal place of business in another. Yet the other factors point firmly in the direction of applying the consumer-protection laws of the States where the protected consumers lived and where the injury occurred. No doubt, States have an independent interest in preventing deceptive or fraudulent practices by companies operating within their borders. But the State with the strongest interest in regulating such conduct is the State where the consumers — the residents protected by *its consumer*-protection laws — are harmed by it. That is especially true when the plaintiffs complain about the conduct of companies located in separate States. .  .  To conclude otherwise would frustrate the "basic policies underlying" consumer-protection laws. *Morgan,* 474 N.E.2d at 289 n. 6.

*Id*. at, 946-47 (emphasis in the original).  This analysis is particularly apt since Thornhill complains about entities without some single uniform location, but whose activities implicate the law in many states: Walden in Florida and Maryland and Minnesota and other states in which it is certified as an educational institution, and for Laureate in Delaware and Maryland.  *Id.* (consumers' home states have especially strong interest where claims involve multiple companies located in separate states).  The place of the injury, again, is the home states of the purported nationwide class of students.  *See Restatement* § 146.

State consumer-protection laws "vary in material ways." *Id.* at 947.  *Accord, e.g.,* <u>Mazza v. Am. Honda Motor Co.</u>, 666 F.3d 581, 591 (9th Cir. 2012) (material differences in scienter and reliance requirements and  available remedies); <u>Gianino</u>, 846 F. Supp. 2d at 1101 (differences in scienter, reliance, pre-filing notice, limitations, and relief.); <u>Cowit</u>, 2013 WL 940466 at *6; <u>Rikos v. Procter & Gamble Co.</u>, No. 1:11-cv-226, 2012 WL 641946 (S. D. Ohio Feb. 28, 2012); *See also*, *e.g.,* <u>Gourdine v. Felician Coll.</u>, No. A-5248-04T3, 2006 WL 2346278 (N.J. Super. Ct.

App. Div. Aug. 15, 2006) (noting that New Jersey Consumer Fraud Act is not applicable to the learned professions including university education). They, and not some uniform application of Minnesota's or another state's consumer-protection law, must govern the individual claims of class members. Claims therefore cannot be properly asserted on a nationwide basis under Minnesota law, nor can Thornhill rely on it personally, because she has alleged no injury or other significant contact with Minnesota.

D. **The Second Cause of Action For Unjust Enrichment Fails For Its Invalid Reliance on Minnesota Law.**

As with her other claims, the *Restatement* precludes any claim by Thornhill or a nationwide class for unjust enrichment under Minnesota law. The applicable *Restatement* provision, as adopted under Ohio law, is § 221, which provides:

§ 221 Restitution

(1) In actions for restitution, the rights and liabilities of the parties with respect to the particular issue are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

The *Restatement* offers five factors to be considered in choice-of-law decisions for unjust enrichment:

a) the place where the parties' relationship was centered;
b) the place where defendants received the benefit or enrichment;
c) the location where the act conferring the enrichment or benefit was done;
d) the parties' domicile or place of business; and
e) the jurisdiction where a physical thing substantially related to the enrichment was situated at the time of the enrichment.

Thornhill's and the class members' relationship with Walden began in their home states, where they received and reviewed internet communications or other information concerning Walden's programs and in which they prepared and submitted their applications. That relationship was carried out in the students' home states, where the students relied on Walden's

representations and where Walden delivered its allegedly defective services.  The students are domiciled in their home states, and though Walden is incorporated in Florida with offices in Minnesota and Maryland, it is registered and subject to regulation as an educational institution in Ohio, reflecting that Ohio and other home states view their local education law as critical to the process. *See* Ex. 3.  The transaction conferring the enrichment was the students undertaking to enroll and assume financial obligation to Walden, which occurred in and from their home states. The only physical things related to the enrichment were texts and course materials delivered to students' residences, and the students' computer terminals through which they received Walden's representation, instruction and other services and with which, in most cases, they made electronic payments of tuition.  All such things were located in their home states.

The law of unjust enrichment varies across the states.  *See, e.g.,* Colley v. Procter & Gamble Co., No. 1:16-cv-918, 2016 WL 5791658, at *7 (S. D. Ohio, Oct. 4, 2016); Cowit, 2013 WL 940466 at *6;  In re Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801 (S.D. Ohio 2012); Casa Orlando Apts. Ltd. v. Fed. Nat. Mortg. Ass'n, 624 F. 3d 185, 195-96 n. 32 (5th Cir. 2010)(differences in whether or not a demonstrated impoverishment or suffering of a loss is an element of a claim, and the degree and manner in which the existence of a related contract will preclude such a claim); Mazza, 666 F.3d at 591 (noting in a choice of law analysis that "[t]he elements necessary to establish a claim for unjust enrichment also vary materially from state to state"); Gustafson, 294 F.R.D. at 529; Kunzelmann v. Wells Fargo Bank, N.A., No. 9-11-cv-81373-DMM, 2013 WL 139913, at * 10-11 (S.D. Fla. Jan. 10, 2013)  (documenting differences and rejecting nationwide class), *accord* Thompson v. Jiffy Lube Intern., Inc., 250 F.R.D. 607, 626 (D. Kan. 2008).

Consequently, it is the law of the states in which Walden students were resident at the time of their participation in its online programs that controls any unjust enrichment claim they might have based on the facts alleged by Thornhill; and she can maintain no individual or nationwide class claims under Minnesota law.

> **E.    The Fifth Cause of Action For Breach of the Implied Covenant of Good Faith and Fair-Dealing Fails For Its Invalid Reliance on Minnesota Law.**

For the same reasons discussed in Section B, above, Thornhill's attempted stand-alone implied-contract claim for breach of the covenant of good faith and fair dealing, arising out of her alleged student-university contract with Walden, cannot be brought on a nationwide basis under Minnesota law, consistent with Ohio's conflict-of-law principles.  Any such claim would remain subject to *Restatement* § 196 , as a covenant implied in a *service* contract, with the place of the rendition of the services -- i.e. of the plaintiffs' home states -- having the most significant relationship to the parties and their claims. Assuming any good faith and fair dealing claim were even permitted by a student against a university under any state's law, the nature of the claim varies substantially from state to state, as shown *supra* in Section I B.  Ohio conflicts principles, consequently, indicate that Minnesota law could not properly apply to the good faith and fair dealing claims of a nationwide class.

> **F.    The Sixth Cause of Action For Breach of Fiduciary Duty Fails For Its Invalid Reliance on Minnesota Law.**

Finally**,** Thornhill's attempted nationwide class claim for breach of fiduciary duty is likewise barred by the inapplicability of Minnesota law.  Under Ohio conflicts principles, claims for breach of fiduciary duty are assessed under *Restatement* § 145, as is applicable to torts generally.  *See, e.g.,* Bentley v. Equity Trust, 2015 Ohio 4735 at ¶ 19 (2015) (noting that claims for breach of fiduciary duty sound in tort, and applying *Restatement* §§ 145 and 146 to an alleged claim of aiding and abetting such a breach).  Under § 146, there is a presumption that the law of

the place of injury controls unless another jurisdiction has a more significant relationship.  As noted in Section A and C, above, the place of the injury for the alleged class of Walden students is in their home states, where Walden's educational services were rendered and where they incurred depletion of their funds by paying tuition.

The law of fiduciary duty varies among states.  *See e.g.,* Marshall v. H & R. Block Tax Servs., Inc., 270 F.R.D. 400, 409 (S.D. Ill. 2010) ("The court has examined the fiduciary duty laws of the 11 class states and concludes that there are material differences in several respects."); Casa Orlando Apartments, Ltd., 624 F.3d at 194 (states' laws establish different standards for showing fiduciary duty and sometimes different remedies); Gordon v. Chase Home Fin., LLC, No. 8:11-CV-2001-T-33EAJ, 2013 WL 436445, at * 10 n. 5 (M.D. Fla. Feb. 5, 2013) ("fiduciary claims vary from state to state based on what constitutes a fiduciary relationship and because there is no single standard for governing liability."); Grandon v. Merrill Lynch & Co., Inc.,  No. 95 CIV. 10742 (SWK), 2003 WL 22118979, at *10 (S.D.N.Y. Sept. 10, 2003) (the fiduciary duties of brokers are materially different in each of the 50 states); Marchese v. Nelson, 809 F. Supp. 880, 894 (D. Utah 1993) (noting four conflicting approaches in various jurisdictions to determine whether fiduciary duty exists to investors).  Some states, such as Maryland, recognize no independent claim for breach of fiduciary duty at all.  *See, e.g.,* Wasserman v. Kay, 197 Md. App. 586, 631 (2011).  Even when there is general agreement as to approach, there are differences among those states in nuances of the claim. Rohlfing v. Manor Care, Inc., 172 F.R.D. 330, 341 (N.D. Ill. 1997).

Given the variances between the law of the states with respect to the requirements of a breach of fiduciary duty claim, and the inapplicability of Minnesota law generally to claims by

nonresidents of Minnesota, Thornhill's attempted nationwide class claim under Minnesota law fails to state a proper claim.

**II.     The Complaint's Seventh through Twelfth Causes of Action, Alleging Claims for Fraud, Breach of Contract, Consumer-Protection Act Violations, Unjust Enrichment, Violation of the Covenant of Good Faith and Fair Dealing, and Breach of Fiduciary Duty, Brought on Behalf of the Ohio-Based Plaintiff and a Subclass of Ohio-Resident Former Walden Students, Fail to State Valid Claims Under the Applicable Pleading Rules and Requirements of Ohio Law.**

Thornhill's fallback claims in counts seven through twelve, restating her causes of action under Ohio law as claims for herself and a limited class of Walden students in Ohio, are equally defective, but for different reasons.

**A.     Plaintiff Has Failed to State a Claim for Fraudulent Inducement in her Seventh Cause of Action.**

Plaintiff's seventh cause of action for fraud in the inducement is defective on its face for both errors of law and failing to meet applicable pleading standards. "In alleging a fraud, a party must state with particularity the circumstances constituting the fraud" pursuant to FRCP Rule 9(b) and related case law. As explained, for example, by the Sixth Circuit in <u>Sanderson v. HCA - the Healthcare Co.</u>, 447 F.3d 873, 877 (6th Cir. 2006); *cert. denied*, 549 U.S. 889 (2006):

> [T]he complaint must comply with the particularity requirements of Federal Rule of Civil Procedure 9(b) . . .   We have further interpreted 9(b) to require that a plaintiff "allege *the time, place, and content* of the alleged misrepresentations, on which he or she relied, *the fraudulent scheme of the defendants, the fraudulent intent of the defendants, and the        injury* resulting from the fraud." *Yuhasc*, 341 F.3d at 563 (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993).   As a sister circuit has phrased it, "at a minimum, Rule 9(b) requires that the plaintiff specify *the 'who, what, when, where, and how" of the alleged fraud, United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 093 (5th Cir. 1997) *and the injury*.

