# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| LATONYA THORNHILL, | |
| Plaintiff, | Case No. 2:16-CV-962 |
| v. | JUDGE ALGENON L. MARBLEY |
| WALDEN UNIVERSITY, LLC, *et. al*, | Magistrate Judge Jolson |
| Defendants. | |

## ORDER

This matter is before the Court on the Motions to Dismiss Plaintiff's Amended Complaint (Docs. 11, 24), and the Motions to Strike Class Action Allegations in Plaintiff's First Amended Class Action Complaint for Damages (Docs. 12, 25) of Defendants Walden University, LLC and parent company Laureate International Universities, d/b/a Laurate Education Inc. Also before the Court is Plaintiff Thornhill's request for leave to amend her complaint to incorporate numerous facts she discovered after the filing of her Amended Complaint that she contends support her claims. (Doc. 37 at 65-66.) For the reasons set forth below, the Court **GRANTS** Plaintiff's Request to Amend her Complaint and **DENIES** Defendants' Motion to Dismiss and Motion to Strike.

## I. BACKGROUND

Plaintiff, LaTonya Thornhill, is a former doctoral student at Walden who contends that Walden misrepresented the cost of doctoral studies at Walden and the time frame in which these doctoral studies could be completed, and operates an unfairly drawn-out dissertation process for the purpose of receiving more tuition revenue.

1

### A. Factual Background

#### 1. The Parties

Plaintiff was enrolled at Walden as a doctoral student in the "Doctor of Philosophy in Management" program from 2011 until 2015. (Am. Compl., Doc. 20, at ¶¶ 18, 55.) She seeks to represent a nationwide class of similarly-situated "[c]urrent or former students of Walden University who enrolled in and paid, within the United States, tuition for a doctoral degree program at Walden University from 1999 until the present ("Class") and did not receive full reimbursement for tuition, costs and student loans from Defendants." (*Id.* ¶ 290.)

Defendant Walden is a limited liability company incorporated in Florida, with its academic offices in Minnesota and its principal place of business and admissions office in Maryland. (*Id.* ¶ 19.) Walden offers online Bachelor's, Master's, and Doctoral degrees. (*Id.* ¶ 26.) Plaintiff believes that Walden interacts with students and prospective students, potentially in all fifty states, from its Minnesota headquarters, including teaching classes and marketing through its website. (*Id.* ¶ 41.)

Defendant Laureate is Walden's parent company, incorporated in Delaware with its principal place of business in Maryland. (*Id.* ¶ 26.) Because Laureate's website contains information about the inner workings of Walden's doctoral program for prospective students, Plaintiff believes that Laureate "exerts an undue amount of control over Walden's activities." (*Id.* ¶¶ 43-44.)

#### 2. Statistics

Walden's enrollment has increased from 2,082 students in 2001 to 47,456 students in 2010, to 52,600 students in 2016. (*Id.* ¶¶ 28, 29.) Its revenues have enjoyed a similar upward trajectory, from approximately $190 million in 2006 to likely over $400 million in 2016. (*Id.* ¶ 30.) Most of its revenue (78.8% in 2010) comes from federally funded student loans. (*Id.* ¶ 31.)

Walden allocates a considerable amount of its budget to marketing, recruiting, and profit, as opposed to student instruction. In 2009, it allocated approximately 26.8% of its revenue on marketing and recruitment of new students, and 26.8% on profit. (*Id.* ¶ 32.) In the same year, it spent $1,574 per student on instruction, $2,230 per student on marketing, and realized $1,915 per student on profit. (*Id.* ¶ 34.) This allocation essentially hamstrings Walden's dissertation process, which Walden allows to be underfunded and under-resourced. (*Id.* ¶ 35.)

An under-funded and under-resourced dissertation process is also a long dissertation process, which causes Walden's students to rack up student loan debt. Walden students carry some of the highest student loan debt in the country. (*Id.* ¶¶ 36-39.) And its graduation rate is exceedingly low: less than ten percent of Walden doctoral students receive their degrees each year. (*Id.* ¶ 40.) Walden does not disclose its graduation rate to incoming students. (*Id.* ¶ 259.)