Under Ohio law, a claim of fraudulent inducement requires showing that the defendant (1) engaged in a knowing material misrepresentation, or where there was a duty to disclose, a concealment of fact, (2) which is material to the transaction at hand,

(3) made with knowing falsity or with utter disregard and recklessness concerning its truthfulness, (4) with the intent to mislead, (5) with justifiable reliance and (6) a resulting injury proximately caused by that reliance.  Cohen v. Lamko, Inc., 10 Ohio St. 3d 167, 169 (1984); see also, ABM Farms, Inc. v. Woods, 81 Ohio St. 3d 498 (1998).

Thornhill alleges five different types of purported fraud, including alleged misrepresentations about a) the length of the enrollment period, and related tuition payments, it would take to complete her PhD coursework and dissertation, b) "feedback" she thought would be available but was not, c) "control" she would have over finishing, d) inefficiency of Walden's operations which she thought would operate more smoothly and reasonably, and e)  failure of Walden to disclose its graduation rate or that her PhD program was "designed" to last 66 months. The injury she avers is payment of tuition and other costs based on these alleged misrepresentations about the nature and quality of Walden's services.

**No Actionable Damages.**  Thornhill's attempted fraud claim is precluded by a threshold defect under Ohio law of failing to allege a cognizable form of damage incurred in detrimental reliance.  The only damages that Thornhill alleges are loss of the tuition, fees and expenses, which students allegedly would not have paid if correctly informed.  (See allegations of unfairly incurred "costs" at Am. Comp. ¶ 393; see also, ¶s 400, 412, 419, 430, and 447 concerning injurious tuition payments and prayer for relief, E and G, seeking "disgorgement of revenue" and "restitution").  Under Ohio law, there is no claim for fraud from inducement to buy goods or services when the only injury alleged is financial loss from their failure to live up to induced expectations.  Delahunt v. Cytodyne Techs., 241 F. Supp. 2d 827, 834 (S.D. Ohio 2003) (disallowing fraud claim based solely on injury of "receiv[ing] something less valuable than they bargained for" as a result of fraudulent inducement).

**Inadequate "Information and Belief" Allegations.**  There are fifty-seven instances of "information and belief" pleading in the Amended Complaint, the majority of which occur in connection with allegations of fraud.  Under the well-settled law of the Sixth Circuit, while some moderate use of such pleading is permitted under Rule 9(b), any such allegations on "information and belief" must specify the precise facts on which "the information and belief" is based and allege how it plausibly supports the claim.  United States ex rel. Bledsoe v. Cmty. Health Sys.,Inc., 501 F.3d 493, 512 (6th Cir 2007); Craighead v. E.F. Hutton & Co., 899 F.2d 485, 489-90 (6th Cir. 1990).

Throughout the Complaint, Plaintiff repeatedly makes discrete accusations of fraud on "information and belief" without identifying what precise "information and belief" is relied upon, and with the apparent hope of simply burying the court in drifts of information that might or might not be meant to support the claims: *See, e.g.*, ¶s 57, 58, 64, 78, 79, 94, 95, 101, 102. Her accusations are defective for repeatedly leaving it to Walden and the Court to try to infer what information she may be relying upon, if anything, for which specific claim.

**Completion Time.**  Thornhill's repeated allegations that Walden made representations, through its recruiters or otherwise, including the time and related costs for completing her degree (3 years) and for completing the dissertation portion of it (13 months and/or 18 months), are deficient for four reasons.

First, with respect to "completion rate" information, the Amended Complaint repeatedly protests that "completion rate" terms were undefined and were vague and hard to understand. (*See* ¶s 62, 69, 85, 105).  Indeed, Plaintiff repeatedly states "whatever that means" in reference to these terms.  (*See* Am. Comp. ¶s 69, 85, 125).  As a matter of law, vague and indefinite statements, and particularly assertions that a complainant admits are hard to understand, cannot

be the basis for claims of fraud, which require specific representations of fact that are a proper basis for reasonable reliance. Ullmo ex rel. Ullmo v. Gilmour Acad., 273 F.3d 671, 676-78 (6th Cir. 2001) (indefinite statements not actionable nor reasonably relied upon). In addition, those statements were accompanied by express notices that completion times were variable (¶s 59, 80, 96, 120), further precluding any reliance upon them as fixed.

Second, the allegations are fatally equivocal. Thornhill avers at times that such periods were ones in which she was told she "could" complete the program (allegedly both personally (¶ 242) and in the handbook (¶ 155)), but then she selectively intersperses other allegations of being told that she would complete both tasks in such time. (¶s 2, 3 etc.).[7] Such doubletalk is a well-recognized dodge for purposes attempting to plead fraud. Mixing such "could" statements with more allegedly robust representations about what time she "would" take to do so creates impermissible ambiguity under Rule 9(b). *See, e.g.*, Becker v. Wells Fargo Bank, No. 2:10-cv-02799 LKK KJN PS, 2011 WL 1103439, at *11 (E.D. Cal. March 22, 2011), *report and recommendation adopted as modified sub nom*. Becker v. Wells Fargo Bank, N.A., No. CIV. S-10-2799 LKK, 2011 WL 3319577 (E.D. Cal. Aug. 1, 2011):

> In alleging fraud, there is an obvious difference between a statement that loan modification "could" happen, and, on the other hand, representing that loan modification "would" happen. The first is a statement of opinion, the second is a statement of fact that is capable of being fraudulently misrepresented. (E.g., *Neu-Visions Sports v. Soren/McAdam/ Bartells*, 86 Cal. App. 4th 303, 307, 103 Cal. Rptr. 2d 159 (2000)(alleged misrepresentations about value of property to be used to obtain loan and whether lessor would have clear title at time of financing were opinions about future events). Presently, plaintiff's fraud allegations are inconsistently pleaded with respect to whether his loan merely "could be" modified versus whether it definitely "would be" modified. Therefore, the FAC fails to particularly plead facts supporting the "misrepresentation" element of fraud.

---

[7] In the initial Complaint, Plaintiff more candidly included many additional "could" references, but she has purged most of them in re-pleading, while still retaining a few in apparent deference to the reality of what she was actually told.

Statements concerning what "could" happen are, by their terms, hypothetical and a statement of opinion about future occurrence and not actionable.  Tibbs v. Nat'l Homes Constr. Corp., 369 N.E.2d 1218, 1222 (Ohio Ct. App. 1977).  *See also*, Doherty, 862 F. 2d at 575-76 (under analogous Tennessee law, rejecting misrepresentation claim arising from statements that plaintiff could "perform in optometry" despite her disability).

Third, in actuality, this case involves no factual representation, or even an actual quantified prediction, forecasting a 13 month completion date, contrary to Thornhill's conclusory assertion of it.  Instead, what Thornhill disingenuously seizes upon is a mere suggestion in the Handbook that dissertation students "begin planning for program completion at least 13 months in advance of the anticipated graduation date.  (¶s 155, 242 n.31).  That 13-month period is explicitly left open-ended ("at least") and is further connected to an unspecified "anticipated graduation date," which is not guaranteed in that provision to occur at any given moment, and remained fully subject to a host of possible delay factors, including degree of ability, health, and time commitment.  Gilmour Academy, 273 F.3d 676-78 (no fraud from indefinite statements). In all events, to demonstrate falsity, at a minimum, she would need to show that no one "could" complete those requirements in the times stated, which she has failed to and cannot do.  She also admits that she did not rely on a 13-month completion period.  (Am. Comp. ¶ 214).

Fourth, even representing what "would" happen cannot rise to the level of a statement of fact when the speaker is known not to have full knowledge or control with respect to the predicted outcome, as is true about earning a PhD.  That accomplishment is subject to numerous contingencies that Walden cannot dictate, including the students' employment schedule, writing ability, health, perseverance, research skill, other competing obligations, and his or her conceiving, developing and submitting a defensible, passing dissertation.  It is common

knowledge that students beginning doctoral programs often do not finish, particularly the dissertation preparation and defense. Middlebrooks v. Univ. of Maryland at Coll. Park, 980 F. Supp. 824, 826 (D. Md. 1997) (majority did not finish); aff'd sub nom. Univ. of Maryland, 166 F.3d 1209 (4th Cir. 1999). Like any university, Walden therefore does not and cannot guarantee that any given PhD candidate will succeed, and has not been alleged to have done so. Murphy v. Capella Educ. Co., 589 Fed. Appx. 646, 656 (4th Cir. 2014) (noting that the student "enrolled with expectations" of a doctoral degree, not assurances [and] fraud ordinarily cannot be predicated on unfulfilled promises or statements regarding future events."). Accordingly, Thornhill could not have reasonably relied on any alleged statements of when she purportedly "would" finish, which at most could only have realistically been taken as an encouraging vote of confidence, if they were said at all. Doherty, 862 F.2d at 577.

**Changes in Available "Feedback".** Thornhill's allegations about being deprived of two sorts of "feedback" on her dissertation draft -- Writing Center assistance on "APA" guidelines and informal email "feedback" by faculty prior to her submission of three chapters -- fail to provide her with any viable alternative fraud claim.

i. **Writing Center**. With respect to the Writing Center, all Thornhill vaguely alleges is that she "relied upon Walden's Writing Center, a resource that would assist with confirming that her Proposal was complying with APA writing guidelines."[8] (¶ 228). Thornhill then quotes a webpage (¶ 232) generally referring to types of feedback that can be obtained, but making no reference to any guarantee to her of feedback on APA guidelines, and providing no specifics of how Walden defrauded her about APA guideline help. Moreover, the full menu of offerings for Walden's Writing Center at the time, and which Thornhill only partially cites, shows ample

---

[8] The APA is the American Psychological Association, which dictates one set of stylistic conventions for some types of dissertations.

ongoing resources, including a webinar and a blog, that remained open to her for purposes of assuring APA compliance.  *See* Exhibit 5.

More importantly, a claim for fraud in the inducement requires a misrepresentation of *present fact* that is *collateral* to the contract induced, and is made prior to the contract being formed.  See*, e.g.*, Lynx Ser., Ltd. v. Horstman, 182 F. Supp. 3d 757, 768 (N.D. Ohio 2016) (dismissing because the "alleged misrepresentation is not collateral . . ."). Her complaint about improper "feedback" is part of, and not collateral to, her breach of contract claim.  (*See* ¶ 334(7) "Walden promised appropriate and timely feedback. . .").  Further, whatever fraud she claims arose from the webpage concerns the future act of providing feedback, which does not involve present fact, but rather an alleged future commitment that is not actionable as fraud.  *Id.  See also, e.g.*, Infocision Mgmt. Corp. v. Found. for Moral Law Inc.*,* No. 5:08cv1342*,* 2009 WL 2244166, at *4 n.3  (N.D. Ohio July 27, 2009) ("fraud ordinarily must be premised upon misrepresentations of past or existing fact, not promises related to future actions or conduct.").