### 3. Recruitment

Walden's recruiting and marketing materials promise that prospective students can obtain a Walden doctoral degree inexpensively and quickly. (*Id.* ¶ 45.) For example, its website advertises the number of hours required to complete coursework for various of its programs and describe the dissertation process as a simple matter of taking a set number of credits. (*Id.* ¶ 46.) This set number of credits equated approximately 18 months or after four or five terms. (*Id.* ¶¶ 156-57.)

Once a prospective student expresses interest in Walden, she is assigned a Walden recruiter, who follows up with the prospective student with a script designed to "'overcome[e] objections' that students might raise on subjects such as 'cost, time to completion, time commitment, third party concerns, credibility, school support services, lack of face-to-face instruction, and other school shopping.'" (*Id.* ¶ 50.) Part of this script involved telling

prospective students a "time to completion" that is both unrealistic and not even in line with the "actual design time of its doctoral programs." (*Id.* ¶ 51.) Indeed, recruiters "were instructed to inform prospective students that Walden's 'time to completion is realistic' and 'since a lot of our programs are self paced, they can speed it up.'" (*Id.* ¶ 143.) Thornhill's recruiter, who she believes is Wajoili Ward-Jiggets, told Thornhill about one month prior to her enrollment, that it would only take 18 months (4-5 dissertation classes) to complete her dissertation. Thornhill believes that recruiters made these types of comments to many potential students, both on the phone and at public events such as a Back to School rally in Barstow, California, and that recruiters would commonly promise short time frames to graduation—for example, three years. (*Id.* ¶¶ 144-45.) These promises were both verbal and in writing. (*Id.* ¶ 147.) It is notable that prior to July 2011, these recruiters were paid "based on the number of students enrolled." (*Id.* ¶ 52.)

Walden did not begin making information on its graduation rates public until 2012. (*Id.* ¶ 54.) In 2012, Walden represented on one of its webpages that it had an "on-time completion rate" of 68.5%. (*Id.* ¶ 55.) In other words, per the website, 68.5% represents "the percentage of students graduating between July 1, 2009 and June 30, 2010, who completed the program in the normal completion time." (*Id.* ¶ 56.) The website did not define "normal completion time," and, though it also stated that "program times may vary," it represented that the variance could be due to "the pace at which a student chooses to complete the program," and represented that a student could "complete this program in a time frame that works best for him or her." (*Id.* ¶ 59.) These representations led students to believe, falsely, that completion rates were high and that students would have control over the length of time the program would take them to complete. (*Id.* ¶¶ 57,

59.) Walden made these false statements on many, if not all, of its doctoral program webpages. (*Id.* ¶ 61.)

In 2013, Walden's webpage for Plaintiff's doctoral program represented that its "on-time completion rate" for July 1, 2011 through June 30, 2012 was 49.3%. (*Id.* ¶¶ 62-65.) It contained similar representations regarding a student's control over his or her program. (*Id.* ¶ 66.)

In 2014, this data for Plaintiff's program moved to Laureate's website, and was reachable through a hyperlink from Walden's website. (*Id.* ¶ 67.) *This* webpage disclosed for the first time that the program was designed to take 66 months rather than the three years that Plaintiff claims had been represented previously. (*Id.* ¶ 68.) The webpage also represented that tuition and fees for the "entire program" would be $66,260, assuming normal time to completion, and that 33% of the students that completed the program in 2012-2013 completed it in 66 months. (*Id.* ¶ 69.) Calculating estimated tuition and fees from a separate webpage on "tuition and fees" using the 66-month metric, however, yields an estimated program cost of $113,650. (*Id.* ¶ 72.)

Plaintiff alleges similar misrepresentations in Walden's webpages for its Doctor of Business Administration program (*id.* ¶¶ 74-91), Psychology program (*id.* ¶¶ 92-113), Doctor of Education program, (*id.* ¶¶ 114-134), and all of its other doctoral programs. (*id.* ¶¶ 135-140.) For each of these programs, Plaintiff claims that "[d]espite blanket statements of estimates based on 'minimum time to completion' and 'normal completion time' across Walden's doctoral programs, the clear majority were 'designed' to take longer." (*Id.* ¶ 135.) And the "promises of tuition costs and times to graduate by Walden and its recruiters were well below the 'design' of each program." (*Id.* at 41, ¶ 142.) When a disgruntled student expressed to a chair that a teacher claimed an average dissertation time of five quarters, that chair responded, "I am sorry that

others' comments have misled you. Those timeliness [sic] have not been my experience at all." (*Id.* ¶ 133.)