Furthermore, she has not alleged that in enrolling in the PhD program in **2011** (¶ 207), Walden then had formulated some fraudulent intention in conflict with representations she then relied on, to cut back APA feedback by the Writing Center four years later in **2015**. (¶ 235). Thornhill also speciously seeks to dodge the required element of reliance, alleging merely that she "relied upon the Writing Center" as an aid.  She does not claim that she relied upon some representation about feedback on APA guideline compliance, or was even aware of such minutiae in 2011, when she decided whether or not to enroll at Walden, or that it substantially

impacted her decision (a far-fetched contention that she understandably avoids, especially given many other available APA guideline resources with Walden and elsewhere).[9]

Apart from not stating a specific plausible claim meeting the pleading requirements of Rule 9(b) and the Twombly/Iqbal principles, the Writing Center allegations fail as a matter of law to avert well-settled limitations on the binding effect of university publications for purposes of fraud. Even under the less demanding requirements of basic contract law, universities are not bound by all representations in catalogs and publications, and also retain substantial discretion to alter programs and methods of how they teach and deliver education. *See, e.g.*, Cooper v. Peterson, 164 Misc. 2d 878, 882 (Sup. Ct. 1995) (rejecting fraud and contract claims based on elimination of a publicized athletic program, noting that even when universities do "not specifically reserved [in their bulletins] the right to make changes, universities must have [that] flexibility . . . "); Ruegsegger, 154 P.3d at 688, (finding no authority suggesting that "the university is . . . bound to honor every provision found in a student handbook."). *See also,* Marquez v. Univ. of Washington, 32 Wash. App. 302 (1982) which concluded that even assuming

> reference to academic aid contained in the prelaw handbook [was] a part of [a] contract . . . . the University is entitled to some leeway in modifying its programs

---

[9] The APA runs its own blog answering questions submitted by student writers, *see* http://blog.apastyle.org/apastyle/2009/07/five-essential-tips-for-apa-style-headings.html, and there are many other internet resources available on the subject, including free APA cite checkers, http://www.citationmachine.net/apa/cite-a-website; https://www.refme.com/us/citation-generator/apa/ and http://citationproducer.com/apa-citation/ citation guides and quick referral forms and sheets http://guides.libraries.psu.edu/apaquickguide/business; http://www.apastyle.org/learn/quick-guide-on-formatting.aspx; https://ssw.unc.edu/files/web/pdf/APA_Quick_Reference_Guide.pdf http://www.library.kent.edu/files/APACheatSheet.pdf and full-fledged tutorials. http://flash1r.apa.org/apastyle/basics/index.htm?_ga=1.144361333.1567178221.1478296238 https://www.youtube.com/watch?v=uVlsbN99LIQ; https://www.youtube.com/watch?v=o4L3WaqBttk; and https://www.youtube.com/watch?v=ZpbHUF2nTak.

> [and] the concept of a binding absolute unchangeable contract is particularly anomalous in the context of post graduate level work.

*Id.* at 305-06 (emphasis added). *Accord* Doherty, 862 F.2d at 578 (generally endorsing same reasoning "particularly . . . in the context of post graduate level work."). If such provisions are not sufficient to be relied upon for purposes of creating a binding implied contract, they provide even less basis for claiming they are specific misrepresentations that reasonably could be relied upon for purposes of plausibly alleging fraud. *See, e.g.*, Gilmour Acad., 273 F.3d at 676-77 (school's statements not actionable *either* as a breach of contract or fraud).

In addition, any such reliance is further precluded by explicit disclaimer made by Walden. The Student Handbook,[10] which Thornhill cites and relies upon throughout her Amended Complaint, contains a specific description of the Writing Center (Exhibit 6 at p. 191-92), but also two express denials of any contract based on what is reflected in the Handbook or other Walden publication:

> The university reserves the right to change any provision, offering, requirement or fee at any time within the student's enrollment period. Neither the provisions of this Walden University Student Handbook, nor the acceptance of students through registration and enrollment in the university, constitutes a contract or an offer of a contract. Walden University publications, including the Catalog and Student Handbook represents current curricula, educational plans, offerings, requirements, tuition, and fees. These may be modified or discontinued from time to time in the university's sole discretion to carry out the university's purposes and objectives. Neither the provisions of this document, nor the acceptance of students through registration and enrollment in the university, constitutes a contract or an offer of a contract.

---

[10] The Handbooks covering the periods of Thornhill's attendance, from the summer of 2011 when she claims she was recruited (¶ 215) through 2016, when Thornhill claims she withdrew (¶ 248) can be found at
http://catalog.waldenu.edu/mime/media/62/1076/Handbook+June+2011_FINAL.pdf
http://catalog.waldenu.edu/mime/media/62/1078/Dec+2011+Handbook+FINAL.pdf
http://catalog.waldenu.edu/mime/media/90/2159/Handbook_September_13_Final.pdf,
http://catalog.waldenu.edu/mime/media/95/2232/Handbook_December_13_FINAL.pdf. and
http://catalog.waldenu.edu/index.php?catoid=107. Excerpts cited above from the 2010-11 Student Handbook when Thornhill enrolled are attached as Exhibits 6, 7 and 13).

Exhibit 7 at p. ii (emphasis added).  Two years ago the United States District Court for the District of Oregon reviewed this language and concluded that it prevented the handbook's provisions from being relied upon as the basis of an implied contract.  Gibson, 66 F. Supp. 3d at 1325 ("[B]ased on the disclaimers contained in the Walden Student Handbook, I conclude that no contract existed between the parties in this case.").

Other courts have similarly found that disclaimers undercut any contractual force of student handbooks.  *See e.g.,* Carr v. Bd. of Regents of Univ. Sys. of Georgia, 249 Fed. Appx. 146, 150-51 (11th Cir. 2007); Eiland v. Wolf, 764 S.W.2d 827, 838 (Tex. App. 1989) *writ denied* (May 10, 1989).  Ohio courts likewise generally recognize the effectiveness of disclaimers to preclude contractual liability arising from employee handbooks.  Olive v. Columbia/HCA Healthcare Corp., No. 75249,  2000 WL 263261, at *13 (Ohio Ct. App. Mar. 9, 2000) ("[E]mployers who provide guidelines in handbooks may issue disclaimers saying nothing contained herein is intended to create a contract."); Finsterwald-Maiden v. AAA S. Cent. Ohio, 115 Ohio App. 3d 442, 447 (1996) ("Where an employee handbook disclaims any intent to create a contractual relationship, courts have found no mutual assent by the parties to be bound by the handbook's provisions.").

In Doherty, 862 F. 2d at 577, the Sixth Circuit likewise endorsed the effectiveness of such a disclaimer under general contract law:

> In view of the disclaimer language on the inside front cover of the catalog, it is difficult to find, as plaintiff asserts, that a binding contract was created promising the SCO class entering in 1978 the right to graduate determined under the standards in the 1978-79 catalog.  *** [I]n view of the disclaimer language . . . [it was reasonable] to expect the students to anticipate and comply with curriculum changes affecting their remaining years at the school.

*Id.* In dicta, the Court recognized only a minor possible limitation on such a disclaimer (inapplicable in that case and even more so here), whereby schools are foreclosed from retroactively changing originally-stated requirements for earning a degree once a student has fully performed by meeting them, and altering them arbitrarily, capriciously or maliciously. *Id.*

The Walden Handbook further expressly states that Walden's educational plans and offerings reflected in both the Handbook and in any university publication, which would include its website, are subject to revision ("may be modified or discontinued"). Such provisions likewise have been held to undermine the binding effect of any such publication. *See, e.g.,* Davis v. George Mason Univ., 395 F. Supp. 2d 331, 337 (E.D. Va. 2005) (performance by the university pursuant to the terms of a catalog was optional because of the catalog's disclaimer that the university may change its terms at any time); *aff'd* 193 F. Appx. 248 (4th Cir. 2006), *cert. denied* 549 U.S. 1208 (2007); *accord* Thornton v. Harvard Univ., 2 F. Supp. 2d 89, 94 (D. Mass. 1998) (no "reasonable expectations" from catalog given "right to change"); Keefe v. N. Y. Law Sch., 71 A.D. 3d 569, 570, 897 N.Y.S. 2d 94 (2010) ("[T]he remedy plaintiff seeks is contradicted by the documentary evidence, as defendant communicated through its student handbook."). Ohio Courts similarly have found reservations of rights to alter an employee handbook as precluding contractual liability because "it logically follow that employees may not rely upon those statements as manifesting a mutual intent to be bound by [those] preexisting terms." Olive, 2000 Ohio App. LEXIS 914 at *36 (2000); *accord* Finsterwald-Maiden 115 Ohio App. 3d at 447 ("Courts have considered provisions permitting the employer to unilaterally alter the handbook at any time as an indication of a lack of mutual assent.").

Thornhill's contention that notwithstanding Gibson, Walden elsewhere "admitted" its handbook is a contract (Am. Comp. ¶ 193) is patent nonsense. *See* Pearson v. Walden Univ.,

144 F. Supp. 3d 503 (S.D.N.Y. 2015). In that case, on a motion to dismiss prior to any need for factual admissions or denials, Walden merely did not *then* contest, for purposes of argument, that it was "policy" for faculty to respond in 14 days. *Id.* at 510. The case was pled as a negligence claim, and Walden moved to dismiss on that basis. Pearson, No. 13-cv-07840 ECF Doc. 21 at 2. ("Plaintiff alleges that she has "incurred student loans debt of $203,035.54 due to the negligence of faculty and staff. Am Comp. at ¶ C."). When the plaintiff first sought to articulate an alternative contract claim in her opposition memo, Walden in its reply "assum[ed] for the sake of argument that this handbook statement conferred contractual rights," and challenged the claim directly on whether there was a sufficiently stated breach. *Id.* ECF Doc. 27 at 4. In fact, in large part on reliance on that argument, the court, dismissed. Pearson, 144 F. Supp. 2d at 510-12 (rejecting three purported bases for her belatedly-alleged contract claim). It allowed her negligence claim to proceed, along with another breach-of-contract claim for $162 raised *sua sponte* by the court in a footnote, without any admission by Walden whatsoever. *Id.* at 513, n. 8.

The Walden Handbook's inclusion of a contractual disclaimer, as well as a further reservation of revisory rights, precludes any reasonable reliance by Thornhill on the Handbook's or website's statements about Walden for purposes of creating an implied contract, and by the same token also undercuts any reasonable reliance on them for purposes of claiming they were a source of fraud. Gilmour Academy, 273 F.3d at 677-78 (no implied contract or fraud from statements that could not be relied upon as specific commitments); Martens v. Minnesota Min. & Mfg. Co., 616 N.W. 2d 732, 741-42 (Minn. 2000) (no contract or fraud claim from policy statements not sufficiently specific and definite); *see also, e.g.*, Mizell v. Sara Lee Corp., No. CIV.A. 2:05CV129, 2005 WL 1668056 (E.D. Va. June 10, 2005) (no fraud claim in light of disclaimer and revisory power); *aff'd*. 158 Fed. App'x. 242 (4th Cir. 2005).