### 4. The Dissertation Process

Each doctoral candidate at Walden must complete a dissertation. (*Id.* ¶ 154.) Regarding the dissertation process timeline, Walden's Student handbook represents that "Doctoral students who want to graduate in a specific quarter must plan their program carefully as follows or their graduation date will be delayed: Begin planning for program completion at least 13 months in advance of the anticipated graduation date[.]" (*Id.* ¶ 155.)

Once students complete four or five dissertation classes (or eighteen months), Walden encourages them with messages like "Hello future doctor, You are receiving this message as you have completed 5 sessions of 9000. I wanted to alert you to some resources that might be helpful as you complete your DBA program this year. I really like the sound of Dr. and I am confident this can be an accomplishment that you can complete this year!!!" (*Id.* ¶ 157.) Students relied on representations like these to stay in the program longer than Walden told them it would last. (*Id.*)

When a student begins the dissertation process, she pays full tuition but enrolls in one dissertation course per term. (*Id.* ¶ 164.) The Walden dissertation process involves five stages of independent research and study on the part of the doctoral candidates: "Premise (or preliminary Prospectus), Prospectus, Proposal, conducting the study and/or research that is the subject of the dissertation, and defending the completed dissertation." (*Id.* ¶¶ 158, 161.) It also requires students to consult with and receive the approval of "faculty and institutional entities at Walden." (*Id.* ¶ 159.) Because Walden is an online school, students have to consult with advisors through an online system called Blackboard. (*Id.* ¶ 160.)

Once a student completes the first stage, the Premise (identifying a preliminary dissertation topic), she nominates the dissertation supervisory committee, which is comprised of two members. (*Id.* ¶¶ 166-67.) For each stage, including the Premise, students need approval from each member of this committee—first from the person designated dissertation supervisory committee chair ("chair"), and second from the person designated supervisory committee member ("member"). (*Id.* ¶¶ 162, 167-68.)

Per the Walden Student Handbook, the supervisory committee provides, among other things, "service to their students[.]" (*Id.* ¶ 168.) It works with dissertation students "as a team, directly guiding students through the proposal, research and analysis, and ultimately the final oral presentation." (*Id.*)

At the third step, the Proposal, students must receive the approval of both supervisory committee members, but also an entity called the Institutional Review Board ("IRB"). (*Id.* ¶ 171.) If the Institutional Review Board has any form of edit to the Proposal, students must begin the approval process anew with the chair, then the member, then the IRB. (*Id.*)

When students complete the fourth step, they must again receive approval of the chair and the member, as well as an entity called the University Research Review ("URR"). (*Id.* ¶ 173.) As with the third step, students must re-start the approval process with the chair if the URR has comments. (*Id.*)

The dissertation process involves layers of review and bureaucracy, which drastically prolong the process. Moreover, an oft-broken Student Handbook policy promising a 14-day committee response time to all student communications, exacerbates these issues. (*Id.* ¶¶ 191-196, 262.) Walden's Student Handbook also promises that students "receive quality feedback on course submissions within a reasonable time frame" (*id.* ¶ 261) and that "Faculty members are

expected to be available to students outside the course discussion areas and in addition to providing substantive feedback on assignments and discussion posts." (*Id.* ¶ 264.) Coupled with Walden's allocation of funds to marketing and profit rather than students, the dissertation process is left woefully undermanaged and inefficient. (*Id.* ¶ 177.) Moreover, turnover in faculty, flaky faculty, and outdated faculty lists make finding and keeping committee members difficult for students. (*Id.* ¶¶ 178-82.) The burden to replace committee members ends up falling on the students, despite language in the Student Handbook that "the student's associate dean/executive director, or designee, ensures that faculty services are restored to all affected students." (*Id.* ¶ 183.)

In short, Walden's lack of infrastructure in place to manage and supervise the dissertation process creates lengthy delays for paying students. (*Id.* ¶¶ 184-190.) Plaintiff, and other putative classmembers, would not have chosen to attend Walden absent these misrepresentations. (*Id.* ¶ 205.)