In addition, Thornhill's complaint that she was initially allowed more Writing Center "feedback," that was later altered with different and allegedly lesser resources concerning APA conventions, is a quarrel over the quality of teaching methods selected, and is a type of day-to-day operational decision-making courts do not supervise.  It is thus further precluded by the so-called "educational malpractice" doctrine, and fundamental principles of academic discretion, which foreclose claims of negligence, breach of contract or fraud based on complaints about program quality and instructional approach of universities.  *See e.g.*, Lawrence v. Loraine Cty. Cmty. Coll., 713 N.E.2d 478, 480 (1998), which  noted that " Ohio does not recognize educational malpractice claims for public policy reasons," and extended the doctrine to preclude analogous grievances pled under theories of statutory consumer fraud, breach of contract, and breach of the covenant of good faith and fair dealing.  The court distinguished between the impermissible claims before it, which contended that the college's education, guidance and supervision were substandard in various respects, from a more global claim that might in theory be sustainable, contending that the university delivered no education at all by "failing to provide *any* of the offerings in the course catalog."  *See also* Trutschel v. Kettering Medical Center, 2009 -Ohio- 3302, 2009 WL 1914549, at *1 (Ohio App. 2 Dist., 2009) (complaint that a school devoted only part of a course, rather than a whole course, to medical terminology was rejected as a disguised "educational malpractice" claim).  Poe v. Hamilton, 56 Ohio App. 3d 137, 139 (1990) ("[T]he professional judgment of educators in determining appropriate methods of teaching should not be disturbed.").

While Lawrence did not specifically recite them, public policy reasons typically invoked in support of educational malpractice doctrine are that (1) such claims are effectively standardless; (2) they are uncertain with respect to injury and damages, inviting disputes over

valuation of services rendered, especially where delays in completing a degree are often caused by problems relating to the quality of work, and other impediments in the student's life; (3) they would launch a flood of litigation by disgruntled students attacking the "reasonableness" of school (and in this case dissertation) procedures; and (4) they would directly involve the court in day-to-day policing of school personnel. *See, e.g.,* <u>Hunter v. Bd. of Educ.</u>, 292 Md. 481, 488 (1982); <u>Peter W. v. San Francisco Unified Sch. Dist.</u>, 60 Cal. App. 3d 814, 822-25 (1976). Both <u>Peter W.</u> and <u>Hunter</u> were cited and effectively endorsed in <u>Denson v. Steubenville Bd. of Educ.</u>, No. 85-J-31, 1986 Ohio App. LEXIS 7716 (July 29, 1986). The same policies apply to Thornhill's attempt to have this court second-guess Walden in determining how best to manage the dissertation process and select among instructional approaches and options.

### ii. <u>Decreasing Informal Email Prior to Submission of Draft through MyDr</u>.

Thornhill's alternative "feedback" complaint -- that she had been able to receive informal email advice from her dissertation committee chairman, but later she was limited only to getting very "general input" until she submitted the draft of the first 3 chapters of her dissertation -- likewise fails for lack of any <u>specific</u> alleged representations guaranteeing that the original "feedback" procedure would continue. Instead, Thornhill complains that the change violated a general description that her dissertation committee would work as "a team, directly guiding students through the proposal, research and analysis and ultimately the final oral presentation." (¶ 240). Fraud, however, requires *specific* untruthful representations, that are reasonably certain in their standards, and can be shown to have been intentionally falsely made, rather than generalities or vague language, or aspirational statements, particularly of the type often found in school literature. <u>Gilmour Academy</u>, 273 F.3d at 676-78 (finding no viable claim for breach of contract or misrepresentation based on statements that school would accommodate students'

particular learning disabilities or "would work with [student] in a very nurturing environment," but providing no specifics).  *See also*, <u>Leiby v. Univ. of Akron</u>, 2005 Ohio 6315, ¶9, *aff'd* 2006 Ohio 2831 (2006) (general handbook statements that faculty would "set and enforce classroom rules of conduct" and "not tolerate academic dishonesty" were not belied and violated by faculty reusing exam questions from earlier years).

There also are no alleged facts that plausibly state how Walden's alleged altering such feedback procedure was not in the zone of discretionary change  retained by universities.  *See* <u>Cooper</u>, 164 Misc.2d  at 882, <u>Ruegsegger,</u> 154 P.3d at 688, and <u>Marquez,</u> 32 Wn App. at 306; *see also*, <u>Doherty</u>, 862 F. 2d at 577 (generally contract principles not rigidly applied, particularly in graduate education).  Thornhill's complaint furthermore is a grievance about whether Walden adopted a less effective teaching method by providing only general guidance before draft dissertation sections were submitted, and reserving more specific comment until later, which is not actionable consistent with the "educational malpractice" doctrine and principles of academic and instructional discretion.  <u>Lawrence</u>, 713 N.E.2d at 480; <u>Trutschel</u>, 2009 Ohio 3302 at *9.

**Control.**  Thornhill's allegation that she was defrauded about the time it would take to achieve her degree by references to the "control" she would have, fail for the same reasons.  Ironically, the purported source of the "misrepresentation" was an explicit notice on the Walden website about how a student's "program completion time <u>may</u> <u>vary</u>" depending on various factors (¶s 59, 80, 96, 120; *see also* ¶s 55, 92, 116), and noting that one factor is the "... pace at which <u>a</u> <u>student</u> <u>chooses</u> to complete the program" (*Id.*).  The provision also stated that Walden assists "working adults" in balancing personal and professional commitments, *and in that regard*, enables the "students to "complete this program <u>in</u> <u>a</u> <u>time</u> <u>frame</u> <u>that</u> <u>works</u> <u>best</u> <u>for</u> him or her." (¶s 55, 92, 116.).

The freedom of working professionals engaged in distance-learning to determine where and when during the day and week to takes courses, what course-load to take on, and what time commitment to make, all make the general statement about individual "control" indisputably accurate.  Indeed, it is a truism, embraced in Ohio education law, that online education provides such control.  *See* OAC § 3301-35-01(9) (**"Digital learning"** means learning facilitated by technology **that gives students some element of control** over time, place, path or pace of learning).  Thornhill's "control" grievance not only is undermined by the requirement that nonspecific generalities do not support fraud claims, Gilmour Academy, 273 F.3d  at 676-77, but because the necessary premise of a claim based on such a generality -- that any impingement on her "control" over timing effectively evidences fraud -- is plainly absurd.  Control to help "balance personal and professional commitments" is all that was expressly referenced.

**Program Inefficiencies and Unreasonable Delays.**  Thornhill further claims she was defrauded because Walden's program fails to operate smoothly (¶ 180), and is fraught with "inefficiencies" (¶ 200), as evidenced by a professor in a residency program suggesting that her dissertation "focus more on millenials." (¶ 243).  She protests that she revised her topic based on the residency professor's observation, but her dissertation committee chair ultimately told her to stick with her original proposal, resulting in wasted time, inefficiency and greater cost.  *Id.*

Thornhill states no fraud claim in these respects because she cites no specific representations that purportedly were violated, but rather just some vague impression created by Walden that it was supposedly more reasonable and efficient in operation than she claims it was.  Even if there had been some such representation, standardless generalities are not actionable.  Gilmour Academy, 273 F.3d  at 676-77.

Moreover, how means of instruction are deployed, including resolution of academic disagreement in dissertation preparation, involve matters of educational judgment which courts are loath to intrude upon or second guess under the law:

> Before we examine plaintiff's . . . theories under state law, we note that this case arises in an academic context where **judicial intervention in any form should be undertaken only with the greatest reluctance**. *See, e.g., Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985) (declaring federal courts unsuited "to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions").

Doherty, 862 F.2d at 576. The fact that Walden is a private university further eliminates a basis for second-guessing. *See, e.g.,* Sanford v. Howard Univ., 415 F. Supp. 23 (D.D.C. 1976) *aff'd*, 549 F.2d 830 (D.C. Cir. 1977). Moreover, complaints about such matters, as well as about the general unreasonableness or inefficiency of academic programs, methods and procedure are squarely barred by "educational malpractice" / "academic discretion" principles, which while originally applied in negligence claims, now broadly preclude contract and tort claims, including fraud. *See* Lawrence, 713 N.E.2d at 480.

**Graduation-Rate Disclosure Issues**. Thornhill's claim that Walden improperly concealed both its graduation rate, and that its PhD in Management program was "designed" for taking over a longer 58-66 month period, rather than the shorter periods she allegedly was told she "could/would" expect, also fails under the applicable requirements for fraudulent nondisclosure. (Am. Comp. ¶ 196 - 97). Ordinarily, parties to a transaction are not under a duty to volunteer information, and Thornhill thus must allege facts plausibly showing the existence of an underlying duty to disclose. Williams v. Aetna Finance Co., 83 Ohio St. 3d 464, 475 (1998), *cert. denied,* 562 U.S. 1051 (1999).

Thornhill cites no basis for the duty she attempts to impose for disclosure of graduation rates, and there is none. Higher education is broadly regulated by the United States Department of Education, which seeks substantial information and disclosure by colleges and universities. The principal source of such disclosure obligations is the Higher Education Opportunity Act of 2008, amending 20 U.S.C. § 1001, *et seq.,* which requires disclosure of university graduation rates only for undergraduates, *id.* § 1092 (L) and certain subclasses of them, such as student receiving athletic-related aid. *Id*. § 1092 (e). Consistent with this limitation, the DOE's National Center for Education Statistics ("NCES") website, which collects disclosed information about colleges and universities,[11] lists only graduation rates for undergraduate programs. *See* website College Navigator and report on graduate school data noting "Graduation Rate/ Graduation 200 - No data reported - component only collects on undergraduate students." (Hardcopy attached as Exhibit 9).[12]

Moreover, how "graduation rates" are properly conceived and computed is a matter of debate, involving such issues, among other things, as whether to focus on gross numbers of graduates or a student cohort, involving students who start the program at the same time and have been enrolled long enough to graduate, how to delimit any such cohort if used, and whether non-full time and repeat students are included and which categories of drop-outs (e.g. those

---

[11]  *See* U.S. Dept. Ed. NCES website excerpts attached as Exhibit 8.

[12]  *See* College Navigator at https://nces.ed.gov/collegenavigator/ and report about graduate program information entitled "IPEDS Data for Graduate Only Institutions" at https://nces.ed.gov/npec/data/IPEDS_Data_for_Graduate-Only_Institutions.pdf pp. 2-3. *See, also, e.g.*, Cal Tech Institutional Research Office, ("The federal government does not require institutions to report graduation rates for graduate programs.") https://www.iro.caltech.edu/gradrates. (also attached as Exhibit 10).

reporting for military service, those who die etc.) are includable or corrected for.  What definition controls is a technical matter ill-suited for juries or judges to decide and declare.[13]

Thornhill's proposal that this Court, through the blunt instrument of common law fraud, create a new regime of institutional reporting, presumably binding upon all Ohio graduate programs who otherwise might risk "fraudulent concealment" liability by not complying, is unprecedented and is far better suited for regulatory or legislative action.  *See, e.g.,* Doe v. Town of Framingham, 965 F. Supp. 226, 230 (D. Mass, 1997) (As education "is an area specifically addressed by such meticulous regulation, there is no need to construct what is likely to be a . . . clumsy common law remedy.").  *Accord e.g.,* Hunter, 292 Md. at 488 , noting that under the extensive regulatory authority conferred upon the State Department of Education and related bodies, that "the totality of the various statutory provisions concerning [them] `quite plainly ... invests [them] with the last word on any matter concerning  . . . the administration of the system of . . . education" constraining the propriety of judicial remedies like those sought here.