### 5. Thornhill's Experience

Thornhill enrolled at Walden in 2011 after viewing and relying upon representations on its websites that the program she chose, Doctor of Philosophy in Management, would take 30 credit hours, or five, six-credit-hour classes. (*Id.* ¶¶ 206-208.) When she contacted Walden, Walden assigned her a recruiter, Wajoili Ward-Jiggets. (*Id.* ¶ 209.) During a phone call about one month prior to her enrolling at Walden, Ward-Jiggets told Plaintiff that it would take only 18 months to complete her dissertation and 3.5 years to complete the entire program. (*Id.* ¶ 213.) Plaintiff relied on these statements when enrolling, and when re-enrolling during each term of her enrollment. (*Id.* ¶ 214.) Plaintiff completed a number of required doctoral-level courses, and received As and Bs. (*Id.* ¶¶ 215-16.) She also completed three residency courses. (*Id.* ¶ 220.)

After completing this coursework, Plaintiff enrolled in dissertation courses for far longer than the promised 18 months. (*Id.* ¶ 218.) She began her dissertation coursework in September 2013, but, to get a head start, started working on her preliminary Prospectus in March 2013. (*Id.* ¶¶ 217, 223.) She submitted her preliminary Prospectus topic to her committee chair, Dr. David K. Banner, who approved it on September 15, 2013. (*Id.* ¶ 223.)

In February 2014, Plaintiff obtained the agreement of Dr. Steve Tippins to serve as the committee member. (*Id.* ¶ 224.) Her preliminary Prospectus was approved on June 4, 2014. (*Id.* ¶ 226.) Plaintiff was slowed in her process, however, by the input of a teacher at a residency she attended in Maryland in December 2013. (*Id.* ¶ 243.) She submitted a new proposal based on this teacher's suggestions, but her chair told her to remain with her initial topic idea. (*Id.*) Plaintiff still had to pay full tuition throughout this delay. (*Id.*) Plaintiff also experienced problems with her advisors complying with the 14-day response time policy. (*See id.* ¶ 245.)

A new problem arose for Plaintiff when she began working on her Proposal, using the Blackboard system to communicate directly with her supervisory committee. (*Id.* ¶ 227.) Plaintiff also used another Walden resource, the Writing Center, to help her comply with APA writing guidelines. (*Id.* ¶ 228.) The Writing Center was one reason Plaintiff continued to re-enroll at Walden, and its availability was promised on Walden's webpage. (*Id.* ¶¶ 229-30.)

In October 2014, doctoral students were informed that they could no longer use the Blackboard system. (*Id.* ¶ 236.) Instead, they had to use a system called MyDR, which they could not access until they had completed their Proposals. (*Id.*) Therefore, Plaintiff had to write her entire proposal without the help of her supervisory committee. (*Id.* ¶¶ 237-38.) She was rebuffed when she attempted to consult with her chair before completing her Prospectus. (*Id.* ¶¶ 239-241.) In January 2015, Walden forbade its doctoral students from using the Writing Center

9

for their dissertations. (*Id.* ¶ 235.) Walden took these and other actions to prolong the dissertation process to collect more tuition revenue. (*Id.* ¶ 245.)

Due to Defendants' misrepresentations and prolonging of the dissertation process, Plaintiff's experience at Walden took much longer, and cost way more, than advertised. She had to take a leave of absence after the fall 2015 quarter, knowing by that time "that to complete the educational process, at a minimum, would require more time and more tuition payments beyond what she had reasonably anticipated she would have had Walden not engaged in its illegal conduct." (*Id.* ¶¶ 246, 249.)

Plaintiff would not have enrolled at Walden if she had known about Walden's "abysmally low completion rate." (*Id.* ¶ 247.) She also would not have enrolled had Walden been honest with her about the cost and/or timeline of a Walden doctorate degree, or the dysfunction in its dissertation process. (*Id.*) Had she not enrolled, she would not have incurred the cost of tuition, residency fees, supply costs, student loans, or other costs associated with her failed degree at Walden.

### B. Procedural Background

Plaintiff filed her complaint on October 5, 2016, (Doc. 1), which Defendants moved to dismiss on December 16, 2016. (Doc. 11.) On the same day, Defendants also moved to strike the class allegations contained in Plaintiff's complaint. (Doc. 12.) After receiving leave from the Court to do so, Plaintiff amended her complaint on January 12, 2017. (Doc. 20.) Because Plaintiff amended her complaint, Defendants' December 16, 2016 motions relating to Plaintiff's original complaint (Docs. 11, 12) are **MOOT**.