Just as state courts are wary of creating standards of common-law educational "reasonableness" based on fear of intruding on officials and regulations governing education, *id.*, so this Court  likewise must abjure from launching new regimes of university reporting obligations under equally vague and potentially intrusive notions of what is actionable non-disclosure for purposes of fraud.  *See also*, Murphy v. Capella Educ. Co., 589 Fed. Appx. 646, 656 (4th Cir. 2014) (finding that no sufficient basis had been pled to support an alleged claim that university had been required by the law of fraud to disclose an alleged  completion rate of less than 10%  for doctoral candidates).  Where the U.S. Department of Education has been

---

[13]  *See, e.g.,* https://surveys.nces.ed.gov/ipeds/VisFaqView.aspx?mode=reg&id=4&show=all and https://surveys.nces.ed.gov/ipeds/VisFaqView.aspx?mode=reg&id=6&show=all   (DOE IPEDS publications discussing graduation rates for programs of four years and less than 2 years reflecting complexities of such rates generally - also attached as Exhibit 11).

authorized and undertaken to collect graduation rates from undergraduate institutions, but elected not to extend such reporting to graduate programs, it is not a court's role to second-guess and reverse that decision through resort to state common law.  *See also*, Doherty, 862 F.2d at 577 (emphasizing reluctance to supervise post-graduate programs).

It is particularly problematic for this Court, sitting in diversity, to pioneer such enlargement of university reporting regulation under state law.  Combs v. Int'l Ins. Co., 354 F.3d 568, 577 (6th Cir. 2004) ("When given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path").  *See also, e.g.*, Ryan v. Royal Ins. Co. of Am., 916 F. 2d 731, 744 (1st Cir. 1990) ("[L]itigants . . . who bring suit . . . under diversity jurisdiction cannot expect that new trails will be blazed").

**Thornhill's Pivotal and Bogus Design-Time Accusations**.  Thornhill also has failed to allege any actionable fraud in connection with program "design" times, which is the keystone of her case.  Repeatedly, Thornhill claims that references to program "design" times on Walden webpages starting in 2014 supposedly show that earlier alleged representations about shorter program length made to students were fraudulent.  (¶s 2, 51, 69, 73, 85, 88, 105, 108, 115, 125, 131, 135-140).  In her own case, Thornhill claims that the "66 month" program "design" time referred to on the Walden 2014 webpage for her program was inconsistent with the three-year period she claims earlier to have been told about (¶ 69).  Her theory, repeatedly stated in connection with her "design time" accusations in both the Original Complaint and the Amended Complaint (¶s 88, 108, 131) is that "design times" must mean "minimum times to complete," and were thus inconsistent with shorter minimum completion times quoted by Walden enrollment advisors to students.  *See* Amended Comp ¶s 88, 108, and 131, explaining:

It is not unreasonable to assume that if Walden designed the course to take 50 months, then 50 months should be the "minimum time to completion."  Despite this Walden represented the DBA as lasting a much shorter time period . . .

It is not unreasonable to assume that if Walden designed the course to take 72 months, then 72 months should be the "minimum time to completion. It's clear . . . Walden utilized a still undefined and likely false "minimum time to completion" calculation . . .

It is not unreasonable to assume that if Walden designed the course to take 66 months, then 66 months should be the "minimum time to completion" . . . Walden, however, utilized . . . three years or less for its "minimum time to completion" . . .

The mere fact that a program in some respect is "designed," or described as "designed" for a hypothetical student needing to do more work, and thus having a longer hypothetical completion period (66 months) than the timespan in which Thornhill allegedly was told she "could" complete her PhD (Am. Comp. ¶ 242), or was the "minimum" completion period, evidences no misrepresentation whatever - rather just use of facially different metrics expressed in clearly differing terminology.

**More importantly, the government document that governs Walden's webpage disclosures unequivocally shows that the "design time" accusations at the heart of her claim, and the claims of class members, are simply specious.**  The "design" time references on Walden's webpage, that Thornhill claims to belie earlier representations about the length of Walden programs (¶s 69, 88, 108, 131) reflect no such conflict.  The webpages that Thornhill complains about are not an invention of Walden's (as Thornhill implies) but are federally-mandated disclosure pages based on a template prescribed by the U. S. Department of  Education under its Gainful Employment regulations at 34 C.F.R. § 668.6(b).  The term "design" time was not selected by Walden but appears automatically on the template's output page when an institution enters "the normal time for completion," as prescribed and defined by regulation, and

53

not the <u>minimum</u> time for completion or a time in which the program "could" be completed. *See*

U.S. DOE "Gainful Employment Disclosure Template Quick Start Guide" (2013) (attached as

Exhibit 12)[14] at p. 9, Screen 5, showing example of an institution inputting "4 years" in the blank

for "normal time to complete the program as published in your instructional catalog or other

publication" and p. 14, showing the resultant output statement automatically generated by the

DOE's template itself, saying "The program is designed to take 4 years to complete."

      With respect to her own specific program, Thornhill made this "design time" theory

explicit with respect to her program's webpage, as she alleged it in the original Complaint:

> It is <u>not</u> <u>unreasonable</u> <u>to</u> <u>assume</u> that if Walden <u>designed</u> the course to take 66
> months, then 66 months <u>should</u> <u>be</u> <u>the</u> "<u>minimum</u> <u>time</u> <u>to</u> <u>completion</u>." Walden,
> however, utilized. . . three years for the "minimum time to complete"
> computation. Walden provided this false information to mislead prospective
> students into enrolling in it PhD in Management program.

(Comp. ¶ 61). After learning that "design time" was not "minimum time to complete," as

explained in Laureate's first motion to dismiss, Thornhill's counsel now have simply removed

this earlier disclosure of their reasoning and baldly insist in the Amended Complaint, without

explanation, that the "design time " somehow conflicted with the earlier three-year

representations, while concealing their still erroneous logic. (Am. Comp. ¶ 69). This attempted

repair fails to salvage her claim, since the bogus theory remains firmly embedded in the

remainder of the Amended Complaint (¶s 69, 85, 105), and continues to vitiate the heart of

Thornhill's accusations. Moreover, Thornhill's attempt to excise the theory from her own

specific grievance in the seventh count now just leaves her accusation nebulous and unexplained,

---

[14]  For purposes of authentication as a government document, the 2013 Quick Start Guide can be
found at
https://web.archive.org/web/20140513201747/http://www2.ed.gov/policy/highered/reg/hearulem
aking/2009/ge-template-qsg-ie.pdf. The current Guide for 2016 is available from the DOE for
comparison at
https://www2.ed.gov/policy/highered/reg/hearulemaking/2009/ge-template-qsg-ie.pdf.

in violation of the enhanced specificity and the plausibility requirements for pleading fraud in federal court. There is no accusation anywhere in her Amended Complaint that the program-duration periods cited by enrollment advisors were stated in terms of conflicting "design" times or "normal times to complete" -- a term she admits to not understanding (*see* ¶s 69, 85, 105) -- rather than faster times in which some students more expeditiously "could" finish, i.e. as minimum times in which programs could be completed.

In addition, even if logic or fact remotely supported Thornhill's unfounded "assumption" that "design" time and "minimum time to complete" should mean the same thing, it does not begin plausibly to show that Walden, by not sharing her assumption about those divergent words, *ipso facto* possessed the required intent to deceive. No such flights of conjecture suffice under the <u>Twombly/Iqbal</u> requirements or the necessity under Rule 9(b) to plead intent with specificity.

There is also no basis for Thornhill's claim that Walden's alleged earlier nondisclosure of a 66 month program "design," prior to the Department of Education's devising and prescribing the term on its template, and requiring its publication prospectively from 2014 onward, is actionable as fraudulent concealment under the common law. Thornhill's contention is based on her erroneous assumption that program "design" means "minimum time to completion" and thus Walden was obligated to correct earlier representations of a 3 year "minimum time to completion." As shown above, there was no such contradiction and thus no duty to report an earlier "design" time.

Consistent with the applicable definition prescribed by DOE in Exhibit 12, the template also plainly requires a statement of a "normal" time to complete regardless if the "normal" time winds up applying to a minority of the graduates (as is clearly disclosed to students and not misstated by Walden) or to a program with a low graduation rate. Thornhill's accusations about

55

either circumstance involving fraudulent use of the word "normal" is as specious as her erroneous assumption of what "design" times are. *See* ¶ 110 n. 18, in which she erroneously asserts "It is <u>not</u> <u>unreasonable</u> <u>to</u> <u>assume</u> a 'normal' time to completion would require 50% or more of the student population to complete the program in that time frame. Anything less (like 44%) would not be normal." *See also* ¶ 111 (21% cannot be "normal"), ¶ 136 (27% cannot be "normal"); ¶ 139 (37% cannot be "normal"). *See also* ¶ 256 alleging that Walden's alleged low graduation rate makes the fact that Walden is representing "*any* time to completion let alone a "normal time to completion" . . . is fraudulent." DOE, the designer of the mandatory web pages, commands otherwise, flatly refuting Thornhill's accusations about misunderstood procedure.

**Intentional Scheme**. Finally, Thornhill's attempted catch-all claim, alleging an "intentional scheme" to delay and defraud, also fails for lack of specificity under both Rule 9(b) and the <u>Twombly/ Iqbal</u> pleading requirements. In fact, Thornhill's allegations of such a scheme are taken verbatim from the Complaint in <u>Travis v. Walden University</u>, which Judge Marvin Garbis dismissed for lack of required specificity. 2015 U.S. Dist. LEXIS 147246 at * 7 ("Plaintiffs merely allege generally that Walden concealed in some fashion, in some context, an alleged scheme and alleged inadequacies in its management of the educational process"). Similarly, all Thornhill alleges are various respects in which she feels Walden should operate more efficiently topped off with wholly conclusory accusations of a deliberate plan to frustrate graduation. Such unsupported theorizing fails to satisfy the applicable test of plausibility. <u>Signal Peak Energy, LLC v. E. Montana Minerals, Inc.</u>, 922 F. Supp. 2d 1142, 1152-53 (D. Mont. 2013) (without specific allegations showing that defendant directed allegedly improper actions as part of a concerted scheme, court could not infer more than mere possibility of misconduct).

Moreover, Thornhill's assertion that Walden concealed such a "scheme" is nonsensical. There is no duty "to disclose [an] intention to commit an intentional tort." Bank of America Corp. v. Superior Court, 198 Cal. App. 4th 862, 872 (2011) (rejecting claim of undisclosed "fraudulent scheme"); In re MRU Holdings Securities Litigation, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011) ("[I]t is 'rather circular to say that . . . Defendants committed fraud by concealing their intent to commit fraud.'").   Further, Thornhill's theory presupposes that Walden was obligated to have forecast and accepted the legal theory of Plaintiff's counsel and proactively engaged in derogatory, self-critical revelations of such supposed intentional scheming.  Any such requirement would far exceed duties imposed by the law of fraud, not to mention conflict with Walden's right of free speech.  See, e.g., Video Software Dealers Ass'n, v. Schwarzenegger, 556 F.3d 950 (9th Cir. 2006) (Compelling the publication of controversial opinions in advertising violated First Amendment);  aff'd sub nom. Brown v. Entm't Merchants Ass'n, 564 U.S. 786 (2011); GAF Corp. v. Heyman, 724 F.2d 727, 740 (2d Cir.1983) (Under the law against securities fraud, [m]anagement is not required "to accuse itself of antisocial or illegal policies"); See also e.g., O'Shea v. Epson Am. Inc., No. CV-09-8063, 2011 WL 3299936, at * 6 - *7 (C.D. Cal. July 29, 2011) (rejecting consumer fraud claim contending that "Epson was obligated to disclose the grossly inefficient ink yields generated by its printers"); aff'd in part, 566 Fed. Appx. 605 (9th Cir. 2014).   It also make application of a reasonable statute of limitations impossible.  As the Supreme Court cautioned in Wood v. Carpenter, 101 U.S. 135, 143 (1879):

> To permit a claim of fraudulent concealment to rest on no more than an alleged failure to own up to [such] conduct  . . . would effectively nullify the statute of limitations in these cases. It can hardly be imagined that illegal activities would ever be so gratuitously revealed.