Plaintiff's amended complaint alleges causes of action on behalf of her personally and a nationwide class under Minnesota law, or, in the alternative, under Ohio law on behalf of her personally and an Ohio sub-class:

Minnesota law claims, for a nationwide class:

- Count I: Fraud in the inducement, against both defendants (Doc. 20 at ¶¶ 306-22);

- Count II: Unjust enrichment, against Walden (*id.* at ¶¶ 323-30);

- Count II: breach of contract, against Walden (*id.* at ¶¶ 331-41);

- Count IV: violation of Minnesota Uniform Deceptive Trade Practices Act, against both defendants (*id.* at ¶¶ 342-53);

- Count V: breach of implied covenant of good faith and fair dealing, against Walden (*id.* at ¶¶ 354-60);

- Count VI: breach of fiduciary duty, against Walden (*id.* at ¶¶ 361-76)

Alternative counts under Ohio law for an Ohio sub-class:

- Count VII: fraud in the inducement, against both defendants (id. at ¶¶ 377-93);

- Count VIII: unjust enrichment, against both defendants (*id.* at ¶¶ 394-401);

- Count IX: breach of contract, against Walden (*id.* at ¶¶ 402-12);

- Count X: breach of implied covenant of good faith and fair dealing, against Walden (*id.* at ¶¶ 413-19);

- Count XI: violation of Ohio Consumer Protection Act, against both defendants (*id.*¶¶ 420-30).

- Count XII: breach of fiduciary duty, against Walden (*id.* at ¶¶ 431-47).

On February 9, 2017, Defendants moved to dismiss Plaintiff's amended complaint and to strike its class allegations. (Docs. 24, 25.) Because Plaintiff sought transfer of her case to a related MDL pending in the United States District Court for the District of Minnesota (*See In re: Walden University, LLC, Doctoral Program Litigation*, MDL No. 2765), the Court stayed discovery and briefing on Defendants' Motions. (Docs. 28, 30.) Due to the few cases involved and their overlapping counsel, the MDL Panel denied Plaintiff's motion to transfer. (Doc. 31.) Following this decision, the Court lifted the stay on the Motions, but did not lift the stay on discovery. (Doc. 36.)

## II. STANDARD OF REVIEW AND ANALYSIS

Plaintiff alleges the following claims under Minnesota law, on behalf of herself and a nationwide class of current and former students who enrolled in and paid for Walden's doctoral programs: fraud in the inducement (both defendants); Violation of Minnesota Uniform Deceptive Trade Practices Act (both defendants); Unjust enrichment (Walden); breach of contract (Walden); breach of implied covenant of good faith and fair dealing (Walden); and breach of fiduciary duty (Walden). Defendants argue that Ohio choice of law provisions make these claims unviable. In the event the Court finds that Ohio law, rather than Minnesota law, prevails, Plaintiff brings alternative claims under Ohio law.

Plaintiff's 117-page Complaint contains two allegations linking Minnesota to her claims. First, Plaintiff alleges that Walden has its "headquarters" in Minnesota (but its principal place of business in Maryland and its place of incorporation in Florida) (Doc. 20 at ¶ 19). Second, Plaintiff alleges the following:

> Upon information and belief, from its Minnesota headquarters, Walden interacts with its enrolled students, including its doctoral students (e.g., through attended classes, etc.). Upon information and belief, from this location, it also interacts with prospective students (e.g., through marketing rom its website.) In essence, Walden's Minnesota headquarters is a body that stretches into all 50 states. At any time, specific interactions from Walden with its students (e.g., such as teaching a class) or prospective students (e.g., falsely claiming on its website a shorter time to complete the dissertation process than the actual design time of those programs) will reach into multiple states at the same time. In other words, the same action from Minnesota headquarters might give rise to harms in all 50 states. Thus, Walden's Minnesota headquarters has a significant relationship with all of its students and the harms it causes to them.