**B.    Plaintiff Has Failed to State a Claim for Breach of Contract in her Ninth Cause of Action.**

Plaintiff's Ninth Cause of Action for breach of contract similarly fails from her inability plausibly to state breach of an enforceable contract under the alleged circumstances.  A breach of contract claim under Ohio law must allege (i) the existence of a binding contract, (ii) the breaching party's failure to perform its contractual obligations without legal excuse, (iii) the non-breaching party's substantial performance of the contract and (iv) the damages suffered by the non-breaching party as a result of the breach.  Garofalo v. Chicago Title Ins. Co., 661 N.E.2d 218, 226 (Ohio App. 1995).

A complaint asserting breach of contract must allege specific promises with certainty and definiteness, rather than generalities without standards.  Episcopal Ret. Homes, Inc. v.  Ohio Dept. Indus. Relations, 61 Ohio St. 3d 366, 369 (1991) (contract must be definite as to its essential terms); Alligood v. Procter & Gamble Co., 72 Ohio App. 3d 309, 311 (1st Dist. 1991) ("specific as to its essential terms"); accord Gilmour Academy, 273 F.3d at 677 ("a breach of contract claim will not arise from the failure to fulfill a statement of goals or ideals").

While some courts have deemed the student-university relationship to be contractual in nature, the Sixth Circuit has cautioned that "courts have rejected a rigid application of contract law in this area."  Doherty, 862 F.2d at 577 (citing four sister circuits).  Obligation may be derived from catalogs, handbooks or statements of policy, but any operative contract depends upon the specifics of what is said, construed in conjunction with applicable disclaimers.  Id. at 577-78 ("In view of the disclaimer language on the inside front cover of the catalog, it is difficult to find, as plaintiff asserts, that a binding contract was created promising the SCO class entering in 1978 the right to graduate determined under the standards in the 1978-79 catalog").  Contractual rights extend at most to requiring the institution (1) to grant a degree if specified

criteria in catalogs and bulletins have been relied upon and satisfied, *id.,* (2) not entirely to default in their obligation to instruct, Lawrence, 713 N.E.2d at 480; Baker v. Or. City School, 2011 Ohio Misc. LEXIS 16063 (Apr. 13, 2011) (no instruction) and (3) in some cases to honor specific commitments that have been stated with an adequate level of particularity, Gilmour Academy, 273 F.3d at 677, and not disclaimed,  Doherty, 862 F.2d at 577.  Not every such term that appears in school publications supports a contract, and substantial discretion is retained by the institution to alter such procedures. *Id.*, Cooper, 164 Misc.2d  at 882,  Ruegsegger, 154 P.3d at 688; Marquez, 32 Wn. App. at 306.

Overall, Thornhill fails to allege any contract satisfying these standards:  (a) she does not claim she earned a degree but was denied it, or (b) that Walden failed to provide her with any instruction or course content, or (c) that any specifically-stated and not contractually-disclaimed commitment to her was breached.   Nor can she use the covenant of good faith and fair dealing as a crutch for her purported grievances.  In view of courts' care, as explained in Doherty, in limiting any contractual dimension of the student-university relationship, by avoiding "rigid" application of contract law and granting broad discretion to schools to manage and change their programs especially at the graduate level, as explained in Doherty,  it be incongruous simultaneously to introduce the potential breadth and uncertainty of obligations under such a covenant into so complex and sensitive a relationship.  Ohio courts have shown no inclination to do so (*see* Lawrence rejecting such a claim), nor is it this court's role to stretch state common law in any such new direction.

The specific contractual commitments she contends were violated also fail to support valid claims when considered independently, as shown below.

**Grievances Not Affecting Thornhill**.  Thornhill indiscriminately seeks to throw into her breach of contact claim alleged practices she nowhere contends to have been personally affected by.  Thus, for example, she complains about a defective process for obtaining a dissertation chairman and member (¶ 182), unreasonable attrition in committee members (¶ 185) and lag time in replacing them, without alleging she was personally impacted.  In complaining about untimely responses from her dissertation committee, she alleges that her chairman sent out an email to certain of his thesis students about confusion in his responses to students submitting drafts through the "MyDr" procedure (¶ 244), while not alleging that she was personally affected.   In fact, she complains she never got to the "MyDr" stage, which would have required her to complete three draft dissertation chapters. (¶s 236, 239, 241).   These allegations, focused on purported mistreatment of others, cannot properly serve as the basis of a personal claim.

**Unreasonable and Inefficient Management and Procedures**.   The vast majority of grievances alleged by Thornhill as breaches of contract concern generalized complaints about quality of procedures and management of Walden's dissertation process. These include generalized grievances about the "unreasonableness and burdensomeness" of dissertation committee selection, lack of "reasonable" stability in committee members, lack of appropriate and timely feedback in the dissertation process, and a process "fraught with inefficiencies," "unreasonable conduct inconsistent with the reasonable expectations of class members," and insufficient team work.  (¶s 334-35, 341).   These allegations fail to state viable claims, because they assert generalized  grievances about the "unreasonableness" of academic program that would require the court to dictate standards of reasonableness to remedy, directly in conflict with "educational malpractice"/academic discretion principles.  Lawrence, 713 N.E.2d at 480.   Her claim also relies on allegations of a vague duty of reasonableness at odds with the specificity

required in academic contracting,  <u>Gilmour Academy</u>, 273 F.3d  at 676-77, and further fail to

assert non-conclusory claims consistent with the <u>Twombly/Iqbal</u> pleading standards.

       **<u>Lack of Response in 14 Days</u>.**   While Thornhill correctly notes that Walden's

Handbook contain an aspirational exhortation to faculty for 14-day response times to student

submissions, she ignores the fact there are disclaimers of contractual intent or obligation that

preclude her reliance on those response goals.  Within its Faculty Mentoring and Teaching

Responsibilities section, the Student Handbook states:

> Providing timely and substantive feedback in the electronic classroom and to all student assignments and final products — <u>Faculty members will  .  .  . return research drafts (for  .  .  . theses, dissertations, and doctoral studies) within 14 calendar days</u>…
>
> Responding to all student inquiries within 48 hours —If additional action is required, the faculty member <u>will respond to the student within 48 hours and complete appropriate action within 14 calendar days</u>.
>
> Completing appropriate action <u>on materials received from students within 14 calendar days of their receipt</u>.

(Attached as Exhibit 13).  As already noted, however, the Student Handbook also expressly

provides disclaimers of any contractual intent, *see* pp. 41-44, *supra*, and reservation of revisory

power, specifically found to preclude any claim for breach of contract concerning its provisions.

<u>Gibson</u>, 66 F. Supp. at 1326-27 (Walden not bound by Handbook's stated 45-day period to

review student appeal or by nondiscrimination provisions).  *Accord*, <u>Doherty</u>, 862 F.2d at 577

(disclaimer undermined conclusion that a binding contract was created.)  This disclaimer has

been in the preface of the Student Handbook since Thornhill enrolled.[15]

       Even in the absence of such disclaimers, the contention that Walden would render itself

liable for breach of contract for each and every time a faculty member takes more than 14 days to

---

[15] *See* n. 10  at  p.41,  *supra*.

respond to a student is simply implausible. This extreme theory is at the heart of Thornhill's

own and her class allegations, which seek to predicate claims on the assumption that most

Walden doctoral students experience a breach of the 14-business day response period <u>at least</u>

<u>once</u>.") Am. Comp. ¶ (195) (emphasis added). <u>Definitive Solutions Co., Inc. v. Sliper</u>, 2016

Ohio 533, at ¶ 14 ("We will not interpret a contractual provision to reach an absurd result");

*appeal not allowed*, 2016-Ohio-4606, 52 N.E.3d 1204 (2016); *accord* <u>Kellogg Co. v. Sabhlok</u>,

471 F.3d 629, 636 (6th Cir. 2006) ("Contracts must be construed consistent with common sense

and in a manner that avoids absurd results"). Coordinating responses jointly by a chairperson

and committee member, particularly on matters of academic substance, could reasonably be

delayed by any number of causes. Regardless of whether or not contractual intent is expressly

disclaimed, courts sensibly have refused to find deadlines in university procedure to be binding

contracts, particularly in such "review" contexts where the school's academic judgment is

required. *See, e.g.*, <u>Tesema v. Lake Washington Tech. Coll.</u>, No. C04-2533JLR, 2006 WL

408237 (W.D. Wash. Feb. 17, 2006):

> Mr. Tesema has likewise failed to provide sufficient evidence that <u>the college's</u>
> <u>lag</u> in processing his grade appeal . . . constitutes breach. Mr. Tesema argues that
> Defendants' failure to process his grievance according to schedule requires this
> court to grant him a passing grade. . . . [T]he court declines to . . . <u>employ[] a</u>
> <u>hyper-technical</u> <u>reading</u> <u>of</u> <u>a</u> <u>student</u> <u>handbook</u> <u>that</u> <u>governs</u> <u>internal</u> <u>college</u>
> <u>affairs</u>.

*Id.* at *8 (emphasis added) (quotations omitted). *See also*, <u>Gally v. Columbia Univ.</u>, 22 F. Supp.

2d 199, 208 (S.D.N.Y 1998) (Provision in academic policies stating final grades "are reviewed at

the close of the academic year" was aspirational and "mere delay" was not an actionable breach

of contract); <u>De Simone v. Siena Coll.</u>, 663 N.Y.S. 2d 701, 702 (N.Y. App. 1997) ("[T]he

alleged untimeliness of defendant's nonrenewal notice [as prescribed in the faculty handbook],

even assuming a two-day delay . . . was, at worse, a *de minimis* breach of a nonessential time period and was insufficient to sustain a cause of action for breach of contract…").

Thornhill's bizarre contention that even 14-days is an excessive response time, (Am. Comp. ¶ 196) and that the Court should shorten it, finds no support in any stated contract language or other stated source of legal rights, and further reflects the wishful thinking and unconstrained activism driving her case.

**Team and Control.**   For the same reasons noted earlier in connection with her fraud allegations, Thornhill can conjure up no claim from the "team," "control," and "self-pacing" references in Walden's materials because they are generalized and/or aspirational statements too vague to serve as the necessary specific commitments Thornhill strains to derive from them. Gilmour Academy, *ante*. Plaintiff's complaints about the degree of teaming and lack of having plenary control over pacing violate no specific standards of performance promised to her and would involve the Court in improperly imposing such standards in day-to-day operation of a dissertation program, contrary to the "educational malpractice" doctrine and related principles of academic discretion.  Procedures for a PhD program, and appropriate timing and supervision in writing a defensible doctoral dissertation, are for educators and not courts to determine. Furthermore, the Handbook and website excerpts she seeks to rely upon are subject to the same contractual disclaimers for the Handbook and Walden publications noted above.