(*Id.* ¶ 41.) Plaintiff bases her brief in opposition to Defendants' Motion to Dismiss her Minnesota claims, however, on evidence she discovered after filing her Amended Complaint. For example, Plaintiff argues: "[w]hile the Amended Complaint alleges upon information and belief that the principal place of business is in Maryland, according to the Minnesota Attorney

General's office, it is in fact Minnesota." (Doc. 37 8 n.20.) She also argues that Defendants' participation in a regime called SARA has the effect of funneling nationwide complaints about Walden to Minnesota. (*Id.* at 9.)

Plaintiff acknowledges that she relies on materials outside the complaint to oppose Defendants' motion to dismiss:

> In support of its position on the conflict of laws analysis, Plaintiff relies upon materials outside of the Amended Complaint (indeed, received *after* the Amended Complaint was filed). However, as a conflict of laws analysis is typically undertaken after discovery, it is acceptable for Plaintiff to rely on such materials. If, however, the Court believes such materials would result in defeating Defendants' motion but would require such materials to be incorporated into the complaint, leave to amend should be allowed.

(*Id.* at 9 n.21.)

A motion to dismiss "is a test of the plaintiff's cause of action as stated in the complaint[.]" *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005). As noted above, however, Plaintiff's complaint contains almost nothing to tie her claims, or those of a potential nationwide class, to Minnesota. Yet Plaintiff argues additional ties in her opposition brief. To the extent this evidence should be incorporated in the complaint, Plaintiff seeks leave to do so. (Doc. 37 at 66.)

Rule 15(a) permits a party to amend a pleading with the Court's leave, which should be "freely given[] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). The purpose of Rule 15 is "to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." *Roger v. Lehman Bros. Kuhn Loeb, Inc.*, 621 F. Supp. 114, 119 (S.D. Ohio 1985) (citing *McHenry v. Ford Motor Co.*, 269 F.2d 18 (6th Cir. 1959)); *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir. 1986). Whether to grant leave to amend is committed to the discretion of the District Court. *Zenith Radio Corp. v. Hazeltine Research Inc.,* 401 U.S. 321, 330 (1971). Abuse of discretion occurs when a District Court fails to state the basis for its

denial or fails to consider the competing interests of the parties and likelihood of prejudice to the opponent. *Moore*, 790 F.2d at 559.

Under Sixth Circuit precedent, "[i]n deciding whether to grant a motion to amend, courts should consider undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005). Delay alone is not a ground for denying leave. *Dana Corp. v. Blue Cross & Blue Shield Mutual*, 900 F.2d 882, 883 (6th Cir. 1990). Rather, there must be "significant prejudice." *Brown v. Worthington Steel, Inc.*, 211 F.R.D. 320, 323 (S.D. Ohio 2002) (citing *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999)); *Moore*, 790 F.2d at 562.

Although Defendants did not respond to Plaintiff's request for leave to amend, they will not be prejudiced by Plaintiff filing an amended complaint. Moreover, Defendants have notice of the facts Plaintiff wishes to allege in her amended complaint; they responded to these facts in their reply brief. This case is in the pleadings stage, and discovery has been stayed, so an amendment will not require Defendants "to expend significant additional resources to conduct discovery and prepare for trial." *Brown*, 211 F.R.D at 323. There is no indication that Plaintiff has sought to amend in bad faith or that she has repeatedly failed to cure deficiencies by previous amendments. Because allegations connecting the dispute to Minnesota are central to Plaintiff's claims (she pleads Ohio-based claims only to the extent the dispute does not belong under Minnesota law), having these allegations properly before the Court is critical to the Court deciding her claims on their merits. *Roger*, 621 F. Supp. at 119.

Therefore, to aid in its analysis on the merits of Defendants' motion to dismiss, the Court **GRANTS** Plaintiff's request for leave to amend her complaint to include allegations discovered after the filing of her amended complaint. In light of the Court's ruling, the Court **DENIES** Defendants' Motion to Dismiss and Defendants' Motion to Strike Plaintiff's Class Action Allegations without prejudice to re-filing them should Plaintiff's amended complaint so warrant. (Docs. 24 and 25.) Plaintiff shall have until **Friday, October 13, 2017** to file an amended complaint. Defendants shall have until **Friday, October 27** to re-file its motions to dismiss.

**IT IS SO ORDERED.**

                                                 **/s/ Algenon L. Marbley**
                                                 **ALGENON L. MARBLEY**
                                                 **UNITED STATES DISTRICT JUDGE**

**DATED: September 29, 2017**