**Completion Times.**   Thornhill's claims that Walden supposedly "promised" her that its PhD course "could be completed in as little as 13 or 18 months" and had a "minimum time to complete of three years with expense of $60,000 to $70,000" fails to provide contractual commitments.   As already shown, she cites no representation to her, that she relied upon as an implied contract in enrolling, stating a three-year period, and all the Student Handbook

63

disclaimed any contractual effect of University publications generally, and reserved the right to amend them.

Further, representations about time that could/would be needed by a student to earn a degree are, at best unenforceable opinion rather than a promise. <u>Davis Wetlands Bank, LLC v. United States</u>, 114 Fed. Cl.  113, 124 (2013) ("contractual obligation . . .  must have been in the form of an undertaking rather than a mere prediction or statement of opinion . . . "). Calamari & Perillo, <u>The Law of Contracts</u> § 2-6(b) at 33 (3d ed. 1987) ("[A]n expression of opinion is not a promise").  Moreover, no school can guarantee that any student will survive the rigors of a PhD program at all, and Walden has not been alleged to have done so.  It is common knowledge that doctoral programs are challenging and there is anticipated attrition. *See, e.g.*, <u>Middlebrooks</u>, 980 F. Supp. at 826 (difficult to complete and majority dropped out).  Consequently, statements about time it could/would take to finish have no force as binding obligations but must be taken as aspirational at most.  <u>Gilmour Academy</u>, *ante*.

### C.   Plaintiff Has Failed to Allege and Show Compliance with the Prerequisites for a Class-Action Claim under the Ohio Consumer Sales Practices Act in Her Eleventh Cause of Action.

Thornhill's attempted claim on behalf of an Ohio-subclass (¶s 420 *et seq.* ) for breach of Ohio's Consumer Sales Practices Act ("OCSPA"), O.R.C. § 1345.02 is foreclosed because of the Complaint's failure to allege and show compliance with Ohio's class-action notice requirements in § 1345.09(B), which provides that the defendant must have notice that its alleged practices are unfair and deceptive either by way of (1) an Ohio administrative rule that declares the specific conduct at issue unfair or deceptive, or (2) an Ohio court decision determining that Walden's alleged conduct is substantially similar to an act or practice previously declared to be deceptive by one of the methods referenced in § 1345.09(B).  <u>Marone v. Philip Morris USA, Inc.</u>, 110 Ohio St. 3d 5, 850 N.E. 2d 31 (2006).  In the absence of her pleading compliance with these

requirements and stating the facts which show it, no such class action can be maintained, either in state court or in federal court sitting in diversity. Phillips v. Philip Morris Companies Inc., 290 F.R.D. 476, 477 (N.D. Ohio 2013).

> **D.** **Plaintiff Has Failed to State a Substantive Claim for Violation of the Ohio Consumer Sales Practices Act in Her Eleventh Cause of Action.**

Thornhill's attempted claim under the OCSPA further fails because of lack of sufficient allegations to state a plausible claim. OCSPA § 1345.02(A) makes it unlawful for a "supplier" to engage in an unfair, deceptive, or unconscionable act or practice in regard to a consumer transaction. OCSPA § 1345.01(B) defines a "supplier" as a "person engaged in the business of effecting or soliciting consumer transactions, whether or not he deals directly with the consumer." O.R.C. § 1345.01(B).

The practices Thornhill alleges to be deceptive are a subset of those raised in her previously addressed fraud and contract claims and fail to support her for the same reasons stated above. Statements that the dissertation committee would "work as a team" and students had "control" over pacing are too general and aspirational to support claims of deception. Gilmour Academy, 273 F.3d 676-77. They also have not been plausibly alleged to have been untrue, given the Complaint's admission (¶s 237 - 238) that she received the committee's "general input" (although purportedly too general in her view) and that she had significant "control" over the time and place she took her online courses and in her course load. Also, nothing about the "team" reference guaranteed her some particularized level of, or sequencing in "feedback," much less assurances that "feedback" procedures could not be revised.

Representations that the dissertation process "could take as little as 13 or 18 months" or that the minimum length would be three years at a cost between $60,000 -$70,000 are non-actionable opinions and assertions about the future. Tibbs, 369 N.E. 2d at 1222; Doherty, 862

F.2d at 577, <u>Becker</u>, 2011 WL 1103439, at *11.  Plaintiff also has failed to state any injurious impact of fraudulent statements about "minimum" times for degree completion because she has not alleged that she had the background, qualifications, ability and available time to be a stellar performer, able to finish in a projected "minimal" completion period.  She also has failed to identify some representation that she received and relied upon in 2011, indicating her program would be three years, and was warned that completion times vary.

Her complaints about an unreasonable and burdensome dissertation staffing process and unreasonable attrition of committee members (¶ 275) do not involve practices that personally affected her.  (*See* Comp. ¶s 206-249 detailing her individual problems).  Determining what would be reasonable or non-burdensome in dissertation practices also would directly involve the Court in imposing standards for managing the day-to-day operation of the school, violating the "educational malpractice" doctrine and principles of academic discretion, as would the Court's determination of what procedures of "feedback" were proper and not within a school's discretion to revise.  <u>Lawrence</u>, 713 N.E. 2d at 480.

Walden's aspiration that online faculty respond to students within 14 days provides no basis for a OCSPA claim because of the disclaimer in the handbook describing it, and would be contrary to the flexibility acknowledged by the courts as reasonably necessary in university operations, notwithstanding  recommended internal deadlines.  *See* cases at p. 40-41, *supra*.

Thornhill's attempted alternative scattershot accusation that Walden failed to disclose an "intentional scheme" of  systematic prolongation of the dissertation process, or a program "fraught with inefficiency" and turnover fails to state a consumer protection act claim for the same reason the identical allegations were rejected in <u>Travis v. Walden University, LLC</u>, 2015 U.S. Dist. LEXIS 147246  at * 7  ("Plaintiffs merely allege generally that Walden concealed in

some fashion, in some context, an alleged scheme and alleged inadequacies in its management of the educational process."). *See also, e.g.*, Epson, 2011 WL 3299936 at * 6 (no need to confess alleged inefficiency of ink yields.). *See also*, other cases and authorities *supra* at p. 57 concerning no obligations to publicly endorse adverse theories or to volunteer disclosures she otherwise claims should have been made.

### E. Plaintiff Has Failed to State a Claim for Unjust Enrichment in Her Eighth Cause of Action.

Thornhill also has failed to state a claim for unjust enrichment because she has acknowledged and asserted that the student-university relationship is contractual in nature. (¶ 331 *ff* and ¶ 402 *ff*). McDade v. Cleveland State Univ., 2014 -Ohio- 4026, 2014 WL 4557015, at *1 (Ohio App. 10 Dist., 2014) ("The trial court [found] that the relationship between C[leveland] S[tate] U[niversity] and McDade was contractual in nature, and therefore her claims for . . . unjust enrichment were not available [and] [o]n appeal, McDade concedes that her only claim is one for breach of contract"). Consistent with principles of freedom of contract, and reluctance to augment what the parties choose to express, such a contract forecloses quasi-contractual supplementation.

In addition, the alleged conduct supposedly creating the unjustness and inequity in Walden's receipt of her tuition payments is precisely the same as claimed in her fraud, breach of contract and OCSPA counts. For the reasons shown above, those allegations about the unreasonableness, burdensomeness, inefficiency and improprieties of Walden's dissertation process involve no unjustness and are effectively claims for educational malpractice, and cannot be salvaged through artful pleading as "unjust enrichment."

> Inquiry into whether the defendant was unjustly enriched by receipt of the plaintiffs' tuition payments requires an examination of the quality and value of services provided in return… [A]ctions that necessitate such an inquiry cannot be maintained . . . here, [in] unjust enrichment claims.

Scalzi v. Mead Sch. for Human Dev., No. XO5CV 950148213S, 1999 WL 391917, at *13 (Conn. Super. Ct. June 4, 1999) (striking unjust enrichment count);  *accord* Bittle v. Oklahoma City Univ., 6 P.3d 509, 515  (Okl. App. 2000) (dismissing claims including unjust enrichment based on educational malpractice).

Further, courts have roundly rejected stand-alone claims for "unjust enrichment" which merely repeat the same conduct in earlier tort and contract counts, once having determined that the earlier counts fail to state claims.   Noble Sys. Corp. v. Alorica Cent., LLC, 543 F.3d 978, 987 (8th Cir. 2008) (dismissing unjust enrichment claim where underlying tort claims had been dismissed); Steamfitters Local Union 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 937 (3d Cir.1999) (dismissing unjust enrichment claim where court had dismissed underlying tort claims upon which it was based); *cert. denied*, 528 U.S. 1105 (2000); Ass'n Ben. Servs., Inc. v. Caremark Rx, Inc., 493 F.3d 841, 855 (7th Cir. 2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well."); Blystra v. Fiber Tech Grp., Inc., 407 F. Supp. 2d 636, 644 n. 11 (D.N.J. 2005) (treating plaintiffs' unjust enrichment claims as "subsumed by their other tort claims, and not as an independent cause of action.").  Because Thornhill's tort and contract claims are meritless: and her unjust enrichment claim merely parrots those other grievances, it also must properly be dismissed.

Thornhill also fails to allege with sufficient specificity facts showing that there was enrichment unjustly at her expense.  She has failed to take into account that there was ongoing benefit to her from her working with Walden's faculty, even if not resulting in the degree she desired.  Zinter v. Univ. of Minn., 799 N.W. 2d 243, 247 (Minn. Ct. App. 2011) (rejecting unjust

enrichment claim because University entered no "bargain that . . . [plaintiff] would receive a degree [and] [b]ecause it provided . . . the instruction for which she paid, it did not retain a benefit without recompense"). For this further reason, she has failed to state an adequate claim of unjust enrichment, which must be dismissed.

###### F. Plaintiff Has Failed to State a Claim for Breach of the Covenant of Good Faith and Fair Dealing in Her Tenth Cause of Action.

As already noted in Section 2B above, Thornhill's claim for breach of the covenant of good faith and fair dealing fails because contract law is generally applied selectively and with moderation to academic institutions, particular to doctoral programs. See Doherty.  It follows *a fortiori* that they would not simultaneously permit expansive supplemental contract claims based on amorphous duties implied from general notions of good faith and fair dealing that would risk second-guessing decisions within the academic discretion of the school. *See* Lawrence, which rejected such a claim.  *Accord,* Sullivan v. Boston Architectural Center, 2000 WL 35487586 (Mass. Super, April 3, 2000); Keefe v. New York Law School, 71 A.D. 3d 569, 897 N.Y.S. 2d 94 (2010)  ("[O]nly specific promises set forth in a school's bulletins, circulars and handbooks, . . . can establish the existence of an implied contract [and not] "the implied covenant of good faith and fair dealing.")  *See also,* Bittle, 6 P.3d at 514-15 (claims limited to "some specific identifiable agreement for an educational institution's provisions of particular services.").

###### G. Plaintiff Has Failed to State a Claim for Breach of Fiduciary Duty in Her Twelfth Cause of Action.

Plaintiff's afterthought attempt to claim that Walden breached a fiduciary duty to her and others enrolled in its doctoral programs similarly states no cognizable claim under Ohio law. Thornhill's fiduciary duty claim is simply a re-labeled duplication of her fraud claim, alleging that Walden misrepresented the length of its program and availability of the Writing Center and related resources and failed to disclose graduation rates.  (Am. Comp. ¶¶ 436 - 442).   Such a

claim raises the same remedial problem under Ohio law that her fraud claim did, as her damages are simply allegedly misspent tuition for allegedly defective services.   Delahunt, 241 F. Supp.2d at 834.  As a relabeled fraud claim, it also fails for the other defects addressed above in connection with that claim.  *See,* Section II A *supra.*

More fundamentally, Ohio recognizes no school-based fiduciary relationship.  In Smith, 132 Ohio App. 3d at 220, the Court of Appeals found no support for the existence of a "fiduciary relationship between an educational institution and a prospective student" and declined to create one.  This federal court has even less reason to conjure up such a new obligation from state law. *Accord, e.g.,* Shapiro v. Butterfield, 921 S.W.2d 649, 651-52 (Mo. Ct. App. 1996) (no fiduciary relationship between faculty advisor and student); Ho v. Univ. of Texas at Arlington, 984 S.W.2d 672, 693 (Tex. App. 1998) (finding, as a matter of law, that no fiduciary duty between student and faculty member/advisor existed); Abrams v. Mary Washington Coll., 1994 WL 1031166, at *4 (Va. Cir. Ct. Apr. 27, 1994) (finding no basis in common law for creating a fiduciary relationship between senior college officials and students).

The grounds stated for Plaintiff's fiduciary duty claims are (1) an alleged allusion in a Walden video about some enrollment advisors sharing *their own experiences as former Walden students* to "build . . .  trust" with new students;  (¶ 279); (2) guidelines contained in a non-contractual Walden Handbook reminding faculty of the  its "duty" and "responsibility" to students being of high importance (¶ 282) and (3) the "work as a team" reference in the Handbook (*id.*)    Such bland aspirational language is insufficient to create a legally-enforceable duty of any kind by anyone, Gilmour Academy, much less a special relationship with a school involving the extraordinary duties of a fiduciary.   Moreover, as noted previously, Ohio courts place strict limits on their regulation of the student-university relationship, by only selectively

70

finding contractual duties to students and particularly to graduate students, by deferring to school judgment, and by prohibiting "educational malpractice" claims. Ohio likewise has rejected the theory that universities and schools stand in *loco parentis* with students. Evans v. Ohio State Univ., 112 Ohio App. 3d 724, 737 (1996). Opening the door to fiduciary duty claims, imposing the *highest* duty of *utmost* care to students, would stand settled law on its head.

In addition, because there are many facets of the student-university relationship in which schools have interests potentially adverse to those of students, there is no basis for concluding that a university has a duty to act solely in its students' interest, as a fiduciary must. Pasqualetti v. Kia Motors of America, Inc., 663 F. Supp. 2d 586, 597-98 (N.D. Ohio 2009) (parties having conflicting interests have no fiduciary relationship). Such adverse interests arise, among other places, in assuring that academic work meets school standards, assuring student compliance with ethical and disciplinary guidelines, and enforcing student financial obligations.

Thornhill's alternative theory, that Walden graduates too few students and spends too much on recruiting to be considered a university (¶s 276, 279) is frivolous. At the outset, Thornhill's grievances focus only on dissertation programs, not Walden's extensive undergraduate and masters' programs, about which she knows and alleges nothing. Moreover, her questioning Walden's educational mission is belied by the extensive educational regulation it and other for-profit institutions are subject to. *See* p. 13-14, 20 *supra,* including its approval to operate as a university in Ohio and elsewhere. For-profit schools such as Walden are no less subject to the protections of education institutions than non-profits, including, for example, the educational malpractice doctrine. *See, e.g.,* Blane v. Alabama Commercial Coll., Inc., 585 So. 2d 866 (Ala. 1991); CenCor, Inc. v. Tolman, 868 P.2d 396, 399 (Colo. 1994); Alsides v. Brown Inst., Ltd., 592 N.W. 2d 468, 470, 473 (Minn. Ct. App. 1999); Jamieson v. Vetterott

Educ.Centers, Inc., 259 F.R.D. 520 (D. Kan. 2009). In any case, an alleged business element makes no difference because "[t]he vast majority of business relationships do not give rise to a fiduciary relationship." Pasqualetti, 663 F. Supp. 2d at 598 (emphasis added).

Plaintiff's allegations that Laureate, unlike Walden, does not itself offer classes makes no difference, even assuming arguendo that educational protections did not flow through to it as a sponsor and owner of Walden. (¶ 271). There is are no allegation showing any kind of relationship being established between Plaintiff and Laureate whatsoever, not to mention plausible allegations that Laureate further undertook, and students had some basis to expect, it would serve in the extraordinary role as their fiduciary.

Thornhill's further allegations that there is a financial conflict of interest between students and Walden, because of its desire to act profitably (¶ 275), does not make the defendants fiduciaries, but proves just the opposite. Walden's for-profit status is fully disclosed repeatedly on U. S. Dept. of Education[16] and state education agency[17] websites and is well known, precluding any reasonable belief by students that it acts solely in their interest as a fiduciary. Pasqualetti, 663 F. Supp. 2d at 598.

. In a few rare cases, breach of fiduciary duty claims by a student against a university have survived a motion to dismiss or for summary judgment, based on situations where a dissertation or other faculty advisor allegedly engaged in egregious abuse of a student, such as seeking sexual favors or stealing a student's academic work, after establishing a relationship of trust. No such breach of trust by any faculty member is alleged in this instance; Thornhill merely complains her

---

[16]https://nces.ed.gov/globallocator/index.asp?search=1&State=MN&city=&zipcode=55002&miles=50&itemname=walden&sortby=name&College=1&Status=Search+Finished&Records=70&CS=EC3F85D3.

[17] https://www.ohiohighered.org/board-of-regents/university-system-of-ohio/independent-colleges-and-universities.

dissertation advisors were not as available as she wanted, not that they lied or abused her.   In the case  relied on by Thornhill (¶ 284) -- <u>Johnson v. Walden Univ.</u>, 839 F. Supp. 2d 518 (D. Conn. 2011) -- summary judgment was denied against a student claiming his advisor had defrauded him by misrepresenting that his degree would permit him to be professionally licensed as a sports psychologist.  For purposes of finding that limitations might be tolled on the fraud claim, the court concluded there might have been a fiduciary relationship between an undergraduate and his assigned "faculty mentor" under Connecticut law requiring Walden, within the limitations period, to correct earlier alleged misrepresentations made outside that period.  *Id.* at 529 ("Dr. Anderson, who was Johnson's Faculty Mentor . . . advised Johnson he would be able to become a practicing psychologist . . . ").  As no comparable personal abuse by faculty is alleged, even the outlier cases willing to recognize a possible fiduciary relationship with students are easily distinguishable and inapposite.

**H.     Thornhill's Claims Also Would Fail Substantively Under Minnesota Law.**

Finally, while Ohio law is not consistent with all facets of Minnesota law that would be relevant to fully adjudicating all aspects of Thornhill's and the class members' claims, Minnesota law is consistent with Ohio cases cited above warranting dismissal of her claims on points discussed above.  Accordingly, even if Minnesota law rather than Ohio law were deemed controlling on her claims, contrary to the authorities cited Sections I A-F above, those claims would still fail under Minnesota law for the reasons stated in Section II.  *See, e.g*., <u>Martens</u>, 616 N.W. 2d at 742 (generalized statement of opportunity were general policies and not actionable as fraudulent representation, which must be definite and specific statements of fact); *id.* at 742-44 (obligations of a contract must be stated with certainty and definiteness and generalized statements of policy not actionable); *accord* <u>Fimon v. Knerol Drywall Supplies</u>, C7-02-1588, 2003 WL 1220240 *5  (Minn. Ct. App. Mar. 18, 2003) (specific and distinct); <u>Zinter</u>, 799 N.W.

73

2d at 245-46  (relation of university and student can be partly contractual but authority of school is subject to substantial deference the courts);  Miller v. Citizens Sec. Grp., Inc., 116 F. 3d 343, 348-49 (8th Cir. 1997) (disclaimers of contractual intent preclude reasonable reliance and formation of an enforceable contract);  Glorvigen v. Cirrus Design Corp., 796 N.W. 2d 541,552-54 (Minn. App. 2011), *aff'd, on other grounds* 816 N.W.2d 572 (Minn. 2012) (claims in the nature of educational malpractice about quality of education are broadly foreclosed, whether alleged in terms of contract or tort, including even product liability);  Caldas v. Affordable Granite & Stone, Inc., 820 N.W. 2d 826, 838-39 (2012) (unjust enrichment is not permitted when parties relationship is governed by a contract).

## CONCLUSION

For the reasons stated above, Thornhill has failed to   state claims for which relief may be granted;  and her Amended Complaint must be dismissed in its entirety.  Further, because Thornhill would have no ongoing standing to represent a class, the proper resolution is to close the matter in its entirety, treating class certification and prosecution of class claims as moot.  *See, e.g.,* Pisciotta v. Old Nat'l Bancorp, 499 F.3d 629, 632-33 (7th Cir. 2007); *see also* S & M Homes, LLC v. Chi Title Ins. Co., No. 2:12-cv-03057-JPM-tmp, 2014 U.S. Dist. LEXIS, 158754 at *24 (W.D. Tenn., March 14, 2014). Since the Defendants simultaneously with this motion also have moved the strike the class action allegations, the Court may elect to still reach that motion and strike the class nevertheless.  *Id.*  (finding class certification moot because of rejection of plaintiff's claims but also proceeding to reject certification as inappropriate).

Respectfully submitted,

_s/Sanford E. Watson (Trial Attorney)_
Sanford E. Watson (0040862), Trial Attorney
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113
Telephone:     216-592-5000
Facsimile:     216-592-5009
E-mail:           sanford.watson@tuckerellis.com

Brian Laliberte (0071125)
Scott J. Stitt (0073943)
TUCKER ELLIS LLP
175 South Third Street, Suite 520
Columbus, OH 43215
Telephone:    614-358-9717
Facsimile:    614-358-9712
E-mail:          brian.laliberte@tuckerellis.com
                     scott.stitt@tuckerellis.com


_Of counsel:_

Kathleen Pontone (_pro hac vice_)
Anthony Walter Kraus (_pro hac vice_)
Stephanie Kaye Baron (_pro hac vice_)
MILES & STOCKBRIDGE PC
100 Light Street
Baltimore, MD 21202
Telephone:     410.727.6464
Facsimile:     410.385.3700
E-mail:     kpontone@milesstockbridge.com
                  akraus@milesstockbridge.com
                  sbaron@milesstockbridge.com

_Attorneys for Defendants Walden University,
LLC and Laureate International Universities
d/b/a Laureate Education Inc._