**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| LATONYA THORNHILL,        ) | |
|        ) | |
|     *Plaintiff*,        ) | |
|        ) | Case No.: 2:16-cv-00962-ALM-KAJ |
| v.        ) | |
|        ) | Judge: Algenon L. Marbley |
| WALDEN UNIVERSITY, LLC and        ) | |
| LAUREATE INTERNATIONAL UNIVERSITIES ) | |
| D/B/A LAUREATE EDUCATON INC.        ) | |
|        ) | ***JURY TRIAL DEMANDED*** |
|     *Defendant*.        ) | |
| _____) | |

**PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**

Plaintiff LaTonya Thornhill ("Plaintiff"), by and through her undersigned counsel, brings this Second Amended Class Action Complaint ("Complaint") on behalf of herself and all others similarly situated against Defendant Walden University, LLC ("Walden") and Laureate International Universities d/b/a Laureate Education Inc. ("Laureate").

1.      This action seeks redress for Plaintiff and thousands of similarly situated doctoral students who were harmed by 1) Walden's false representations and omissions, and 2) its dissertation process ("the Walden Dissertation Process")—a process intended to ensure that it would be difficult, if not impossible, for students to timely complete, or complete at all, their doctoral programs. In turn, Defendants' false representations and omissions and Walden's unfairly drawn-out dissertation process ensured that Walden and Laureate continued to receive tuition and fee payments from doctoral students for an extended period well beyond the completion dates represented to Plaintiff and other similarly situated doctoral students.

2.      The bait was displayed when Walden's marketing materials (including its website),

recruiters and admissions' officers misled its prospective and new students by promising that

their mostly student-loan financed doctoral degrees would cost less and take a shorter time to

complete than its doctoral programs were designed to take. For example, students seeking a

PhD in Psychology were told it would take "three to four years" with an overall cost of $55,000 -

$65,000 to complete the general psychology program. Ex. 1, T. Westenskow and K. Callahan

Email Exchange (Aug. 18-20, 2008). However, later-released Walden/Laureate documents

confirm the same psychology program was "designed" to take six years. Ex. 2, PhD Psych.

Program Data, Laureate (March 6, 2015). Further, students seeking a Doctors of Business

Administration ("DBA") were told it would take as little as 96 total weeks to obtain their

degree. Ex. 3, Walden DBA Program Flowchart. Walden/Laureate, however, later admitted the

DBA program was "designed" to take much longer: 50 months. Ex. 4, DBA Program Data

(Apr. 14, 2016 data). Other programs such as the Doctor of Education (EdD) and Plaintiff's

program, the Doctor of Philosophy in Management ("PhD in Management"), were commonly

promised three years to completion, though the courses again were "designed" to, and did, take

longer (52 months for the EdD program, though only 23% of students that graduated did so in

that time frame, and 66 months for the PhD in Management program, though only 33% who

graduated did so in that time frame). Ex. 5, EdD Program Data, Laureate (April 15, 2016 data);

Ex. 6, Management PhD Program Data, Laureate (March 10, 2015).

3.      Walden's marketing materials, recruiters, student handbooks and employees also

reassured prospective students that after their doctoral course work[1] was completed, the

dissertation process (the final hurdle to achieving a doctoral degree) would take a short time

---

[1] Doctoral course work *does not* include the KAMs process, which is designed as a mini-dissertation process and thus suffers the same problems as the dissertation process.

period as well, *e.g.,* as little as 13 or 18 months, or would only require four or five dissertation level courses. See, e.g., Ex. 3; Ex. 7, F. Turner Group Email (July 5, 2010)("You will be in DBA 9000 a total of 5 sessions (40 weeks) in order to complete all the required things outlined in the process checklist that I have highlighted below."); Ex. 8, DBA Residency Presentation at slides 7, 8 and 10 (Nov. 8, 2011).

4.      The bait was taken once the doctoral students were committed, having paid significant money for the necessary pre-dissertation classes and course work. This is when the problems began. Instead of the promised short (e.g., 13 or 18-month dissertation period or four/five dissertation level classes), the Walden Dissertation Process created an endless routine of hurdles, tuition payments and student loans. Students who believed they were getting ever closer to obtaining their doctoral degree were in fact stuck with decreasing resources, high faculty turnover, disorganization, a lack of oversight, poorly trained instructors, and little to no constructive feedback (or if feedback was given, inconsistent feedback), all of which increased the length of the doctoral students' enrollments at Walden. Frustrated, doctoral students now realized that contrary to Walden's promises, they did not have control over the time it would take to complete their dissertation; they were at the mercy of the Walden Dissertation Process.

5.      While students reasonably believed they were taking the necessary steps to obtain their doctoral degrees, quarters stretched into years of continuing tuition payments. Walden's promises of an affordable education became $50,000-$400,000 of crushing debt, while the dissertation process dragged on for years.

6.      Finally, most students' debt would grow so large, they would have no choice but to un-enroll so they could stop accumulating more debt and dedicate themselves full time to paying back their enormous student loans, without degrees to show for their work.

7.      Though Walden and Laureate were aware that their programs were designed to last longer than what was promised, this information was withheld from Plaintiff and other Walden doctoral students prior to their enrollment and while they were enrolled.

8.      The Walden Dissertation Process ensnared thousands of students in addition to Plaintiff. For 2014-2015, Walden allegedly awarded 462 doctoral degrees in the winter of 2014, 545 doctoral degrees in the summer of 2014, 558 doctoral degrees in the winter of 2015 and 457 doctoral degrees in the summer of 2015.[2] Upon information and belief, over 12,500 doctoral students are enrolled in Walden at any given time; however, less than 10% of that doctoral population would (or will) graduate in any given year.[3]

9.      Universities exist to educate and grant degrees. With a, upon information and belief, less than 10% completion rate for the doctoral population, Walden does not act like a university (for-profit or otherwise). Rather, Walden acts like a for-profit corporation.

10.     As a for-profit corporation, Walden, and its parent Laureate, created this process to receive ever-increasing amounts of money in the form of tuition payments and fees. The longer a student pursued a degree, the more tuition payments and fees that student would pay. Further,

---

[2] This data was collected from Walden commencement programs available online at: http://www.mywaldenalumni.com/s/1277/images/editor_documents/2014_events/laur337__nr-commencement_program_book_winter_2014_final__2_.pdf, http://www.mywaldenalumni.com/s/1277/images/editor_documents/2014/laur6485__nr-commencement_program_book_summer_2014_web.pdf, http://www.mywaldenalumni.com/s/1277/images/editor_documents/commencement_s12/2015/commencement_program_winter_2015_final.pdf and http://www.mywaldenalumni.com/s/1277/images/editor_documents/s15_commencement_program.pdf.

[3] The 10% was conservatively calculated from the following information. In 2013, Walden allegedly had 51,016 students. Data available from: https://nces.ed.gov/fastfacts/display.asp?id=74. In 2016, Walden allegedly had 52,600 students. Data from https://www.waldenu.edu/about/who-we-are/students. Given Walden had 51,016 and 52,600 students for the years flanking 2014 and 2015, it is safe to conservatively estimate Walden had over 50,000 total students in 2014 and 2015. As described in Paragraph 35 below, about 25% of the student population is believed to be doctoral students. Therefore, it's a safe assumption that at least 12,500 students were enrolled in doctoral programs at Walden during 2014 and during 2015. In 2014, 1007 doctoral students graduated. In 2015, 1015 doctoral students graduated. Therefore, for both years only 8.1% of the total population of doctoral students in 2014 and 2015 (respectively) received doctoral degrees.

having already paid tens of thousands of dollars to get "half way" through their program (*i.e.,* completing the classroom work prior to starting the dissertation process), most students would understandably be compelled to continue enrolling for additional semesters (and taking out additional loans in the process) to pursue their degree despite Walden's hurdles, feeling they would successfully complete the Walden Dissertation Process if they just keep working.

11.     It was nearly a perfect plan. Given that the Walden doctoral program was mostly online, students were isolated from their peers, unable to see whether others faced the same challenges. Instead, the students would assume it was just them, and continue a fight they could not win.

12.     The Walden Dissertation Process was intended to (and did) generate substantial additional revenue for Walden and Laureate by way of additional tuition and fees. The practice resulted in Plaintiff and the members of the Class and Subclass (defined below) 1) paying substantially more[4] for Walden's doctoral educational services than promised (or reasonably anticipated by the students), 2) borrowing more student loans (based on Walden's estimates) than they would have but for Walden's unlawful activities, 3) failing to graduate when they were told they would (if at all), 4) having poor credit status and inability to obtain other loans (e.g., home mortgage, additional student loans, etc.) due to amount of indebtedness incurred attending Walden, 5) suffering great frustration, sadness, anxiety, depression, distress, loss of time, and damage to personal and professional reputation and 6) inability to transfer credits from Walden to other schools (resulting in lost time spent at Walden).

13.     The Walden Dissertation Process caused substantial damage to Plaintiff and the members of the Class and Subclass. If Walden had not misrepresented or withheld the number of students that completed its doctoral programs (upon information and belief, less than 10% of the doctoral

---

[4] Indeed, had Walden not made false representations, students would not have attended Walden, and thus the damages incurred include all amounts paid/loans incurred to attend Walden.

student population in any given year), *no one* would have attended Walden, made tuition and fee payments or borrowed any amount including but not limited to student loans for tuition and fees, room and board charges, costs of books and supplies and other expenses.

14.     Further, had Walden not misrepresented the timelines, costs and realities of its doctoral program and dissertation process, Plaintiff and the members of the Class and Subclasses would not have paid for the doctoral educational services offered by Walden or borrowed any amount in student loans.

15.     Instead, they relied upon Walden's misrepresentations and omissions, and are now saddled with crippling debt, and most times, no doctoral degree.

16.     Recently, Walden's doctoral programs came under government scrutiny. In October 2016, the Minnesota Office of Higher Education ("MOHE") launched a review of Walden's doctoral programs.[5] As Sandy Connolly of MOHE told NBC News, "We have seen an increased number of complaints related to dissertations at Walden University." Ex. 9, Walden NBC News Article (Oct. 6, 2016). Elizabeth Talbot, manager of Institutional Legislation and Licensing at MOHE told NBC News that the agency was conducting "a qualitative and a quantitative analysis" of student complaints and comparing it to Walden's marketing materials. *Id.* "Is it a policy issue, a culture issue or is it something more nefarious? And we don't know until we complete the program review." *Id.*

---

[5] Laureate admitted to the existence of the MOHE investigation into its doctoral programs in an SEC filing:

> On September 8, 2016, as part of a program review that MOHE is conducting of Walden University's doctoral programs, MOHE sent to Walden University an information request regarding its doctoral programs and complaints filed by doctoral students. We have been informed by MOHE that in an effort to better understand the context, background and issues related to doctoral student complaints in Minnesota, MOHE is initiating a full review of doctoral programs for institutions.

Ex. 50 at 68-69, Excerpts Laureate Form S-1, Dec. 15, 2016.

17.     Plaintiff is now hopeful that she can get justice for her and the Class's claims in court, while Minnesota conducts its investigation to hopefully put an end to the Walden Dissertation Process.

## THE PARTIES

18.     Plaintiff Thornhill is, and has been at all relevant times, a resident and citizen of the State of Ohio, who attended Walden as a doctoral student from 2011 to 2015.

19.     Defendant Walden is a limited liability company organized under the laws of the State of Florida with its headquarters in Minnesota and its principal place of business in Minneapolis, Minnesota.[6] Upon information and belief, Walden is a wholly-owned subsidiary of Laureate Education, Inc.

20.     Upon information and belief, Defendant Laureate is a corporation organized under the laws of the State of Delaware with its principal place of business in Baltimore, Maryland. Laureate is a parent of Walden.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which certain members of the Class and Defendant are citizens of different states.

22.     This Court has personal jurisdiction over Walden because it conducts significant business in Ohio, including interacting directly with Plaintiff Thornhill for years in Ohio, as well as other members of the Class that reside in Ohio.

---

[6] The Minnesota Attorney General's office contends Walden's principal place of business is in Minnesota. Ex. 51 ("…Minnesota (the state where Walden is principally located)…").

23.    This Court has personal jurisdiction over Laureate because it conducts significant business in Ohio, including receiving profits from tuition paid by Plaintiff and other members of the Class that reside in Ohio.

24.    Venue is proper in the United States District Court for the Southern District of Ohio, pursuant to 28 U.S.C. § 1391, because Walden engaged and engages in substantial business throughout this district, and many of the acts complained of herein took place within this district.

## WALDEN, ITS GROWTH AND ITS FUNDING

25.    Walden is a for-profit, online university.

26.    Founded in 1970, Walden originated as an institution that allowed working adults to obtain graduate level degrees in school administration. Walden currently offers bachelor's, master's, and doctoral degrees to online students.

27.    Walden offers a number of online, doctorate level degrees: Doctor of Business Administration (DBA), PhD in Management, PhD in Counselor Education and Supervision, PhD in Criminal Justice, Doctor of Education (EdD), PhD in Education, Doctor of Nursing Practice (DNP), PhD in Nursing, Doctor of Public Health (DrPH), PhD in Public Health, Doctor of Healthcare Administration (DHA), PhD in Health Education and Promotion, PhD in Health Services, Doctor of Information Technology, PhD in Public Policy and Administration, PhD in Psychology, PhD in Industrial and Organizational Psychology, PhD in Human and Social Services, Doctor of Social Work and PhD in Social Work.

28.     Given the number of degrees offered, and (as described below) the large sums spent on marketing, enrollment at Walden has increased significantly over the last 15 years. In 2001, Walden had an enrollment of 2,082 students. Through the next nine years, enrollment increased over 2000%.



Ex. 10, 2012 Senate For Profit Report, section on Walden at p. 707.

29.     In 2016, Walden's enrollment grew to allegedly 52,600 students.[7]

30.     Not surprisingly, the increased enrollment has led to a similar trajectory for Walden's revenue. In 2006, Walden had revenue of approximately $190,700,000. In 2009, Walden's revenue had nearly doubled to approximately $377,000,000. With allegedly 52,600 current students, Walden's 2016 revenue likely will exceed $400,000,000.

31.     Most of Walden's revenue is derived from federally funded student loans. In 2010, 78.8% ($348,000,000) of Walden's revenue was derived from federal funds.[8]

32.     As a for-profit college, Walden devotes substantial portions of revenue to both marketing and profit. As of 2009, Walden spent approximately 26.8% of its revenue ($101,000,000) on

---

[7] Data from https://www.waldenu.edu/about/who-we-are/students.
[8] Student loans are paid directly to Walden by loan providers. Ex. 52, Walden Disbursement Process webpage.

marketing and recruitment of new students. Likewise, in 2009, Walden allocated approximately 26.8% of its revenue ($101,000,000) to profit. The amount that Walden spends on marketing and recruitment, as well as amounts allocated to profit, is higher than average for other for-profit colleges.

33.    In just three years between 2006 and 2009, the profit generated by Walden increased from $33,000,000 to $101,000,000.

34.    In 2009, Walden spent only $1,574 per student on instruction compared to $2,230 per student on marketing. Even more striking, Walden realized $1,915 in profits per student. By way of comparison, the University of Minnesota spent $13,247 per student on instruction during the same period.

35.    Walden's maximization of its profits and marketing at the expense of student instruction is one of the factors that allows the Walden Dissertation Process to occur. In other words, by choosing to use more of its doctoral students' tuition to create the infrastructure necessary to support a proper dissertation process (and instead channeling that tuition to profits and to bringing in more doctoral students), Walden has created a dissertation process that lacks oversight and the resources necessary to allow timely completion.

36.    Walden students carry some of the highest student loan debts in the country. A 2015 Brookings Institution study found that by 2014, students had accumulated $6.1 billion in debt while at Walden. This was the fifth largest amount of debt out of the more than 3,000 schools in the report.

37.    Further, a 2015 study by the Center for American Progress found that Walden students received the most federal graduate loans in the 2013-2014 academic year, with over $756 million.

38.     Walden doctoral students (like all students) are required to pay back their student loan debt regardless as to whether they receive the degree they sought or not.

39.     According to the Senate's 2012 investigation of For Profit Colleges, in the 2008-2009 time frame, 5,325 doctoral students enrolled at Walden.[9]

| Status of Students Enrolled in Walden E-Learning LLC in 2008-9, as of 2010 | | | | | | |
|---|---|---|---|---|---|---|
| Degree Level | Enrollment | Percent Completed | Percent Still Enrolled | Percent Withdrawn | Number Withdrawn | Median Days |
| Bachelor's Degree | 3,230 | 1.4% | 47.3% | 51.4% | 1,659 | 91 |
| Masters | 11,770 | 14.4% | 57.5% | 28.1% | 3,309 | 173 |
| Doctoral | 5,325 | .6% | 59.8% | 39.6% | 2,108 | 174 |
| All Students | 20,325 | 8.7% | 56.5% | 34.8% | 7,076 | 154 |

Ex. 10, Senate Report on For-Profit Universities, Walden at 714. From this data, it appears 25% of Walden's student population are doctoral students. With an enrollment of 52,600 in 2016, if the 25% doctoral student statistic still holds true, it would mean that approximately 13,150 of those students are doctoral students.

40.     Since, upon information and belief, less than 10% of Walden's doctoral student population receives a doctoral degree each year, an exceeding large number do not receive a degree, despite paying large sums for tuition.

41.     Upon information and belief, from its Minnesota headquarters, Walden interacts with its enrolled students, including its doctoral students (e.g., through attended classes, etc.). Upon information and belief, from this location, it also interacts with prospective students (e.g., through marketing from its website). In essence, Walden's Minnesota headquarters is a body that stretches into all 50 states. At any time, specific interactions from Walden with its students (e.g., such as teaching a class) or prospective students (e.g., falsely claiming on its website a shorter

---

[9] Although unclear from the 2012 Senate Report, it appears this information corresponds to students who enrolled in 2008 and 2009; it was not the entire student population. Therefore, 5,325 doctoral students were added during that time frame. If, however, 5,325 students were the total doctoral student population for 2008 and 2009, then the 0.6% "percent completed" statistic is appalling.

time to complete the dissertation process than the actual design time of those programs) will reach into multiple states at the same time. In other words, the same action from Minnesota headquarters might give rise to harms in all 50 states. Thus, Walden's Minnesota headquarters has a significant relationship with all of its students and the harms it caused to them.

42.     Further, the goal of enrolling in doctoral programs is to obtain a doctoral degree. Whether a student receives a Walden degree (and diploma), is determined from policies and specific decisions made in Minnesota.

### LAUREATE

43.     Laureate is not simply the parent company of Walden, upon information and belief, it also exerts an undue amount of control over Walden's activities.

44.     This can be seen from web pages owned and operated by Laureate which display information about the inner workings of Walden. See, e.g., Ex. 2 and 4-6. Such data was only recently made publicly available, allegedly for prospective Walden students considering whether to attend Walden, but was not sent to current Walden students. These web pages, however, are under a Laureate domain (*e.g.,* http://programdata.laureate.net/walden/), not a www.walden.com domain.[10] Importantly, these Laureate webpages describe how the Walden Dissertation Process was created and implemented for Walden's doctoral programs, and how it ensnared Walden students.

### WALDEN'S NEVER-ENDING PHD PROGRAM

45.     Through recruiting and marketing, Walden promises that obtaining a doctoral degree from Walden is not only feasible, it is inexpensive and relatively quick.

---

[10] By displaying this information on a Laureate website from 2014-2016 instead of on its own, Walden may not have complied with the CFR's requirements. 34 CFR 668.6 (b)(2)(iii) ("Display the information required under paragraph (b)(1) of this section on the institution's Web site.").

46.     Prospective Walden students' first contact with Walden is through its website, where Walden has webpages dedicated to each of its programs. Some of those webpages describe the coursework for each program, the total credits or classes a student needs to complete, and the length of the dissertation process. See, e.g. Group Ex. 11, 2012 Archived Walden Webpages (PhD in Education KAM-Based required 20 cr.; PhD in Education Mixed-Model required 20 cr.; PhD in Health Services (Community Health Education and Advocacy specialization) required 20 cr.; PhD in General Psychology required 20 cr.; PhD in Human Services required 20 cr.; PhD in Public Health (Community Health Education specialization) required 20 cr.). Of import, these pages describe the dissertation as taking a specific—and set—number of credits (and thus a set time to completion). *Id.*

47.     Prospective students apply to Walden through its website.

48.     At the beginning of the application process (or by requesting additional information from Walden), each prospective student is assigned and contacted by a Walden recruiter.

49.     The 2012 Senate For Profit Report discussed Walden's recruiting process in detail, including false representations made by Walden's more than 500 recruiters to prospective students. Ex. 10 at 712-713, 717-718.

50.     Walden provided its recruiters and sales staff with "scripts" they were to use to "overcom[e] objections" that students might raise on subjects such as "cost, *time to completion*, time commitment, third party concerns, credibility, school support services, lack of face-to-face instruction, and other school shopping." *Id.* at 712-713 (emphasis added). The Senate report noted that in response to a Walden 2007 enrollment advisor scorecard survey, Walden students complained their recruiters "misled them in order to induce their enrollment." *Id.* at 713.

51.     Upon information and belief, when it came to "time to completion" the Walden "scripts" instructed its recruiters and sales staff to mislead doctoral students by providing them unrealistic timelines to program and/or dissertation completion. The timeline provided by the recruiters and sales staff clashed with the actual design time of its doctoral programs.

52.     Walden also "closely monitor[ed] 'talk time,'" which the Senate report defined as "the amount of time recruiters spen[t] on the phone with prospective students." *Id.* at 713. This confirms that Walden has/had records from which each students' recruiters could be determined.

53.     Prior to July 2011, Walden paid its recruiters "based on the number of students enrolled." *Id.* at 712. As the Senate report confirmed, this "enrollment-driven culture…may have influenced the recruiting tactics employed by the enrollment staff." *Id.*

54.     Upon information and belief, prior to 2012, Walden did not publicly provide meaningful data regarding graduation rates of its various doctoral programs. It appears that only after the Senate investigation into Walden and other For Profit Schools, that it began providing such information in 2012.

**Walden Designed its PhD in Management Program to Take Five Years, Six Months, but Represented a Much Shorter "On-Time Completion Rate" and "Normal Completion Time"**

55.     Focusing on the Doctor of Management (Plaintiff Thornhill's chosen area), the first available webpage about Walden graduation rates, time frames and potential costs is from March 2012. Ex. 12, PhD in Management Program Data (March 10, 2012). While not providing much data regarding graduation rates, Walden did state it had an "on-time completion rate" for this program of 68.5%, with average tuition costs of $73,795-106,555 and average books and supplies costs of $3,249-3,393.

**Program Completion**—The program completion rate is the percentage of students who graduated between July 1, 2009, and June 30, 2010, who completed this program in the normal completion time.

The program completion time may vary depending on transfer of credit and the pace at which a student chooses to complete the program. Because many of the students in this program are working adults and need to balance personal and professional commitments, our academic advisors can help establish an appropriate program of study that enables each student to complete this program in a time frame that works best for him or her.

| Rate | Percentage |
|---|---|
| On-time completion rate | 68.5% |

**Program Costs**—The total program costs are the estimated average costs over the duration of the program, excluding any scholarship or tuition reductions, for students completing the program on time. These costs can vary based on the number of credits. Typically, tuition and fees are subject to change annually.

| Expense | Cost |
|---|---|
| Tuition and Fees | $73,795 - $106,555 |
| Books and Supplies | $3,249- $3,393 |
| Room and Board | Not applicable |

*Id.*

56.     The 68.5% completion rate was represented as arising from the following metric:

Program Completion—The program completion rate is the percentage of students who graduated between July 1, 2009, and June 30, 2010, who completed this program in the normal completion time.

*Id.*

57.     Upon information and belief, the 68.5% "On-time completion rate" that Walden provided on this page was false.[11]

58.     Upon information and belief, Walden provided the 68.5% "On-time completion rate" to mislead students into enrolling into its Doctor of Management program.[12]

---

[11] This identical phrase appears on many, if not all, of the contemporaneous Program Data webpages for the doctoral programs offered by Walden, and is believed to be false on all such pages.

[12] As this identical phrase appears on many, if not all, of the contemporaneous Program Data webpages for other doctoral programs offered by Walden, it is believed Walden provided it to mislead prospective students into enrolling in their various doctoral programs.

59.     For this webpage, Walden did not define "normal completion time." However, the next sentence on the page represented that "program completion time may vary" depending on various factors. One of the two specific variables identified by Walden was the "… pace at which **a student chooses** to complete the program." *Id.* (emphasis added). To further reinforce the illusion that its students would have control over the length of time the program took them to complete, Walden also represented that the student can "complete this program in a time frame that works best for him or her."

60.     Upon information and belief, the statements that doctoral students can choose a) the pace at which they can complete the PhD in Management program and/or b) the time frame that works best for them to complete their degree were false.

61.     Upon information and belief, Walden provided the "… pace at which a student chooses to complete the program" and "complete this program in a time frame that works best for him or her" statements to mislead students to enrolling in its PhD in management program.[13]

62.     A year later, on or about June 12, 2013, Walden updated this webpage to show its still undefined "On-time completion rate" had sharply dropped to 49.3% with average tuition costs of $64,860-111,500 and average books and supplies costs of $3,604-4,558.

---

[13] As these identical phrases appear on many, if not all, of the contemporaneous Program Data webpages for other doctoral programs offered by Walden, it is believed Walden provided them to mislead prospective students into enrolling in their various doctoral programs.

**Program Completion**—The program completion rate is the percentage of students who graduated between July 1, 2011, and June 30, 2012, who completed this program in the normal completion time.

The program completion time may vary depending on transfer of credit and the pace at which a student chooses to complete the program. Because many of the students in this program are working adults and need to balance personal and professional commitments, our academic advisors can help establish an appropriate program of study that enables each student to complete this program in a time frame that works best for him or her.

| Rate | Percentage |
|------|------------|
| On-time completion rate | 49.3% |

Note: Completion rates reflect graduates from the Knowledge Area Module instructional model which is no longer offered in this program.

**Program Costs**—The total program costs are the estimated average costs over the duration of the program, excluding any scholarship or tuition reductions, for students completing the program on time. These costs can vary based on the number of credits. Typically, tuition and fees are subject to change annually.

| Expense | Cost |
|---------|------|
| Tuition and Fees | $64,860-111,500 |
| Books and Supplies | $3,604-4,558 |
| Room and Board | Not applicable |

Ex. 13, PhD in Management Program Data (June 12, 2013).

63.    The time frame of the metric used to calculate the 49.3% also changed:

Program Completion—The program completion rate is the percentage of students who graduated between July 1, 2011, and June 30, 2012, who completed this program in the normal completion time.

*Id.*

64.    Upon information and belief, the 49.3% "On-time completion rate" that Walden provided on this page was false.

65.    Upon information and belief, Walden provided the 49.3% "On-time completion rate" to mislead students into enrolling into its Doctor of Management program.

66.    Again, Walden also represented that the students could exercise control over how long the program took to finish.

67.     In 2014, the webpage format for this page changed, as did its location. Ex. 14, PhD in Management Program Data, Laureate (March 7, 2014). Instead of being found on a Walden website, it was now moved to Laureate's website.[14]

68.     The Laureate website also provided additional information about the Walden PhD in Management. This new information showed the prior representations made by Walden in the previous two versions of this webpage were false.

69.     For the first time, Walden/Laureate admitted the PhD in Management program was actually "designed to take 66 months," and not the three years that had been previously represented.



*Id.* Despite the program being designed to allegedly take "66 months," Walden still used its prior undefined "normal time to completion" time frame (whatever that was) when it calculated the "Tuition and fees" and "Books and supplies" "for the entire program" – representing that a

---

[14] Although hyperlinked through Walden's website, the actual link to which this data resided (as well as for all of Walden's doctoral programs) can be found only on a Laureate webpage at: http://programdata.**laureate**.net/walden/phd-in-management.html (emphasis added).

student that took "the normal time to completion" (*i.e.*, apparently 66 months) would pay $66,260 and $3,820, respectively. *Id.*

70.     As it turns out, a PhD in Management program "designed to take 66 months" would cost far more than $66,260 and $3,820 based on representations by Walden on a separate webpage about its "Tuition and fees."

71.     In other words, at the time this Laureate webpage was offered,[15] Walden also had a "Tuition and Fees" explanation on its own webpage. Ex. 15, PhD in Management Tuition and Fees (Feb. 9, 2014). The "Tuition and Fees" tab on Walden's webpage explained that it would cost $4,835 per quarter for tuition plus $1,160 for residency fees (four required[16]), along with a technology fee of $120 per quarter to complete the PhD in Management program.

---

[15] The Ex. 14 Laureate page is dated from March 7, 2014. The Ex. 15, Walden "Tuition and Fees' page is dated from Feb. 9. Upon information and belief, both pages were available from the internet at the same time.
[16] The residency fee did not cover travel, lodging and other expenses associated with the residencies. Those additional costs had to be separately covered by the student.

| Curriculum Component | Requirements | Cost |
|---|---|---|
| | CURRICULUM | **TUITION AND FEES** | HIGHLIGHTS | LEARNING OUTCOMES | PROGRAM DATA | | |
| Self-Directed Specializations | 98-102 total quarter credit hours | $4,835 per quarter |
| Course-Based Specializations | 96 total quarter credit hours | $645 per quarter credit hour |
| 4-Day Residency Fee | 4 during your program (Residency 2 and Residency 4 may be virtual) | $1,160 each, plus travel, lodging, other expenses Virtual: $1,260 each |
| Technology Fee | per quarter | $120 |

Tuition and fees are subject to change.

Call 1-866-492-5336 for information about a full range of options for:

- Federal Financial Aid
- Transfer of Credit

*Id.* Relying on this Feb. 9. 2014 Walden data, the Plaintiff's PhD in Management would allegedly be obtained in roughly three years (12 quarters) for approximately $64,100 in tuition and fees.[17]

72.     While this estimated $64,100 in tuition and fees is consistent with Laureate's estimate of $66,260 in tuition and fees, [18] it is inconsistent with the admitted 66-month design of the program. Using 66 months as a base (22 quarters), the tuition and fees to complete the program should be represented to be $113,650.[19] The "design" of the program then results in twice the

---

[17] $64,100 = ($4,835 quarterly tuition * 12 quarters) + (4 * $1,160 for four required residency fees) + ($120 per quarter technology fee *12).

[18] In other words, Walden's 2014 program data on Laureate's website for a 22-month program would somehow be only $2,160 more than what a three-year program was represented on Walden's webpage to cost.

[19] $113,650 = ($4,835 quarterly tuition * 22 quarters) + (4 * $1,160 for four required residency fees) + ($120 per quarter technology fee *22).

disclosed tuition and fees for the student, yet Walden and Laureate still misrepresented the cost to student to complete the program as being less than half the properly-calculated amount.

73.     Worse, only 33% of students that graduated with a PhD in Management completed the 66-month designed program within that time frame. Ex. 14. The remaining 67% of graduates took longer. *Id.*

**Walden Designed its DBA Program to Take 50 Months But Promised A Shorter Timeframe**

74.     Walden's misrepresentations were not just limited to Plaintiff Thornhill's program, it was across all doctoral programs.

75.     Focusing next on the DBA program, the first available webpage about Walden graduation rates, time frames and potential costs is from December 2012. Ex. 16, DBA Program Data (Dec. 23, 2012). While not providing much data regarding graduation rates, Walden did state it "had fewer than 10 graduates" between July 1, 2010 and June 30, 2011. Walden stated its tuition and fees cost was $61,850 with $0 for books and supplies.

**Program Completion**—This program had fewer than 10 graduates during July 1, 2010, to June 30, 2011. As a result, Walden does not disclose this information in order to protect students' privacy per U.S. Department of Education guidelines.

**Program Costs**—The total program costs are the estimated average costs over the duration of the program, excluding any scholarship or tuition reductions, for students completing the program on time. These costs can vary based on the number of credits. Typically, tuition and fees are subject to change annually.

| Expense | Cost |
|---|---|
| Tuition and Fees | $61,850 |
| Books and Supplies | $0 |
| Room and Board | Not applicable |

View cost per credit in the Tuition and Fees section.

*Id.*

76.     About five months later, on or about May 17, 2013, Walden updated this webpage to state its "On-time completion rate" was 97.1% with a $7,000 decrease in average tuition costs to $54,530 and books and supplies costs of $0.

Program Completion—The program completion rate is the percentage of students who graduated between July 1, 2011, and June 30, 2012, who completed this program in the normal completion time.

The program completion time may vary depending on transfer of credit and the pace at which a student chooses to complete the program. Because many of the students in this program are working adults and need to balance personal and professional commitments, our academic advisors can help establish an appropriate program of study that enables each student to complete this program in a time frame that works best for him or her.

| Rate | Percentage |
|------|------------|
| On-time completion rate | 97.1% |

Program Costs—The total program costs are the estimated average costs over the duration of the program, excluding any scholarship or tuition reductions, for students completing the program on time. These costs can vary based on the number of credits. Typically, tuition and fees are subject to change annually.

| Expense | Cost |
|---------|------|
| Tuition and Fees | $54,530 |
| Books and Supplies | $0 |

Ex. 17, DBA Program Data (May 17, 2013).

77.     The 97.1% completion rate was represented as arising from the following metric:

Program Completion—The program completion rate is the percentage of students who graduated between July 1, 2011, and June 30, 2012, who completed this program in the normal completion time.

*Id.*

78.     Upon information and belief, the 97.1% "On-time completion rate" and "Tuition and fees" amount that Walden provided on this page was false.

79.     Upon information and belief, Walden provided the 97.1% "On-time completion rate" and "Tuition and fees" amount to mislead students into enrolling into its DBA program.

22

80.  For this webpage, Walden did not define "normal completion time." However, the next sentence on the page represented that "program completion time may vary" depending on various factors. One of the two specific variables identified by Walden was the "… pace at which **a student chooses** to complete the program." *Id.* (emphasis added). To further reinforce the illusion that its students would have control over the length of time the program took them to complete, Walden also represented that the student can "complete this program in a time frame that works best for him or her." *Id.*

81.  Upon information and belief, the statements that doctoral students can choose a) the pace at which they can complete the DBA program and/or b) the time frame that works best for them to complete their degree were false.

82.  Upon information and belief, Walden provided the "… pace at which a student chooses to complete the program" and "complete this program in a time frame that works best for him or her" statements to mislead students to enrolling in its DBA program.

83.  In 2016, the webpage format for this page changed, as did its location. Ex. 4, DBA Program Data, Laureate (Apr. 14, 2016 data). Instead of being found on a Walden website, it had been moved to Laureate's website.[20]

84.  This Laureate webpage also provided additional information about the Walden DBA program. This new information showed the prior representations made by Walden in the previous two versions of this webpage were false.

85.  For the first time, Walden/Laureate admitted the DBA program was "designed to take 50 months."

---

[20] Although hyperlinked through Walden's website, the actual link to which this data resided (as well as for all of Walden's doctoral programs) can be found only on a Laureate webpage at:
http://programdata.laureate.net/walden/doctor-of-business-administration.html (emphasis added).



*Id.* Despite the program being designed to take "50 months," Walden still used its prior undefined "normal time to completion" time frame (whatever that was) when it calculated the "Tuition and fees" "for the entire program" – representing that a student that took "the normal time to completion" (*i.e.*, apparently 50 months) would pay $75,931.

86.     Further, Laureate admitted on its webpage that only 52% of students that graduated with a DBA completed the 50-month designed program within that time frame. *Id.* The remaining 48% *of graduates* took longer. *Id.*

87.     The misrepresentations don't stop there. While admitting on the Laureate webpage that Walden's DBA program was "designed" to take 50 months, Walden's contemporaneously offered tuition and fees page calculated a time to graduation of 10 semesters, or 3 years, 4 months.[21]

---

[21] Walden includes a "Technology Fee" of $165 a semester and estimates it will take $1,650 of such fees until graduation (hence 10 semesters…$165 * 10 = $1,650). Walden also has three semesters in a year: fall, spring and summer. http://academicguides.waldenu.edu/academicadvising/faqs/academiccalendar. Therefore, its calculation includes a time frame of 3 1/3 years.

| Curriculum Component | Requirements | Cost | Total* |
|---|---|---|---|
| Tuition | 60 total semester credit hours | $950 per semester hour | $57,000 |
| Residency Fee | Two residencies | $1,275 each through 12/31/15 $1,320 each beginning 1/1/16 (travel, lodging, and other expenses are additional) | $2,640 |
| Technology Fee | Per semester | $165 | $1,650 |
| | | Total | $61,290 |
| | | *Transfer up to 30 credits* | $29,325 |
| | | Total With Transfer Credits† | $31,965 |

Ex. 18, DBA Tuition and Fees (May 4, 2016). Walden's tuition calculation omitted the additional 1 year, 4 months of the 50 month "designed" time to provide prospective students a lower cost.

88.     It's not unreasonable to assume that if Walden designed the course to take 50 months, then 50 months should be the "minimum time to completion." Despite this, Walden represented the DBA program as lasting a much shorter time period, as well as utilizing false and misleading tuition and fees calculation based on three years for the "minimum time to completion" calculation. Walden provided this false information to mislead prospective students into enrolling in its DBA program.

89.     Further, the tuition estimates on both the Laureate and Walden webpages (despite both being from April 2016) are inconsistent. On the tuition and fees page, Walden estimates it will cost $61,290, but the Laureate page states it will cost $75,931. Regardless, upon information and belief, both amounts are lower than the course design, and are therefore false and misleading.

90.     Further, and as discussed in greater detail below, Walden made specific promises to students that its DBA program would last 96 total weeks and/or would require only five dissertation level classes.  See, e.g. Ex. 3, Walden DBA Flowchart (96 weeks; five dissertation classes in 40 weeks); Ex. 8, Residency Presentation at slides 7, 8 and 10 (five dissertation classes); Ex. 7, F. Turner email ("You will be in DBA 9000 a total of 5 sessions (40 weeks) in order to complete all the required things outlined in the process checklist that I have highlighted below."); Ex. 19, The Journey (five dissertation classes in 40 weeks). In view of the 50-month "design" time, the 96-week/five-dissertation-level-class representations were false.

91.     What should not be lost is that the above statistics such as the "normal time to completion" and estimated tuition are allegedly calculated from students that graduated. The clear majority of Walden doctoral students do not graduate, yet still paid for tuition fees and costs, and are still burdened by student loan debt.

**Walden Designed its PhD in Psychology Program to Take 72 Months But Promised A Shorter Timeframe**

92.     Turning to Walden's PhD in Psychology program, the first available webpage about Walden graduation rates, time frames and potential costs is from December 2012. Ex. 20, Psych PhD Program Data (Dec, 22, 2012). While not providing much data regarding graduation rates, Walden did state it had an "On-time completion rate" of 58.3% between July 1, 2010 and June 30, 2011, with tuition and fees cost of $73,040-102,270 and $3,600-5,500 for books and supplies.

**Program Completion**—The program completion rate is the percentage of students who graduated between July 1, 2010, and June 30, 2011, who completed this program in the normal completion time.

The program completion time may vary depending on transfer of credit and the pace at which a student chooses to complete the program. Because many of the students in this program are working adults and need to balance personal and professional commitments, our academic advisors can help establish an appropriate program of study that enables each student to complete this program in a time frame that works best for him or her.

| Rate | Percentage |
|---|---|
| On-time completion rate | 58.3% |

**Program Costs**—The total program costs are the estimated average costs over the duration of the program, excluding any scholarship or tuition reductions, for students completing the program on time. These costs can vary based on the number of credits. Typically, tuition and fees are subject to change annually.

| Expense | Cost |
|---|---|
| Tuition and Fees | $73,040-102,270 |
| Books and Supplies | $3,600-5,500 |
| Room and Board | Not applicable |

*Id.*

93.     The 58.3% completion rate was represented as arising from the following metric:

> Program Completion—The program completion rate is the percentage of students who graduated between July 1, 2011, and June 30, 2012, who completed this program in the normal completion time.

*Id.*

94.     Upon information and belief, the 58.3% "On-time completion rate" and "Tuition and fees" amount that Walden provided on this page were false.

95.     Upon information and belief, Walden provided the 58.3% "On-time completion rate" and "Tuition and fees" amount to mislead students into enrolling into its Psychology PhD program.

96.     For this webpage, and identical to the DBA program webpage (as well as all other doctoral degree pages), Walden did not define "normal completion time." However, the next sentence on the page represented that "program completion time may vary" depending on

27

various factors. One of the two specific variables identified by Walden was the "… pace at which **a student chooses** to complete the program." *Id.* (emphasis added). To further reinforce the illusion that its students would have control over the length of time the program took them to complete, Walden also represented that the student can "complete this program in a time frame that works best for him or her."

97.     Upon information and belief, the statements that doctoral students can choose a) the pace at which they can complete the PhD in Psychology program and/or b) the time frame that works best for them to complete their degree were false.

98.     Upon information and belief, Walden provided the "… pace at which a student chooses to complete the program" and "complete this program in a time frame that works best for him or her" statements to mislead students to enrolling in its PhD in Psychology program.

99.     About seven months later, on or about July 10, 2013, Walden updated this webpage to state its "On-time completion rate" was a range from 49.3-72.9% with tuition costs of $71,510-100,655 and books and supplies costs of $3,816 to 5,830.

**Program Completion**—The program completion rate is the percentage of students who graduated between July 1, 2011, and June 30, 2012, who completed this program in the normal completion time.

The program completion time may vary depending on transfer of credit and the pace at which a student chooses to complete the program. Because many of the students in this program are working adults and need to balance personal and professional commitments, our academic advisors can help establish an appropriate program of study that enables each student to complete this program in a time frame that works best for him or her.

| Rate | Percentage |
|------|-----------|
| On-time completion rate | 49.3-72.9% |

**Program Costs**—The total program costs are the estimated average costs over the duration of the program, excluding any scholarship or tuition reductions, for students completing the program on time. These costs can vary based on the number of credits. Typically, tuition and fees are subject to change annually.

| Expense | Cost |
|---------|------|
| Tuition and Fees | $71,510-100,655 |
| Books and Supplies | $3,816-5,830 |

Ex. 21, Psych PhD Program Data (July 10, 2013).

100.    The 49.3-72.9% completion rate was represented as arising from the following metric:

Program Completion—The program completion rate is the percentage of students who graduated between July 1, 2011, and June 30, 2012, who completed this program in the normal completion time.

*Id.*

101.    Besides not making sense, upon information and belief, the 49.3-72.9% "On-time completion rate" and "Tuition and fees" amount that Walden provided on this page was false.

102.    Upon information and belief, Walden provided the 49.3-72.9% "On-time completion rate" and "Tuition and fees" amount to mislead students into enrolling into its PhD in Psychology program.

103.    In 2014-2015, the webpage format for this page changed, as did its location. Ex. 2, PhD Psych. Program Data, Laureate (Jan. 2015 data). Instead of being found on a Walden website, it had been moved to Laureate's website.[22]

104.    The Laureate website also provided additional information about the Walden PhD in Psychology. This new information showed the prior representations made by Walden in the previous two versions of this webpage were false.

105.    For the first time, Walden/Laureate admitted the PhD in Psychology program was "designed to take 72 months."



*Id.* Despite the program being designed to allegedly take "72 months," Walden still used its prior undefined "normal time to completion" time frame (whatever that was) when it calculated the "Tuition and fees" "for the entire program" – representing that a student that took "the normal time to completion" (*i.e.*, apparently 72 months) would pay $67,610…a $10,000-$40,000 drop in price despite taking six years. Upon information and belief, these amounts were false.

---

[22] Although hyperlinked through Walden's website, the actual link to which this data resided (as well as for all of Walden's doctoral programs) can be found only on a Laureate webpage at:
http://programdata.**laureate.net**/walden/phd-in-psychology.html (emphasis added).

106.    Upon information and belief, had the "normal time to completion" been calculated from the "designed" 72-month time, tuition would have exceeded $150,000

107.    Further, only 44% of students that graduated with a PhD in Psychology completed the 72-month designed program within that time frame. *Id*. The remaining 56% of students *that graduated* took longer. *Id.*

108.    It's not unreasonable to assume that if Walden designed the course to take 72 months, then 72 months should be the "minimum time to completion." It's clear, however, that from previous calculations, Walden utilized a still undefined and likely false "minimum time to completion" calculation. Walden provided this false information to mislead prospective students into enrolling in its PhD in Psychology program.

109.    Also, as discussed in greater detail below, Walden's specific promises that its PhD in Psychology program would take only 3-4 years were obviously false in view that the program was designed to take 6 years.

110.    Further, this Laureate webpage admits that only 44% of students in 2012-2013 completed the program within the "normal" 72-month time frame. The "normal time to completion" then cannot be as low as 72 months then, it must be something longer.[23]

111.    Despite these fraudulent misrepresentations, this Laureate webpage remained available from 2014 through early 2016. When Walden/Laureate finally updated the webpage in mid-to-late 2016, its misrepresentations became even more pronounced.

---

[23] It is not unreasonable to assume a "normal" time to completion would require 50% or more of the student population to complete the program in that time frame. Anything less (like 44%) would not be normal.



Ex. 22, PhD in Psychology Program Data, Laureate (April 2016 data). While the PhD in

Psychology program from 2014 through early 2016 was allegedly "designed to take 72 months,"

inexplicably, the mid-to-late 2016 program was shortened so that it now allegedly was "designed

to take 66 months to complete." *Id.* This despite the most recent webpage reflecting an even

lower rate of students (only 21%) completing the 66-month program. Moreover, despite an eight-

month reduction in "designed" completion time, the represented tuition and fees increased from

increased almost $20,000. Further, the $86,987 tuition was calculated from a fictional "normal

time to completion" of likely three years. Had the "normal time to completion" been calculated

from the "designed" 66-month time, it would have exceeded $100,000. Even further, the "normal

completion time" could not be 66 months, as only 21% of graduating students completed the

program in that time frame…meaning a "normal completion time" (*i.e.,* when half or more of the

students would complete the program) would exceed 66 months.

112.    The statements on this page were obviously false, with intent to mislead prospective

students to enroll in Walden's PhD in Psychology program.

113.    Again, the "normal time to completion" is calculated from students that graduated. Upon information and belief, the clear majority of Walden doctoral students do not graduate, yet still paid for tuition fees and costs, and are still burdened by student loan debt.

**Walden Designed its EdD Program to Take 52 Months But Promised A Shorter Timeframe**

114.    For years, Walden misrepresented to prospective and current students that the EdD program would take its students three years. For example, its 2005 Viewbook (also used for at least 2006 enrollment) states, "The Ed.D. program takes three years to compete." Ex. 23, 2005 Viewbook (excerpts) at 6. Further, students in 2010 and 2011 completed documents for their instructors entitled, "My AL/CIA/HEAL/HEL/SPED/TL Ed.D. Timeline," which calculated EdD three-year completion deadlines for the EdD program and six EdD specializations. Ex. 24, EdD Timeline. Also, as discussed below, promises of three-year programs were made at multiple events attended by Walden recruiters.

115.    Additionally, after beginning their program and gaining access to Walden's portal, EdD students could view general student record documents which repeated the students' "Expected Graduation Date" would be three years. Group Ex. 53, 2007, 2008, 2010 General Student Records. Being part of the online program, the representations contained therein would have arisen from the Academic headquarters in Minnesota.

116.    These representations were false, as Walden designed the EdD program to take 52 months.

117.    The first available webpage about Walden graduation rates, time frames and potential costs is from January 2013. Ex. 25, EdD Program Data (Jan. 19, 2013). While not providing much data regarding graduation rates, Walden did state it had a 59.2% "on time completion rate"

from July 1, 2010 through June 30, 2011. Walden stated its tuition and fees cost was $57,945-$62,565 with $0 for books and supplies. *Id*.

Program Completion—The program completion rate is the percentage of students who graduated between July 1, 2010, and June 30, 2011, who completed this program in the normal completion time.

The program completion time may vary depending on transfer of credit and the pace at which a student chooses to complete the program. Because many of the students in this program are working adults and need to balance personal and professional commitments, our academic advisors can help establish an appropriate program of study that enables each student to complete this program in a time frame that works best for him or her.

| Rate | Percentage |
|------|-----------|
| On-time completion rate | 59.2% |

Program Costs—The total program costs are the estimated average costs over the duration of the program, excluding any scholarship or tuition reductions, for students completing the program on time. These costs can vary based on the number of credits. Typically, tuition and fees are subject to change annually.

| Expense | Cost |
|---------|------|
| Tuition and Fees | $57,945-62,565 |
| Books and Supplies | $0 |

118. The 59.2% completion rate was represented as arising from the following metric:

Program Completion—The program completion rate is the percentage of students who graduated between July 1, 2011, and June 30, 2012, who completed this program in the normal completion time.

*Id.*

119. Upon information and belief, the 59.2% "On-time completion rate" and "Tuition and fees" amount that Walden provided on this page was false.

120. Upon information and belief, Walden provided the 59.2% "On-time completion rate" and "Tuition and fees" to mislead students into enrolling into its EdD program.

121. For this webpage, Walden did not define "normal completion time." However, the next sentence on the page represented that "program completion time may vary" depending on various factors. One of the two specific variables identified by Walden was the "... pace at

34

which **a student chooses** to complete the program." *Id.* (emphasis added). To further reinforce the illusion that its students would have control over the length of time the program took them to complete, Walden also represented that the student can "complete this program in a time frame that works best for him or her." *Id.*

122.    Upon information and belief, the statements that doctoral students can choose a) the pace at which they can complete the EdD program and/or b) the time frame that works best for them to complete their degree were false.

123.    Upon information and belief, Walden provided the "… pace at which a student chooses to complete the program" and "complete this program in a time frame that works best for him or her" statements to mislead students to enrolling in its EdD program.

124.    In 2016, the webpage format for this page changed, as did its location. Ex. 5, EdD Program Data, Laureate (Apr. 15, 2016 data). Instead of being found on a Walden website, it had been moved to Laureate's website.

125.    The Laureate website also provided additional information about the Walden EdD program. This new information showed the prior representations made by Walden in the previous version of this webpage were false.

126.    For the first time, Walden/Laureate admitted the EdD program was "designed to take 52 months."

<u>Go back to Walden's Doctor of Education (EdD) program</u>

**Walden University**

**Doctor of Education**
Program Level - Doctoral degree
Program Length - 52 months

🖨
PRINT

**COST**

Q. How much will this program cost me?*

A. Tuition and fees: $59,731
Books and supplies: $0
On-campus room & board: *not offered*

What other costs are there for this program?

For further program cost information click here.

* The amounts shown above include costs for the entire program, assuming normal time to completion. Note that this

**SUCCESS**

Q. How long will it take me to complete this program?

A. The program is designed to take 52 months to complete. Of those that completed the program in 2014-2015, 23% finished in 52 months.

Q. What are my chances of getting a job when I graduate?

A. The job placement rate for students who completed this program is *%.

*Id.* Despite the program being designed to take "52 months," Walden still used its prior undefined "normal time to completion" time frame (whatever that was) when it calculated the "Tuition and fees" "for the entire program" – representing that a student that took "the normal time to completion" (*i.e.*, apparently 52 months) would be $59,731.

127.    Further, only 23% of students that graduated with an EdD completed the 52-month designed program within that time frame. *Id.* The remaining 77% *of graduates* took longer. *Id.*

128.    The misrepresentations don't stop there. While admitting on the Laureate webpage that Walden's EdD program was "designed" to take 52 months, Walden's contemporaneously[24] offered tuition and fees page calculated a time to graduation of 12 quarters, continuing its misrepresentation of the EdD program as a three-year program.[25]

---

[24] The EdD Laureate page contained data from April 15, 2016. Ex. 5. The EdD Tuition and Fees page from Walden's cite is date April 12, 2016. Ex. 26.
[25] Walden includes a "Technology Fee" of $125 a quarter and estimates it will take $1,750 of such fees until graduation (hence 12 quarters…$125 * 12 = $1,750). Twelve quarters equals a time frame of 3 years.

36

## Doctor of Education

| Curriculum Component | Requirements | Cost | Total* |
|---|---|---|---|
| Tuition | 76 total quarter credit hours | $590 per quarter hour | $44,840 |
| Residency Fee | One residency | $925 (travel, lodging, and other expenses are additional) | $925 |
| Technology Fee | Per quarter | $125 | $1,750 |
| | | Total | $47,515 |
| | | *Transfer up to 38 credits* | *$22,670* |
| | | Total with Maximum Transfer Credits† | $24,845 |

Ex. 26, EdD Tuition and Fees (April 12, 2016).

129.    Walden's tuition calculation omitted the additional 18 months of the 52 month "designed" time[26] to provide prospective students a lower cost.

130.    The tuition estimates on both the Walden and Laureate pages also are inconsistent. On Walden's tuition and fees page, Walden estimates it will cost $47,515 in tuition and fees, while the Laureate page states it will cost $59,731. Regardless, upon information and belief, both estimates are lower than the course design, are therefore false. Both misrepresentations were made by Walden/Laureate in the hopes of students relying upon them to enroll in Walden's EdD program.

131.    The above materials show that despite designing its EdD program to take 52 months, Walden promised a much shorter time frame (*e.g.,* twelve quarters). Walden knowingly made these false statements with the hopes that prospective students would rely upon them and enroll in its EdD program.

---

[26] The Laureate "designed" time webpage is dated from April 15, 2016 (and is only "updated once annually"), showing it is concurrent with the Walden tuition and fees page.

132.    It's not unreasonable to assume that if Walden designed the course to take 52 months, then 52 months should be the "minimum time to completion" (although again, only 23% of students who graduated did so in 52 months…so the "minimum time to completion" should be longer than 52 months). Walden, however, utilized false and misleading tuition and fees calculations based on three years or less for its "minimum time to completion" calculation. Walden provided this false information to mislead prospective students into enrolling in its EdD program.

133.    Further showing the dishonesty of Walden, in a 2014 submission to MOHE, Walden provided the "Number of Months to Complete the Ed.D. Higher Education and Adult Learning (HEAL) Program" since 2009. Ex. 27, Walden Ltr to MOHE (June 20, 2014). In contrast to the three years promised to EdD students (see, e.g., Ex. 23-24), Walden's letter to MOHE confirmed that only *two* EdD HEAL students from 2009-2014 allegedly graduated in three years or less.

Number of Months to Complete the Ed.D. Higher Education and Adult Learning (HEAL) Program: Graduates since 2009

| Months | # of Grads | % of Grads |
|--------|-----------|-----------|
| 35 | 2 | 2% |
| 39 | 5 | 4% |
| 41 | 1 | 1% |
| 43 | 18 | 16% |
| 45 | 3 | 3% |
| 47 | 18 | 16% |
| 49 | 8 | 7% |
| 51 | 19 | 16% |
| 53 | 6 | 5% |
| 55 | 13 | 11% |
| 57 | 3 | 3% |
| 59 | 16 | 14% |
| 63 | 2 | 2% |
| 65 | 2 | 2% |
| TOTAL | 116 | 100% |

Average # of Months

50 months (or roughly 4 years)

*Id.* Worse, Walden admitted to MOHE that the average time to graduation was "50 months." *Id.* This again confirms that not only were Walden's promises of three-year timelines false, it was aware such promises were untruthful.

134.     Walden's admissions before MOHE hint at the extent of its fraud across all programs. While it touts a shorter timeline for all its doctoral programs and dissertation coursework, this document shows in the history of the EdD HEAL program, no more than two students allegedly graduated within its promised (*i.e.,* three year) time frame.[27] Knowing it had such a horrid "on time completion rate," Walden should not have made any representations to prospective or current students about shorter (*e.g.,* three year) time frames to graduate or dissertation timelines. Also, as other doctoral programs have longer design times (*e.g.,* PhD in Management at 66 months, PhD in Psychology at 72 months, etc.), the statistics for these programs are likely far more embarrassing for Walden. For example, in an email exchange where an Educational Psychology student expressed frustration to his chair that "[a]t Residency one of the speakers said that the average student usually completes their dissertation in 5 quarters," his chair responded:

> I am sorry that others' comments have misled you. Those timeliness have not been my experience at all.

Ex. 28, A.Romosz and J.Clayborn Email Exchange, at June 25, 2015. In fact, in a prior email, she stated, "Most students spend 1-2 years in proposal writing." *Id.* at June 24, 2015.

135.     The importance of this exchange should be emphasized. Five terms to complete a dissertation has been a common promise made at Walden for well-over a decade, not only by its

---

[27] While this table aligns two students with "35 months," the next field is "39 months." Arguably, these two students could have graduated in any time period less than "39 months," meaning this document does not exclude the fact that no student may have finished the EdD HEAL program within the promised three years. Further, this document is silent as in to the amount of hours of transfer credit these two students had, which should have shortened the time to graduation.

employees, but also by its marketing materials. See, e.g., Ex. 48, 2004-2005 Catalog at 74 (PhD in Education, 30 cr.), 90 (PhD in Public Health, 30 cr.), 91 (PhD in Health Services, 30 cr.), 99 (PhD in Human Services 30 cr.), 113 (PhD in Applied Management and Decision Sciences,[28] 30 cr.) and 121 (PhD in Public Policy Administration, 30 cr.); Ex. 29, 2010-2011 Walden Catalog (excerpts) at 339, 345, 350; Group Ex. 11, 2012 Archived Walden Webpages (PhD in Education KAM-Based required 20 cr.; PhD in Education Mixed-Model required 20 cr.; PhD in Health Services (Community Health Education and Advocacy specialization) required 20 cr.; PhD in General Psychology required 20 cr.; PhD in Human Services required 20 cr.; PhD in Public Health (Community Health Education specialization) required 20 cr.); see also Ex. 3, 7, 8, 19. However, a dissertation committee chair—one of the best people at Walden to comment on the time frame for dissertations—confirmed 1) she has not seen anyone complete a dissertation in five terms, and 2) most students take 1-2 years just to complete their proposals—one of the five stages of the dissertation process.

**Walden's "Normal Time to Completion" and Course Design Fraud Cover All its Doctoral Programs.**

136.    Walden and Laureate's manipulation of tuition rates and times to completion were not confined to just the above doctoral programs. Despite blanket statements of estimates based on "minimum time to completion" and "normal completion time" across Walden's doctoral programs, the clear majority were "designed" to take longer.

137.    The Laureate webpage for the PhD in Health Services program (upon information and belief available from 2014 until early 2016) stated it was "designed to take 66 months to complete," although only 27% of the 2012-2013 graduates completed the program within that

---

[28] The PhD in Applied Management and Decision Sciences program eventually became the PhD in Management program.

time. Ex. 30, PhD in Health Services Program Data, Laureate (Feb. 21, 2015). Despite reciting "66 months" until completion, the "Tuition and fees" cited for this program was $59,285 "assuming normal time to completion." *Id.* However, if 66 months was used as a "normal time to completion" (despite only 27% of students who graduated meeting this time frame), the estimated tuition and fees should have exceeded $100,000. Further, with only 27% of students meeting the "designed" time, a "normal time to completion" must be longer than 66 months.

138.    The Laureate webpage for the PhD in Public Policy and Administration program (upon information and belief available from 2014 until early 2016) stated it was "designed to take 66 months to complete" and, allegedly, 100% of its 2012-2013 graduates completed it within that time frame. Ex. 31, PhD in Public Policy and Administration Program Data, Laureate (March 6, 2015). Despite this boast, it still indicated that students' "Tuition and fees" and "Books and supplies" would cost only $48,650 and $3,933 respectively. *Id.* However, if 66 months was used as a "normal time to completion," the estimated tuition and fees should have exceeded $100,000.

139.    Bizarrely, in mid-to-late 2016, the Laureate webpage for a PhD in Public Policy Administration was updated to state the program was now "designed to take 55 months to complete" (allegedly shortening the program by 11 months), yet the number of students that completed it on time drastically dropped to 28%. Ex. 32, PhD in Public Policy and Administration Program Data, Laureate (April 15, 2016 data). Bafflingly, despite shortening the program by 11 months, the costs of "Tuition and fees" and "Books and supplies" increased to $67,241 and $4,367. *Id.* However, if 55 months was used as a "normal time to completion," the estimated tuition and fees should have likely exceeded $100,000. Further, with only 28% of students meeting the "designed" time, a "normal time to completion" must be longer than 55 months.

140.    The same Laureate webpage for the PhD in Public Health program (upon information and belief available from 2014 until early 2016) stated it was "designed to take 66 months to complete," although of those that completed the program in 2012-2013, only 37% completed it within that time frame. Ex. 33, PhD in Public Health Program Data, Laureate (Feb. 21, 2015). This was a drastic drop for a program that allegedly in March 6, 2012, reported an alleged 88.9% completion rate from the still nebulous "normal completion time" metric. Ex. 34, PhD in Public Health Program Data, Laureate (March 6, 2012). Further, with only 37% of students meeting the "designed" time, a "normal time to completion" must be longer than 66 months. Also, Walden stated that the "Tuition and fees" and "Books and supplies" for this program would cost $49,200 and $3,528, respectively. Ex. 33. Obviously, if a 66-month designed time to completion were utilized, the fees would far exceed $49,200.

141.    Still, in mid-to-late 2016, the Laureate webpage for the PhD in Public Health was updated to report that the program was "designed to take 63 months to complete" (an alleged three month shortening of the program), although now only 30% of students that graduated in 2014-2015 completed the program in that time frame. Ex. 35, PhD in Public Health Program Data, Laureate (April 15, 2016 data). Further, regardless of whether a 66 or 63-month time frame was utilized, the "Tuition and fees" would not be $70,563; rather, they would exceed $100,000. Finally, with only 30% of students meeting the "designed" time, a "normal time to completion" must be longer than 63 months.

**<u>Walden's False Representations Across All Programs Continued Even After the Filing of This Suit.</u>**

142.    At least as early as 2005 and 2006, Walden promised its students—across all PhD programs—that not only would "most" of its PhD students earn their degrees, they would do so "in 4.5 years or less."

## Doctoral Programs

Most Ph.D. students earn their degree in 4.5 years or less. The Ed.D. program takes three years to complete.

You can expect to spend approximately 15–20 hours per week in any doctoral program to maintain steady progress toward this completion time. Some activities, such as residencies, allow you to focus on your program for a more extended time within a given period, ranging from weekend sessions to two-week summer and winter sessions.

Ex. 23 at 6; *See also* Ex. 54, 2006 Viewbook at 6 (identical promise).[29] This statement was not only provided in a general statement about its programs, the Viewbook reiterated the identical "4.5 years or less" specifically for each doctoral program. Ex. 23 at 34-35, 39, 53, 80, 106, 114; Ex. 54 at 34-35, 39, 53, 75, 79, 100, 101, 106, 114. The identical timeline was also promised on Walden webpages for numerous programs during the same timeframe. Group Ex. 66.

143.    As explained in the Viewbook, students would have control over when they would graduate because they would need only "15-20 hours per week in any doctoral program to maintain steady progress *toward this completion time.*" Ex. 23 at 6 (emphasis added); Ex. 54 at 6. Further, as the statement focused on *most* PhD students, the implication was that the average time to completion was less than 4.5 years. Worse for Walden, the statement that *most* PhD students *graduate* is an assertion that a number much larger than 50% of its students graduate.

144.    Over 10 years later, even after the filing of this lawsuit, Walden continued these same false representations. In September of 2017 at a residency for psychology doctoral students

---

[29] The back covers of the 2005 and 2006 Viewbook confirm the academic materials contained therein arose from Minnesota. *Id.* As the misrepresentations at issue arise from disclosures of an academic nature (e.g., timelines to graduation, hours to study per week), they arise from Minnesota. This can also be see in that similar representations were made in Walden's 1996-1997 catalog which back cover only acknowledges Minnesota, confirming the similar representations between these publications arise from Minneapolis. Ex. 56.

43

entitled, "An Introduction to the Dissertation Process," Walden faculty misled students about the time to complete the dissertation process. Ex. 55. Specifically, Walden faculty stated 1) it was "pretty typical" for psychology doctoral students to complete the dissertation in "2 years"[30] and 2) it would only require 15-20 hours per week to meet this goal. *Id.* at 10-11.

145.    Walden's 2017 promise of a "pretty typical" two-year dissertation requiring only 15-20 hours per week aligns with its more-than-10-year-old promise that *most* students graduate in less than 4.5 years spending "approximately 15-20 hours per week." *Compare* Ex. 55 at 10-11 with e.g., Ex. 23 at 6 and Ex. 54 at 6.

146.    Such disclosures have been made by Walden for over 20 years, as shown by a 1996-1997 catalog which states:

> This is one university where students set the pace; they are in control of their time and can choose what they accomplish—and when. Walden is totally dedicated to helping students complete the program in a timely manner. Most are awarded their doctorate within three years of enrolling—but it is up to each person to decide how fast he or she wants to proceed.

Ex. 56 at 8.

147.    Walden has made misrepresentations to prospective and current students for over 20 years. Such a long timeframe of similar, fraudulent representations shows how deeply ingrained misleading doctoral students is to Defendants' culture. Because such representations persisted even after the filing of this lawsuit, the only way to prevent Defendants from continuing their misrepresentations is through a judgement of this Court.

---

[30] This statement flies in the face of Walden's Gainful Employment disclosures which provided only 44% of students *that graduated* with a PhD in Psychology completed the program in 72 months. Ex. 2. Given that the Gainful Employment documents do not account for students *who did not graduate* (it appears that less than 10% of Walden doctoral students actually graduate), it's likely only 4.4% of Walden psychology students graduated in less than six years. A two-year dissertation process then is not "pretty typical."

## PROMISES OF TUITION COSTS AND TIMES TO GRADUATE BY WALDEN AND ITS RECRUITERS WERE WELL BELOW THE "DESIGN" OF EACH PROGRAM

148.    The Defendants' plan to extract as much money from doctoral students as possible began in recruiting and enrollment.

149.    Despite the actual "design" of each doctoral program, Walden recruiting and enrollment employees repeatedly touted shorter time frames for completion of the programs and its dissertation process.

150.    Walden's recruiters were specifically instructed on how to discuss "time to completion" with prospective students. Ex. 47, Overcoming Objections at 1. Recruiters were instructed to inform prospective students that Walden's "time to completion is realistic" and "since a lot of our programs are self paced, they can speed it up." *Id.* The "times to completion" provided by the recruiters, however, were not based off the actual design time of each program, but were rather false, shorter times to induce student enrollment. Further, the comments that students can "speed [] up" their programs were made to reinforce the illusion that its students would have control over the length of time the program would take to complete.

151.    Upon information and belief, recruiters commonly explained to potential students that after the completion of doctoral classwork, it would take only 18 months (or 4-5 dissertation classes) to complete the dissertation, and that students would rely upon such statements. Such representations were made specifically to Plaintiff Thornhill in this action by a recruiter (upon information and belief Enrollment Advisor Wajoili Ward-Jiggets)[31] about one month prior to her enrolling in the PhD in Management program. Like any other student would, Plaintiff Thornhill relied upon her recruiter's representations of how long the dissertation process would last.

---

[31] While Plaintiff might not recall the exact recruiter's name (due to the passage of time), the 2012 For Profit Senate report explains Walden kept detailed information on the recruiting process. Ex. 10 at 713. Walden then could identify this individual simply by reviewing its records.

152.    Upon information and belief, recruiters would commonly promise shorter time frames to graduation (e.g., three years). Walden recruiters made these verbal promises on the phone when speaking to prospective students as well as at public events such as a Back to School rally in Barstow, California, knowing students would rely upon them when enrolling.

153.    Later, such promises were confirmed by Walden employees in the enrollment office.

154.    While most promises were verbal, some promises by recruiters and the enrollment office were in writing. *See, e.g.,* Ex. 1, Email Exchange between T. Westenskow and K. Callahan (Aug. 18-20, 2008).

155.    Representations of a faster timeline were not made to just the named Plaintiff. There are numerous complaints online about this practice, and how misleading Walden's estimates were. For example, one woman recounts how she and five other educators from Coffee County, Georgia were promised that their doctoral program would take only three years (for a program Walden/Laureate would later admit was designed to take 52 months though only 23% of those that graduated did so in that time frame).[32] Despite that, only one of those educators received her doctorate in the time promised.

---

[32] This is the identical promise made to Plaintiff Wright in the currently pending Minnesota action *Wright et al. v. Walden University, et al.,* 0:16-cv-04037 (D.Minn) at a Barstow rally.

**Vette S.** said
364 days ago

> Thank goodness someone has staeted this process. I am from Coffee County, GA. In 2004 or 2005 A Walden representative met with a large group of teachers and made the following statements. The program would be a 3 year Doctorial program costing of approximately $ 25,000. The Universitywould "hold your hand" through the program as your dissertation would be composed through research articles used in your coursework. After completing my coursework with a 4.0, I began the dissertation process. After writing chapters 1-2 and having it reviewed by my chair I went through the process of revions paying more out of pocket for additional semesters. After my chair approved chapters 1-2, he said after writing and revising chapter 3 I would be ready to schedule a proposal defense. Then I get back an email stating that the dissertation rubric had changed and all my articles used for my study needed to be peer reviewed and were beginning to be dated. After 4 years yes...some of the research would begin to be dated. My three chapters at this point were a total rewrite. Having hired a corporate editor to review my work, she was disturbed that my first 3 chapters were not being approved. Already going beyond the 3 year program with over $70,000 in debt and receiving emails from my chair stating this program was a "process", I withdrew from the program in December of 2008. Stuck with a 900 loan payment, no degree, and the emotional stress of going through almost 4 years to receive nothing...I began to see what the word "process" meant to Walden. Another semester, more money and nothing but heartache for me. Out of 6 educators from Coffee County School System only one was able to receive her Doctorate Degree within the 3 year time frame.

Excerpt from "Got a Class Action" (available at: http://gotaclassaction.com/walden-university-and-laureate-education-inc-named-in-class-action-lawsuit-over-systematic-prolonging-of-the-thesis-and-dissertation-process/).

156.    Another poster confirmed that her 18-month program was now in its fourth year.

**Carolyn B.** said
255 days ago

> My 18 month program is now in its 4 th yr. My chair actually submitted a 14month old draft to form and style for review instead of the finished product(its been complete for 6 months now). I didn't even receive an apology. I am now at 130,000 in debt for a degree I don't think will ever be finished.This quarter,our class doesn't have an instructor but they still took money for it. Is that legal??

*Id.*

157.    Taken together, the 2012 Senate Report, the history of Plaintiff and the stories of the above students (as well as many others referenced herein) confirm that Walden and Laureate's

representations concerning the timeline to complete a Walden doctoral degree were false. Further, with a doctoral "completion" rate of, upon information and belief, less than 10% of its doctoral student population, any statements concerning a "minimum completion time," or a completion time at all, would be false and misleading.

158. Instead, Walden and Laureate should tell prospective students they'd be lucky to obtain a doctoral degree, let alone obtain a degree in a reasonable time frame.

159. Further, prior webpages for Walden doctoral programs (from archive.org) represent specific time periods (based on credit hours) that would constitute completion of the dissertation process. See, e.g., Group Ex. 11, 2012 Archived Walden Webpages (PhD in Education KAM-Based required 20 cr.; PhD in Education Mixed-Model required 20 cr.; PhD in Health Services (Community Health Education and Advocacy specialization) required 20 cr.; PhD in General Psychology required 20 cr.; PhD in Human Services required 20 cr.; PhD in Public Health (Community Health Education specialization) required 20 cr.). There is no indication on these pages that the dissertation process would last longer than the set number of credit hours provided by Walden. The message of these Walden webpages targeted at prospective students is clear: if you complete the represented number of dissertation credit hours, you will obtain your doctoral degree. These webpages were provided by Walden for students to assist them in making their decision to attend Walden, and students relied upon the representations therein including how long the dissertation process would last.

**THE TRAP OF THE WALDEN DISSERTATION PROCESS CONTINUES AFTER THE STUDENTS ENROLL**

160. Once doctoral students enrolled in Walden, the false promises continued.

161. At Walden, each doctoral degree candidate, regardless of discipline, must go through the process of completing a dissertation.

162.    The Walden Student Handbook reflects that the dissertation process could be completed

in as little as 13 months.

### Dissertation Timing

Doctoral students who want to graduate in a specific quarter must plan their program
carefully as follows or their graduation date will be delayed:

- Begin planning for program completion at least 13 months in advance of the anticipated
  graduation date

Ex. 36, Excerpts, 2013-2014 Walden Student Handbook at 273 (December 2013), available at

http://catalog.waldenu.edu/content.php?catoid=117&navoid=32382, and Ex. 37, Excerpts, 2010-

2011 Walden Student Handbook (Sept. 2011) at 189, available at

http://catalog.waldenu.edu/mime/media/58/1050/Dec+2011+Handbook+FINAL.pdf.

163.    Further, as stated above, it has been common for Walden for over a decade to represent

that the dissertation process would be completed in 18 months or after four/five dissertation level

classes (*i.e.,* four/five successive terms). For example, numerous DBA program materials

confirm just five 9000 level dissertation classes were required to complete the program (which

would correspond to about 18 months). Ex. 3, Walden DBA Flowchart; Ex. 7; F. Turner Group

Email (July 5, 2010); Ex. 8, DBA Residency Presentation at slides 7, 8 and 10; Ex. 19, The

Journey. The psychology doctoral degree and the counseling and organizational psychology

specializations were touted as requiring only 30 credits. Ex. 29, 2010-2011 Walden Catalog

(excerpts) at p. 339, 344, 350. For these programs, 30 credits equate to five terms of a 6-credit

course. *Id.* The EdD program also calculated time to completion of the dissertation process of

about 16-18 months. Ex. 24, EdD Timeline. Walden's 2004-2005 Catalog represented six

doctoral degrees as only requiring 30 credits (i.e., five terms). Ex. 48 at 74, 90, 91, 99, 113 and

121. And in 2012, Walden's website for *numerous* doctoral programs represented only 20 cr.

were required to complete the dissertation. See, e.g. Group Ex. 11, 2012 Archived Walden

Webpages (PhD in Education KAM-Based required 20 cr.; PhD in Education Mixed-Model

required 20 cr.; PhD in Health Services (Community Health Education and Advocacy

specialization) required 20 cr.; PhD in General Psychology required 20 cr.; PhD in Human

Services required 20 cr.; PhD in Public Health (Community Health Education specialization)

required 20 cr.).

164.    Once students exceeded the 18 months/four or five dissertation classes, Walden

continued the trap by encouraging them the finish line is in sight. One example can be seen in a

March 5, 2013 email sent to DBA students who had gone past the promised five dissertation

classes. The letter teases "Hello future doctor" and includes false hope that "you can complete

this year!!!":

> Hello future doctor,
>
> You are receiving this message as you have completed 5 sessions of 9000.  I
> wanted to alert you to some resources that might be helpful as you complete
> your DBA program this year. I really like the sound of Dr. and I am confident this
> can be an accomplishment that you can complete this year!!!

Ex. 38, DBA Email to J. Harrison (March 5, 2013). Walden made such statements knowing

enticements were necessary to keep students enrolled in the program beyond its promised end

dates. And students relied upon such representations.

### HOW THE WALDEN DISSERATION PROCESS TRAP WAS SPRUNG

165.    Doctoral degrees, including Walden's doctoral degrees, differ from bachelor's degrees in

several important respects; however, most pertinent to this Complaint, after completion of course

work, doctoral degrees require independent study and research by the student to complete the

dissertation.

166.     To complete the dissertation, students must consult and seek the approval of faculty and institutional entities at Walden. Because of this, it is imperative that students work closely with the faculty members, whose approval is necessary for the advancement of the dissertation through its many stages.

167.     With an online degree, such coordination is more difficult as most students cannot regularly interact with their chairs, members or advisors, unless they do so through the Interactive Blackboard System provided by Walden. With only this confined communication system, often doctoral students feel isolated and without direction.

168.     There are five stages of the dissertation: Premise (or preliminary Prospectus), Prospectus, Proposal, conducting the study and/or research that is the subject of the dissertation, and defending the completed dissertation.

169.     At each stage of the process, the student must gain approval of the dissertation supervisory committee chair ("chair") and a supervisory committee member ("member"). Approvals must be sought first from the chair, then the member. In this line of approvals, if the member does not issue an approval, the student must begin the process again with the chair before approaching the member again.

170.     Given the need for consecutive approvals from multiple Walden personnel for each stage of the dissertation process, timely responses by the chair and member are required to advance the process.

171.     To start the dissertation process, the student must enroll in the dissertation course for a student's respective field of study. Typically, this will be the only course/class the doctoral student will enroll in for that semester/term (and for their remaining semesters/terms at Walden). Despite this, the doctoral students will still pay full tuition.

51

172.     As discussed above, it was commonly promised that students would only need four-five dissertation level classes (or 13-18 months of dissertation level classes) to graduate. See, e.g., Ex. 3, 7, 8, 11, 19, 24, 29, 48.

173.     Once enrolled in the dissertation course, the student must develop and draft a Premise. The Premise is a brief document which identifies a preliminary topic for the dissertation. The Premise is also used to locate faculty members who will form the dissertation supervisory committee.

174.     After determining a topic and drafting the Premise, the student must nominate the dissertation supervisory committee. The dissertation supervisory committee has two members: the chair and member. The dissertation supervisory committee is supposed to provide guidance to the student on both the content and the methodology of his or her dissertation. Further, once the chair and member accept their nominations, they must approve of the Premise before the student can advance.

175.     The Student Handbook describes Doctoral Committee Member Roles.

> Faculty members in Walden University doctoral programs who accept the duty of serving on a dissertation or doctoral study committee assume a dual responsibility of high importance. **One part is service to their students**; the other is service to the academic practice, discipline, and professional field to which the dissertation is related. For the first part, expectations concerning the faculty service to be performed are determined by students' needs, and by university academic policy pertaining to how these needs are to be addressed. For the second, expectations are set both by university academic policy and by policies and practice that frame acceptable work in the discipline and professional field at large.

Ex. 37, Excerpts, Dec. 2011 Student Handbook at 174 (emphasis added); *See also* Ex. 36 at 258. Further, "Walden intends that dissertation/doctoral study committee members work as a team, directly guiding students through the proposal, research and analysis, and ultimately the final oral presentation." Ex. 37 at 174; Ex. 36 at 259.

176.    The Prospectus (the second step in the dissertation process) is meant to build on the Premise and serve as the foundation of the Proposal (the third step in the dissertation process). The goal of the Prospectus is to develop a plan for the Proposal and ultimately outline the basic structure of the dissertation. Like the Premise, the Prospectus must be approved by both the chair and member before proceeding to the Proposal.

177.    The Proposal (third step of the dissertation process) is essentially the first three chapters of the dissertation, outlining the rationale for conducting the study and describing the design and methodology of the study. Students must work closely with the chair and member to complete the Proposal. As the Handbook promises, the chair and member are to "guide" their students "through the proposal." *Id.*

178.    In addition to approval by the dissertation supervisory committee chair and member, the Institutional Review Board ("IRB") must also approve the Proposal. This adds a third level of approvals, and like with the member, if the IRB does not approve the Proposal (even if just for minor, grammatical reasons), instead of the student going back to the IRB with edits to the Proposal, he or she must begin again with the chair, then (if approved by the chair) to the member, and then (again, if approved) finally to the IRB again. It is also not uncommon for the IRB to disagree with the student's Proposal or sometimes the student's topic in its entirety. Thus, regardless of whether the prior chair and member had approved the student's topic (for years in some cases), Premise, Prospectus and Proposal, the student must now begin the process anew to address the IRB's concerns. And the student does not address the concerns directly to the IRB, but rather, to the chair…then (if approved) the member…and finally (if approved) the IRB again.

179.    After/If the Proposal is approved by the IRB, the student must conduct the study and/or research that is the subject of the dissertation, and finish drafting the dissertation.

180.    The chair and member must approve the completed dissertation, which is then submitted to the University Research Review ("URR") for approval. This again adds another third level of approval, and again, if the URR does not approve of the dissertation (even if just for minor, grammatical reasons), instead of the student going back to the URR with edits to the dissertation, he or she must begin again with the chair, then (if approved by the chair) to the member, and then (again, if approved) finally to the URR again.

181.    It is also not uncommon for the URR to disagree with the student's dissertation in its entirety. As a result, regardless of whether the prior chair, member and IRB approved the Proposal and chair and member approved the dissertation, the student must now begin the process anew to address the URR's concerns. And, like with the IRB, the student does not address the concerns directly to the URR, but rather, to the chair…then (if approved) the member…and finally (if approved) the URR again.

182.    After/If approval is received from the URR, the student must orally defend the dissertation.

183.    After successful oral defense of the dissertation, the student has essentially completed the dissertation process and it may be submitted for publishing.

## WALDEN SYSTEMATICALLY PROLONGS THE DISSERTATION PROCESS

184.    With so many levels of approval required (and the need to constantly restart the approval process), the dissertation process described above is designed to maximize tuition and costs for Walden. Beyond this, the dissertation process is plagued by a complete disregard for Walden's promises and policies through which Walden creates a seemingly endless process that drags on for term after term, year after year for students.[33] This disregard by Walden and Laureate is

---

[33] Walden also offers a Knowledge Area Module "KAM" option in its doctoral programs. The same review problems that arise during the dissertation process also arise with KAMs.

intentional. Further, because Walden funnels most of its students' tuition into marketing and profits, insufficient funds are left to properly manage the students or create sufficient infrastructure to handle an efficient dissertation process. However, this works in Walden's favor, because it ensures numerous delays for the students in which they will pay additional tuition and costs.

185.    Further, the process for obtaining a chair and member is time consuming and difficult, based on obsolete and outdated materials provided by Walden. Making matters worse, for some students retaining the chair and member throughout the entire dissertation process is an additional challenge.

186.    Walden instructs students to consult the Faculty Expertise Directory (which is just an outdated spreadsheet) to find Walden faculty members capable of serving on the dissertation supervisory committee as either chair or member. The dissertation supervisory committee must feature an expert on the student's content and an advisor on methodology. To obtain a chair and member, the student must submit a Committee Member Nomination form, along with a copy of the Premise, to the nominee. If the nominee agrees to serve on the committee and that nominee's service is approved by the program director, then the student may begin finalizing the Premise.

187.    However, the chair and member nomination process does not run as smoothly as Walden represents to its students. First, students spend multiple months attempting to obtain the agreement of a faculty member to serve as chair or member. Students blindly submit requests to faculty members, and most times do not hear back as either the Faculty Expertise Directory is outdated or the faculty members simply do not wish to respond.

188.    Even worse, once the faculty members agree to serve in the roles of chair and member, they sometimes quit, are fired, or simply stop responding to the student. Upon information and

belief, retention of chairs and members is a systemic, institutional issue. Further, this issue is not corrected by Walden because 1) it is in Walden's best, financial interest to prolong its students' time in the dissertation process and 2) Walden is not willing to spend the necessary amount to hire and retain quality, Committee-qualified employees (instead, Walden would rather spend its money on marketing to bring in additional doctoral students).

189.     When a Walden student's member or chair chooses to quit his or her role on the committee, the student essentially is required to start the dissertation process from scratch. The student is forced to locate an additional faculty member to serve in the vacated role. This requires the student to consult the same outdated list of faculty members, hoping to receive a positive response (or any response) from his or her inquiries. However, even if the student locates a new faculty member to serve in the role, the new chair or member may (and often does) disagree with the student's Prospectus, Proposal or dissertation. As a result, regardless of whether the prior chair or member approved the Prospectus, Proposal or dissertation, the student must now begin the process anew and address the new chair or member's concerns.

190.     Walden's requiring of students to find substitute faculty members and the delay it causes violates its rules. Walden's Handbooks promise that if a faculty member suddenly departs, *Walden* will take the appropriate steps to rectify the situation.

> Unexpected interruptions: Faculty services may be unexpectedly interrupted because of an instructor's death or prolonged ill health, or because of an instructor's discontinuation of association with the university. In such cases, **the student's associate dean/executive director, or designee, ensures that faculty services are restored to all affected students.** The associate dean/executive director or designee communicates with affected students throughout the restoration process until appropriate assignments are finalized.

Ex. 37, Excerpts, 2010-2011 Handbook at 123 (emphasis added); Ex. 36, Excerpts 2013-2014 Handbook at 214-215.

191.    As stated above, Walden repeatedly broke this promise, in that once chairs or members left, Walden forced its students to find replacements. This delay always benefitted Walden, because any delay to the dissertation process led to additional tuition payments (including costs for books, residency, technology fees, etc.).

192.    Further, upon information and belief, the turnover rate of chairs and members is high. This high turnover results in Walden students being caught in a cycle of finding chairs and/or members, and gaining their approval, only to start the process again when the committee chair or member leaves Walden or simply stops responding. The turnover is intentional and part of Walden's policy to essentially hold its students captive to the tuition generating machine that Walden has constructed, while it continues to spend its money on marketing to lure in additional students. Upon information and belief, and due to a lack of supervision by Walden, most Walden doctoral students experience a loss of a chair or member at least once (and usually more times) during their dissertation.

193.    With its lack of resources and infrastructure (again due to maximizing profits and marketing at the expense of spending tuition on its students), chairs and members are also often unsupervised by Walden in their interactions with students leading to numerous problems, all of which extend the dissertation process. For example, Walden students depend on the chair and member for guidance and feedback during the entire process. As part of Walden's overall scheme, however, that much-needed counsel is consistently lacking and frequently nonexistent.

194.    The lack of supervision by Walden allows the chairs and members great latitude to shirk their duties, either by giving no or inconsistent feedback, or by simply giving students a "satisfactory" grade term after term regardless of the quality of the work product reviewed so that the student can continue their enrollment and payment of tuition.

57

195.     Internal Walden emails admit to this lack of supervision. For example, in May 2015, the Walden Leadership Team highlighted its lack of oversight for all prior years in view that its dissertation chairs continually awarded students "satisfactory" grades in dissertation courses even when students allegedly made little or no progress:

> The leadership team is very concerned that some students have been awarded a grade of satisfactory for assignments and for the overall course grade when little or no progress was made. Such students incur a heavy debt burden and are often dissatisfied and problematic.

Ex. 39, Harrison Email (May 28, 2015). With this email, Walden admitted its unsupervised and flawed dissertation process resulted in students "incur[ring] a heavy debt burden." The callous tone of this email is shocking when it's noted that Walden was "concerned" not with the students admitted "heavy debt burden"; rather, it was concerned that these students were "often…problematic." *Id.*

196.     Due to a lack of supervision by Walden, many of the chairs and members also do not have the proper educational backgrounds to understand their students' research. Often, this is not found out by the students until many months (if not years) into the dissertation process. When it is, the students are again forced to replace their chairs/members, risking yet again receiving a new committee member who might disagree with the students' work, and potentially requiring them to start over.

197.     Unbelievably, in some cases, due to a lack of supervision, chairs/members require students to pay for third-party editors, some of whom work for companies created by the very same chairs/members. This results in the chair/member receiving additional money, and creates a conflict of interest, where if students refuse to use the chair/member's outside editor, they fear retribution in the form of an "unsatisfactory" grade or the withholding of approval at some stage in the process.Walden also has specifically implemented a formal policy which states that the

chair and member must respond to requests from students for commentary, feedback, or even formal review, within 14 days. This academic policy arises (at least) from its Handbook which would have been prepared by its academic offices in Minneapolis. See e.g., Ex. 37 at iii. Further, when Walden violates this policy and refunds its students' money, those determinations were made by the specific school for which the student was enrolled—all of which were necessarily located in the office of academic affairs in Minneapolis, confirming performance was dictated from Minnesota.

198.    However, due to a lack of supervision and as part of the Walden's scheme, Walden faculty routinely do not abide by the 14-day response requirement. This is especially frustrating for Walden students because they literally cannot progress without the approval of the chair and member. Thus, it causes significant delays in moving forward with, and the completion of, the dissertation process.

199.    In prior, now-resolved litigation brought by a *pro se* Walden doctoral student, Walden admitted its 14-day turnaround policy was contractual. *Pearson v. Walden Univ.*, 144 F. Supp. 3d 503, 510 (S.D.N.Y. 2015)("Defendant does not contest the fact that it is University policy for faculty members to complete review of student work within 14 days of receipt."). With this admission, the Southern District of New York found Walden's 14-day policy was actionable.

> In this context, Defendant's only relevant response to Plaintiff's negligence claim is that "if every short delay by a professor in responding to an email or reviewing a paper justified judicial review[,] then the courts would be overwhelmed with such claims." (Def.'s Mem. of Law in Supp. of Mot. To Dismiss 5 (Dkt. No. 21); see also Def.'s Reply in Further Supp. of Mot. To Dismiss 3 (Dkt. No. 27).) True enough, but it may be that few universities have an explicit 14-day review policy or charge continuous tuition such that a minor delay has a definite, traceable cost to its students. Where an institution charges tuition on a continuous basis, it is at least foreseeable that a delay in reviewing student work will cost the student money in the form of additional tuition.

*Id.* at 512.[34]

200.    Further, students have petitioned Walden and been reimbursed due to Walden's failure to abide by its 14-day policy. Ex. 40, Callahan Tuition Waiver Request From at 2 ("I have been told repeatedly that feedback would occur within two weeks of submission and this was also the false pitch that I was provided upon enrollment in a doctoral program at Walden. Unfortunately this rarely happens. This is obviously just another way for Walden to continue to gauge students for ongoing tuition in these so-called 'classes'. It is unethical and wrong."); Ex. 41, Email Granting Callahan Tuition Waiver.

201.    Upon information and belief, most Walden doctoral students experience a breach of the 14-day response period at least once (and usually many more times) during their dissertation. These breaches unnecessarily prolong students' efforts to obtain their degrees, and result in students having to extend their enrollment in their respective dissertation course, pay additional tuition (including costs for books, residency, technology fees, etc.) and incur additional student loans.

202.    In fact, even a 14-day "response" time is too long. 14 days to receive input comprises 1/6 of a Walden term. While waiting for input (the substance of which is most times guidance on how to proceed), the student essentially cannot advance his or her dissertation for two weeks, yet still must pay tuition during that time frame. With a 14-calendar day response time, if a student would require input from their chair or member just three times in a quarter, that would amount to a loss of half of a quarter.

203.    Further, delays of time caused by a lack of supervision would necessitate substantive changes to the students' dissertation. For example, dissertation references could only be utilized

---

[34] It logically follows if one promise in the Handbook was actionable, other promises in the same Handbook should be as well.

if they were less than five years old. However, through chair and member delays, the already-approved references would age beyond the five-year requirement and need to be discarded. This required the student to spend time and additional tuition to identify and utilize new references. For programs such as the PhD in Psychology program (a program "designed to take 72 months"), this would mean all of students' references would become outdated at some point and need to be replaced solely due to program design and through no fault of the students.

204.    Walden's failure to dedicate sufficient resources, oversee and regulate the supervisory committee program unnecessarily prolongs students' efforts to obtain their degrees, and results in students having to extend their enrollment in their respective dissertation course and pay additional tuition (including costs for books, residency, technology fees, etc.) and incur additional student loans.

205.    Dissertation courses at Walden can cost about $3,000 or more per academic term. Accordingly, the practical effect of Walden's tuition generation scheme, which forces repeated enrollment for additional terms, is extremely expensive for students and highly lucrative for Walden.

206.    Walden, as experienced by Plaintiff and the Class and Subclass members, is intentionally and deliberately using its dissertation process as a means of improperly extracting tuition and generating revenue. Walden has intentionally and knowingly created and implemented a dissertation process that is fraught with inefficiencies, meant to ensure that students do not receive the timely responses and attention that they were promised, and has created inordinate turnover of faculty and supervisory committee chairs and members. All of this is done without any honesty or transparency by Walden regarding the actual time and expense that its doctoral students will incur in an effort to complete their degrees...if completion is even possible. Further,

61

it is an insidious scheme in that, once students have spent considerable time and expense embarking on the process, they are left with two options in the face of these delays: 1) quit the program, thereby essentially throwing away the time and money expended (as most, if not all, of their credits are not transferable to other institutions) and accelerating the start of the payback period; or 2) continue to enroll in additional quarters with the hope of completing the program someday before they run out of money.

**WALDEN'S COST OF ATTENDANCE AND ITS IMPACT ON DOCTORAL STUDENTS' LOAN DEBT**

207.    According to the Federal Student Aid website (an office of the U.S. Dept. of Education), schools determine their "cost of attendance" ("COA") from factors such as "tuition and fees," "cost of room and board," and "cost of books, supplies, transportation and miscellaneous expenses" among other factors. Ex. 42 Federal Student Aid webpage "How Aid is Calculated," from https://studentaid.ed.gov/sa/fafsa/next-steps/how-calculated (Downloaded Jan. 4, 2017).

---

### What does cost of attendance (COA) mean?

Your COA is the amount it will cost you to go to school. Most two-year and four-year colleges will calculate your COA to show your total cost for the school year (for instance, for the fall semester plus the spring semester). Schools with programs that last a different period of time (for instance, an 18-month certificate program) might give you a COA that covers a time period other than a year.

If you're attending at least half-time, your COA is the estimate of

- tuition and fees;
- the cost of room and board (or living expenses for students who do not contract with the school for room and board);
- the cost of books, supplies, transportation, loan fees, and miscellaneous expenses (including a reasonable amount for the documented cost of a personal computer);
- an allowance for child care or other dependent care;
- costs related to a disability; and/or
- reasonable costs for eligible study-abroad programs.

---

The amount of loans for which students are eligible then is not limited to tuition and fees.

208.    In determining its students' COA, and therefore amount of loans its students are eligible

to receive, Walden relies on these Dept. of Education factors. When calculating its total

estimated costs to attend, Walden's Net Price Calculator acknowledges it considers: 1)

"estimated tuition and fees," 2) "estimated room and board charges," 3) "estimated cost of books

and supplies" and 4) "estimated other expenses." https://www.waldenu.edu/financial-aid/price-

calculator.

209.    For a 28 year old who does not plan on applying for financial aid and is "living on my

own or with a roommate," Walden's Net Price Calculator estimates his or her "tuition and fees"

would be $12,240, "room and board charges" would be $9,900, "costs of books and supplies"

would be $1,200 and "other expenses" would be $8,100 for a total of $31,440.



210.    When students apply for loans to attend Walden, they rely upon information from Walden as to the amount required. Also, students rely upon the amounts made available to them from student loan services, as the amount made available was determined from Walden-provided information. Therefore, if Walden informs its students that it will cost $31,440 for one year of attendance, it is reasonable for students to rely upon such a representation when applying for loans. Further, it is reasonable for Walden to expect that if it informs students it would cost a certain amount to attend Walden (*e.g.,* $31,440), those students might take out the full value in loans, especially when over 78.8% of its students apply for and receive loans of this type.

211.    If Walden had not engaged in the above-described fraud or violations, its students including Plaintiff and the Class would not have chosen to attend Walden and thus would not have taken any student loans for Walden including those for 1) "estimated tuition and fees," 2) "estimated room and board charges," 3) "estimated cost of books and supplies" and 4) "estimated other expenses."

## PLAINTIFF THORNHILL'S EXPERIENCE AT WALDEN

212.    Plaintiff Thornhill was a student at Walden pursuing her Doctor of Philosophy in Management, specializing in Leadership and Organizational Change.

213.    Plaintiff Thornhill enrolled in her doctoral program in 2011. Prior to enrollment and during the enrollment process, Plaintiff Thornhill visited Walden's webpages for her program. Plaintiff relied upon the representations on these pages when enrolling.

214.    For example, in the webpages for her chosen program from 2010 and 2011, the "Proposal, dissertation, and oral presentation" are described as lasting 30 credit hours (*i.e.,* five, six-credit-hour classes). Group Ex. 49, PhD in Management Completion Requirements (30 cr.

for May 27, 2010; 20 cr. for Aug. 12, 2011).[35] Plaintiff Thornhill relied upon the representations of the webpages she visited during this time, and believed that she only needed to complete a specific number of credits (including dissertation credits) to obtain her degree.

215.    When Plaintiff Thornhill contacted Walden, she was assigned a recruiter. Upon information and belief, Enrollment Advisor Wajoili Ward-Jiggets was assigned as Plaintiff's recruiter.

216.    At the time of Plaintiff Thornhill's enrollment, Walden paid its recruiters "based on the number of students enrolled." Ex. 10 at 712.

217.    Being compensated in such a manner, her recruiter would have received a direct financial benefit once Plaintiff Thornhill enrolled.

218.    Also, Plaintiff Thornhill's recruiter (as did all recruiters) had a "script" with specific discussion points including "time to completion."

219.    During a phone call about one month prior to Plaintiff enrolling in the PhD in Management program, Plaintiff's recruiter represented that it would take only 18 months to complete the dissertation and 3 ½ years to complete her program. At no time did Plaintiff's recruiter explain that she would require additional dissertation classes or that that the dissertation process would exceed 18 months.

220.    Plaintiff Thornhill relied on her recruiter's statements that it would take 18 months to complete her dissertation and 3 ½ years to complete the program when she enrolled at Walden, as well as when re-enrolling each semester.

---

[35] Prior to and during the enrollment process at Walden, Plaintiff Thornhill visited Walden webpages accessible at those times and, as no doubt intended by Walden, relied upon the information represented therein, including how long the dissertation process would last. Understandably, given the passage of time (and the incomplete record of archive.org), Plaintiff Thornhill is presently unsure which of Walden's prior webpages she visited. However, the Walden webpages of which she is aware from the 2010-2011 time frame represented that the dissertation process would take a specific number of credits (or time period).

221.    Between the summer of 2011 and Spring of 2014, Plaintiff Thornhill completed the

following doctoral-level courses: Foundations for a Ph.D. Study; Research Theory; Managing

Organizational Systems & Complexity; Management of Decision-Making; Leadership, Influence

& Power; Challenging Conventional Leadership; Qualitative Reasoning & Analysis, Changing

Face of Leadership; The Socially Conscious Leader; Developing a Prospectus; Quantitative

Reasoning & Analysis; Advance Qualitative Analysis; Applications of Current Topics in

Management and Writing a Proposal.

222.    Plaintiff received only As and Bs in her courses.

223.    Upon completion of those required doctoral-level courses, Plaintiff Thornhill began her

dissertation in September 3, 2013.[36]

224.    Plaintiff Thornhill enrolled in dissertation courses starting in spring 2013, then continued

with them in the fall quarter of 2013, winter quarter 2013, spring quarter of 2014, summer

quarter of 2014, fall quarter of 2014, winter quarter of 2014, spring quarter of 2015, summer

quarter of 2015 and fall quarter of 2015…far longer than the promised 18 months.

225.    For the quarters she attended, Plaintiff Thornhill paid $3,360, $2,390, $4,710, $4,735,

$4,935, $2,515, $6,160, $2,610, $2,610, $2,610, $6,570, $3,990, $3,990, $3,990, $4,110, $4,110

and $4,110.[37]

226.    Plaintiff also completed three residency courses in Maryland, Georgia and Indiana,

obtaining the necessary satisfactory grades to advance from each of those courses.

---

[36] After being enrolled at Walden for 30 months, Plaintiff began her 9000-level dissertation course work though
technically she began her dissertation coursework even earlier in the Spring of 2013, after 18 months, when she took
"Developing a Prospectus." Regardless, under Walden's 66 month "designed" time, that would leave 36 months to
complete the dissertation process including 12, 9000-level-dissertation classes…not the promised 18 months total or
five dissertation classes.
[37] Each quarterly payment consisted of tuition and a $60, $70, $95, $110 or $120 technology fee.

227. For each of these residency courses, Plaintiff Thornhill paid approximately $3,500, including enrollment of $1,039, $1,125 and $1,125 for each, plus hotel, flight and meals for five days.

228. However, progress on her dissertation remained elusive for this A/B student because of the systematic and intentional manner in which Walden delayed her.

229. Wanting to be sure that she was using her time at Walden efficiently, Plaintiff Thornhill started working on her preliminary Prospectus on March 4, 2013. Her preliminary Prospectus topic was submitted it to Dr. David K. Banner (her dissertation supervisory committee chair and content expert), who approved it on September 15, 2013.

230. On Feb. 23, 2014, Dr. Steve Tippins agreed to be her dissertation supervisory committee member and methodology expert, to complete her supervisory committee.

231. On February 14, 2014, Plaintiff Thornhill submitted her preliminary Prospectus to both Dr. Banner and Dr. Tippins.

232. On June 4, 2014, it was approved.

233. When Plaintiff Thornhill began working on her Proposal, she was initially allowed to communicate and receive input directly from her dissertation supervisory committee chair and member on her dissertation which were typically accomplished via email through Walden's Interactive Blackboard System. Plaintiff Thornhill relied upon such input to gain input on whether she was headed in the correct direction and to receive general pointers.

234. Plaintiff Thornhill also relied upon Walden's Writing Center, a resource that would assist with confirming her Proposal was complying with APA writing guidelines. With the support it provided her, it was a resource she relied upon when deciding to continue reenrolling at Walden.

235.    At the time of her enrollment, Walden's "Dissertation" webpage, specifically marketed towards doctoral students, explained the dissertation process. Ex. 43, Walden Dissertation Webpage (June 30, 2011). Prior to enrolling at Walden, Plaintiff Thornhill reviewed this page and relied upon the representations made therein when enrolling at Walden.

236.    On the "Dissertation" page, Walden represented that doctoral students would be "supported throughout the dissertation process by a range of services and resources dedicated to your success." The first listed resource was: "The Writing Center." *Id.* The Writing Center was a resource promised to doctoral students.

237.    When utilizing the Writing Center, Plaintiff Thornhill could choose an advisor with the specific background necessary to understand and provide further input on Plaintiff Thornhill's Proposal.

238.    According to Walden's current webpage, students who utilize the Writing Center can receive the following types of input:

**Sample Paper Reviews: Overview**

Wondering what to expect from your Writing Center review? Below are the types of assignments we review, along with sample feedback. Feedback will vary among writing instructors but will consist of some of these:

- Explanations of errors
- Links to resources
- Questions or reactions from a reader's perspective
- Recommended next steps
- Revision strategies
- Highlighted patterns
- Models of effective writing
- Video clips to watch

Available at: http://academicguides.waldenu.edu/writingcenter/paperreviews/samplereviews

239. Both direct access to her dissertation supervisory committee chair and member and use of the Writing Center were important resources, and Plaintiff Thornhill relied upon them in advancing along the path to finishing her dissertation.

240. Walden, however, took both of these resources away from Plaintiff Thornhill and all other members of the Class.

241. On or about January 2, 2015, although it was still a resource available for undergraduate students, Walden abruptly prohibited doctoral students from utilizing and relying upon the Writing Center for their dissertations. Despite taking away this important resource, doctoral students' tuition did not decrease.

242. Also, on or about October 30, 2014, doctoral students were informed about a new procedure in which any contacts for specific advice from their dissertation supervisory committee chair and members could only take place through the MyDR computer application. However, doctoral students were specifically prohibited from using MyDR until they had completed Chapters 1-3 of their dissertations (*i.e.,* their Proposals).

243. This placed Plaintiff Thornhill and other members of the Class in the untenable situation of needing to complete the first three chapters of their dissertation, one of the most important foundation steps in the dissertation process, before they could use the MyDR service. In other words, despite paying full tuition for the educational services that Walden said it would provide including, but not limited to, assertions from the Handbook that "Walden intends that dissertation/doctoral study committee members work as a team, directly guiding students through **the proposal**," Plaintiff and other members of the Class were now limited to only receiving the most general input on the Proposal. Ex. 37 at 174; Ex. 36 at 259 (emphasis added).

244.    This was a substantial hurdle for Plaintiff Thornhill and members of the Class. In particular, Chapter 3 was the proposed methodology of the dissertation, which was often quite complex (requiring explanations of how to carry out the research, which tools to utilize, how to prepare and conduct meaningful interviews and observations, etc.). For such an important portion of the Proposal (and the dissertation process as a whole), specific input was often necessary to ensure proper methodologies were utilized. In particular, Plaintiff Thornhill required input on instrumentation, transferability, confirmability and dependability for Chapter 3. Despite this, Walden prohibited Plaintiff Thornhill and the members of the Class from receiving anything but the most general input from the guidance from their Committee advisers that they had been promised.

245.    For example, when Plaintiff Thornhill contacted her chair Dr. David Banner about specific guidance she needed on her Proposal, she was denied such input due to the Walden policy.

David Banner <david.banner@waldenu.edu>                                 Tue, Dec 9, 2014 at 11:53 AM
To: LaTonya Hall <latonya.hall@waldenu.edu>

LaTonya...I cannot review it until you have a draft of all three chapters of the proposal.....

check with MyDR...there may be a way to do a draft......

Dr.B.

Ex. 44, D.Banner and L.Hall Email Exchange (at Dec. 9, 2014).

246.    This was a direct violation of Walden's Student Handbook which required the doctoral study committee members to "work as a team, directly guiding students through the **proposal**, research and analysis, and ultimately the final oral presentation." Ex. 37 at 174 (emphasis added); Ex. 36 at 259.

247.    This happened not once, but multiple times, when Plaintiff Thornhill requested input on

the Proposal, but again was denied such input…until she completed Chapters 1-3 (and thus could

access MyDR).

David Banner <david.banner@waldenu.edu>                    Mon, Jan 19, 2015 at 7:45 AM
To: LaTonya Hall <latonya.hall@waldenu.edu>

LaTonya...the Walden system can be unreliable...please submit all plans to me directly.

Also, submit the prospectus through MyDr...I cannot give you feedback unless you do that...

Dr.B.
[Quoted text hidden]

Ex. 45, D.Banner and L.Hall Email Exchange (at Jan. 19, 2015).

248.    Plaintiff Thornhill's situation was straight out of *Catch-22*. While the Walden recruiters

promised that she could finish her dissertation in 18 months[38] if she listened to her advisers, she

was now prohibited from "listening" to her advisers until she finished the Proposal/Chapters 1-3

of her dissertation…chapters that she needed input from her advisors to complete. Further, while

the Walden Handbook promised that her advisers would work with her as a team on the

Proposal, they expressly would not work with her (as a team or otherwise) on the Proposal until

it was completed.

249.    Problems arose in the dissertation process for Plaintiff Thornhill even prior to the

Proposal Catch-22. For example, Plaintiff Thornhill started working on her preliminary

Prospectus on March 4, 2013. Her preliminary Prospectus topic was approved by Dr. Banner

(her dissertation chair) on September 15, 2013. Despite this, at a residency in December 26-30,

2013 in National Harbor, Maryland, Dr. Kenneth Sherman, a resource to provide feedback on

dissertation topics and prospectuses, told Plaintiff Thornhill she should change her Prospectus

topic to focus more on millennials. Despite already gaining approval from her chair, Plaintiff

---

[38] Also, the Student Handbook indicated the dissertation process could be completed in 13 months.

71

Thornhill relied upon the advisor's input, took time to create a new topic, and submitted it to her dissertation supervisory committee chair for approval. In response, Plaintiff Thornhill's chair told her to disregard the advice given to her at the December 2013 residency (ironically which was advice to disregard Dr. Banner's advice), and instead utilize her initial topic. Through these inconsistent instructions from her advisers, Ms. Thornhill lost progress on her dissertation from the last quarter of 2013 and first quarter of 2014, for which she still had to pay.

250. Further, delays were endemic at Walden, as shown by the following email from Plaintiff Thornhill's chair.



LaTonya Hall <latonya.hall@waldenu.edu>

**MGMT-9000-12,Doctoral Dissertation.2015 Summer Qtr 06/01-08/23-PT1: MyDr**
1 message

David Banner <david.banner@waldenu.edu>                                    Mon, Jun 1, 2015 at 6:01 AM

Mentees: I have had so may requests for MyDr work lately that I have regrettably lost track of who needs what....if I haven't responded to you in a timely way, PLEASE let me know what I need to do to help...

Dr.B.

Ex. 46, D.Banner Email (June 1, 2015). While at Walden, Plaintiff Thornhill experienced delays beyond the 14-days promised.

251. Over the course of Plaintiff Thornhill's time at Walden, she experienced innumerable delays and multiple instances of faculty members failing to fulfill their responsibilities as dissertation supervisory committee chairs and members due to the hurdles Walden itself placed in their way. In other words, Plaintiff Thornhill has been subjected to, and victimized by, the intentional and knowing scheme of Walden to prolong the dissertation process so that it could generate additional tuition revenue. Walden has subjected the other members of the Class to the same scheme, thereby causing them to be damaged in the same manner as Plaintiff Thornhill.

252.    As of now, Plaintiff Thornhill has paid for seventeen quarters during her time at Walden,

including seven quarters of dissertation-level classes and three residencies. Despite being

promised it would take 18 months to complete her dissertation, at the time she unenrolled, she

was still only at the Proposal stage, less than 3/5 of the way towards completing the dissertation.

With the limited resources she was allowed, Plaintiff Thornhill estimates it would have taken her

over a year (at least four more 9000 level dissertation classes)[39] and approximately $30,000 to

complete her dissertation, if completion was even possible given that she needed guidance that

was not forthcoming on her Proposal. Unfortunately, she was forced to take a leave of absence

after the fall quarter of 2015.

253.    Had Plaintiff been made aware of Walden's abysmally low completion rate, she would

not have enrolled in the doctoral program or paid the tuition, residency fees (including travel),

supply costs and other fees charged by Walden, or applied for student loans to pay for tuition and

fees, room and board charges, costs of books and supplies and other expenses. Further, had

Walden not misrepresented the timeline, costs, and hurdles to completing a dissertation or had it

disclosed its true scheme, Plaintiff would not have enrolled in or agreed to pay for the

educational services offered by Walden or applied for loans to pay for tuition and fees, room and

board charges, costs of books and supplies and other expenses. Additionally, had Walden not

omitted to inform Plaintiff of the "design" time of its program, she would not have agreed to

enroll in and pay for the educational services offered by Walden or applied for loans to pay for

tuition and fees, room and board charges, costs of books and supplies and other expenses.

Finally, if Plaintiff had been unaware of the lack of oversight Walden provided to its faculty, she

would not have agreed to enroll in and pay for the educational services offered by Walden or

---

[39] Plaintiff's estimate would be very near the 66 month "designed" time for the PhD in Management program, and equates to at least 11 quarters of 9000-level-dissertation classes…far longer than what was promised.

applied for loans to pay for tuition and fees, room and board charges, costs of books and supplies and other expenses.

254.    Tellingly, almost a year after she left in August 2016, Walden re-opened the Writing Center to doctoral students for doctoral premises and doctoral prospectuses (presumably because Walden had come under increased scrutiny about taking away such an important resource). This confirms the intense pressure placed on its doctoral students by removing this invaluable resource.

255.    Walden has intentionally and unjustly prolonged Plaintiff Thornhill's work toward her doctoral degree and extracted extra tuition payments from her for dissertation coursework that would never have been necessary but for Walden's scheme to generate additional tuition revenue and minimize its overhead so that more of the revenue could be spent on marketing to ensnare more students. Because of the scheme, Plaintiff Thornhill had to withdraw, knowing that to complete the educational process, at a minimum, would require more time and more tuition payments beyond what she had reasonably anticipated she would have had Walden not engaged in its illegal conduct.

**Plaintiff's Experiences are Common at Walden**

256.    Plaintiff's experiences mirror those of thousands of other students. A comprehensive collection of such complaints are located at: http://www.complaintboard.com/walden-university-l4025.html and http://gotaclassaction.com/walden-university-and-laureate-education-inc-named-in-class-action-lawsuit-over-systematic-prolonging-of-the-thesis-and-dissertation-process/. Some of the more relevant complaints are reproduced below, all focusing on the unfair workings of Walden's dissertation process.

bonniea2 ✉ Send email     Sep 18, 2016

### Walden Doctoral Program

Like many of you, I have a similar story regarding the amount of money I am now in debt. I have recently graduated with my PhD. However, the process of reaching this milestone was prolonged by the dissertation process. I am now 178,000 in debt. I want to join this class action suit because of the unethical practices of this University.

Acts333 ✉ Send email     Sep 7, 2016

### Doctoral in DNP

I've been in this program since 2009 and have seen professors quit, Chair persons change, courses added, e-mails disappear, conflicts in time zones and so many other excuses. Walden should be reported to the Department of Education. Their headquarters in Minnesota should be reported to the Atrroney General in the state. Their practices and recruitment should be investigated. What is the percentage of African Americans who take courses are graduating more quickly than other groups. What political connections did they have with Bill Clinton. A major law suit should be filed in all 50 states to recover hundreds of millions today dollars this university has taken from hard working citizens

juliedefelice ✉ Send email     Sep 6, 2016

### Way Too Much Money; No Returns On My Investment Yet

Wow, I have been experiencing some of the same problems notated above.
I am stuck in the proposal phase of my Ed.D degree at Walden.
After comparing rubrics, I submitted to the URR now 4 times, I have passed sections previously that are now deemed as not passing. I had a problem in the very beginning of this journey with a chair person who lived across the globe from me. We were 8 hours apart. How can I make progress when we live in time zones that far apart??? After a fight to get a change, I got an awesome person to help me, but now my URR, who was friends with the first chair person is making my life unbearable. I receive mixed communication and now a grade that keeps changing from draft to draft. My chair and 2nd seems to think the proposal is just fine, but every time the URR gets it, she says it is not. I am spending mega bucks and now have school loans that are in the $100K+. I would love to be part of this class action lawsuit. I think there is a scam someone going on here. I would also like to be reimbursed for all the money I have spent when there has not been progress made towards graduation.

kerrnonne42 ✉ Send email     Sep 4, 2016

### Walden University

I am 287,000 in debt. If I continue with the PhD program in psychology it would take another year or two. I am stuck in proposal, and there is absolutely no help with regard to methodology. I have never defaulted on a loan in my life, and I can't imagine how I will pay off a house. I had to take plus loans. They are not eligible for income based repayment. I am going back to work as a counselor. It took 6 years to spin my wheels, and lose everything. I am suffering from depression. What is happening in this country? How could the federal government even fund this program? This is awful. The residencies were expensive. I had to leave my job to complete 2,750 hours of clinical full time, and needed to take more loan money. This is just awful. Unfortunately, I am losing hope that the government will do anything about this. I need help. I have been in the program from 2010.

amhPhd_Scam ✉ Send email                                                                    Aug 24, 2016

## 11 Years PhD Program $200k in debt

Began my doctorate program with Walden University in September 2003. Completed all required course work before beginning the dissertation process. Problem!!! The course work (mostly independent white papers on a sundry of business management topics) did NOT prepare me for the dissertation process. Why? Walden knew that if they had prepared its ABD (all but dissertation) students with significant courses related to the PROCESS of writing a dissertation (URR, ethical reviews, etc.) they would not make as much money. Fast forward to 2009 - my dissertation process took me two years to complete. Why? My dissertation chair refused to accept my methodology. So I changed it. Then, another member of the dissertation committee (brought on 1 1/2 years later) felt that he didn't like my research - even the title! THEN . . . the another member of the committee suddenly left the university. University failed to notify me; but, I couldn't move forward until the committee member was replaced (all the while, I'm being required to pay tuition). I did complete the program . . . 11 years and $200k in debt (my credit is so messed up). Why did I continue to attend Walden? At the point in which I knew that the school was scamming me - it was too late. I had to complete it (borrowing from parents, taking out credit cards to pay tuition, deeper and deeper into debt). It was better to have my doctorate, than not to have my doctorate.

Jianaii ✉ Send email                                                                         Aug 24, 2016

## Walden's Doctoral Program

I have a similar story as those written here. I have been a part of the doctoral program at Walden going on five years now and every year I was vocal about the waste of time with the two years of "coursework" that I learned absolutely nothing. Then starting the project study process I really started noticing the scam beginning. I had three chairs up to this point and after working on just the proposal phase for two years I am going nowhere. I hired an outside publisher to help me through the process but even that is not really helping as much as I thought it would. I am on my third round of proposal approval and one round of URR. I am almost $200,000 in debt with my undergrad and other degree loans. Walden alone is $100,000. I will be glad to be a part of a class action lawsuit!

Mari

cassie32368 ✉ Send email                                                                    Aug 24, 2016

## Walden Fraud and still no Ph.D

I began my Ed.D quest in 2011 and began to work on my dissertation in 2014. They prolonged approval at the dissertation stage at which I knew it was going to be an uphill battle. I requested a new chair because I knew my work was of quality. I'm now thousands of dollars in debt! I pray thatthese predatory practices at Walden University are looked into by the White House

KNWMN ✉ Send email                                                                    Aug 20, 2016

### Let's get this law suit against Walden off the ground

I have been communicating with students as angry at Walden as I am. Time to move this lawsuit forward.
Greetings:

Last week I twice spoke with an experienced reporter from a major newspaper. They are very excited about running
with this story. It can be perhaps on the same level of fraud and corruption as the for profit Corinthian College. I have
told the reporter my story, and have three others lined up to speak with her next week.

Please send me your story with Walden. I'll forward it to the reporter with your email contact info and she'll reach out to
you. We students are doing this to attract the attention of a lawyer. Let's get this thing going.

My story goes like this. I started my Doctorate with Walden in 2008. All went well and my Chair approved my study and
I was to start my University Research Review (URR) in December 2011. My chair was then dismissed by the university
and I was given a new Chair and a new Second. My second required that I start my study all over. Three years late in
2014 my Chair was about to approve me to start URR again. Then that chair was removed and I again received a new
Chair and new Second. The new second was not assigned until about 6 weeks into the class. The very next day my
father-in-law died so not much progress was made during that semester. The next semester I was again approved to
begin URR and the university dismissed me for lack of progress. I made URR and they call that a lack of progress?! So
here I am over $100K in debt, having had my study formally approved twice by two different chairs, yet I have no
degree.

KNWMN ✉ Send email                                                                    Aug 2, 2016

### Let's sue Walden

Zkeithnewman@yahoo.com
My Walden story begins in 2008 and all went well until January 2012. I had just (in December 2011) been approved to
begin the URR phase of my doctoral program. Walden dismissed my chair, assigned a new one, and I had to start all
over. In 2015, after accruing 3 more years of debt my chair was about ready to approve me to start URR again. Guess
what!? They changed my chair again. I stayed with it and was approved to start URR but am now too old and too far in
debt to continue at Walden. After 8 years I have nothing but a debt that will not disappear until I am 70.

Please, let us join together. Contact me at my yahoo email address and let's get going.

760student ✉ Send email                                                               Jun 30, 2016

### to much time in doctoral study stage

I have had two chairs, 3 second committee members. I was told to use the walden university writing center to get my
doctoral study paper APA compliant. I did and my chair said they did a bad job. Each second committee member
required 1000's of changes to my document and I made the changes, once complete I would have a new second
committee member. I ran out of money using approved APA editors and my document would still get kicked back. This
needs to stop, I just want to finish and graduate.

sbealldavis ✉ Send email                                                      Jun 7, 2016

## Walden University Unethical and Fraudulent!

Please add me to the Walden Class Action Law Suit! I started Walden's doctoral program in 2007 and now it's 2016. I have a 3.7 GPA in course work completed, all residences completed plus extra, submitted my prospectus waited almost 3 months @ over $4k per quarter to get a URR assigned, wrote my initial proposal- rejected but comments were needs minor changes and organization. As time went on I kept re-submitting and getting comments that just a few more changes. I hired and editor, have paid several hundred dollars to get help and each time I'm told how wonderful the paper is but just make these few changes and you'll move forward. I'm more than $200, 000.00 in debt now government loans and 40,000 in personal loans. I'm 60 years old now and still no degree nor moving pass URR. There has also been instances where the 14 day review period took more than 20 days pushing me into another quarter adding more debt to the already enormous debt. Lies, deception and false hopes is what I've experienced. I have lots of documentation. Please add me to the lawsuit, the legacy I once dreamed of leaving for my children and grandchildren has been destroyed. I'm still waiting for Walden to create a way to remove me from the school or continue to drain me until I can't get another loan to continue. They've told me that if I take a leave of absence, I more than likely can't get back I'm now another $8000 in debt to them trying to complete the Summer session to get pass the URR. They are predators the approval of the proposal process has been going on since 2014 now...See below

Student resubmits Proposal committee rubric analysis Jun 02 , 2016
Proposal not ready for URR Approval May 21 , 2016
Student resubmits Proposal committee rubric analysis Apr 25 , 2016
Student resubmits Proposal committee rubric analysis Apr 22 , 2016
Proposal not ready for URR Approval Apr 11 , 2016
Student resubmits Proposal committee rubric analysis Mar 30 , 2016
URR Denies Proposal Feb 22 , 2016
Proposal ready for URR Approval Feb 12 , 2016
Student resubmits Proposal committee rubric analysis Feb 02 , 2016
Proposal not ready for URR Approval Nov 10 , 2015
Student resubmits Proposal committee rubric analysis Nov 01 , 2015
Proposal not ready for URR Approval Oct 23 , 2015
Student resubmits Proposal committee rubric analysis Oct 20 , 2015
Proposal not ready for URR Approval Sep 10 , 2015
Student resubmits Proposal committee rubric analysis Aug 27 , 2015
Student resubmits Proposal committee rubric analysis Aug 27 , 2015
Student resubmits Proposal committee rubric analysis Aug 27 , 2015
Proposal not ready for URR Approval May 13 , 2015
Student resubmits Proposal committee rubric analysis Apr 21 , 2015
Student initial submits Proposal for committee rubric analysis Apr 19 , 2015
Program Director Approves Prospectus Jan 12 , 2015
Prospectus Ready for PD Approval Dec 30 , 2014
Student resubmits Prospectus for committee rubric analysis Dec 10 , 2014
Student resubmits Prospectus for committee rubric analysis Dec 09 , 2014
Prospectus not ready for PD Approval Dec 08 , 2014
Student initial submits Prospectus for committee rubric analysis Dec 08 , 2014
Student initial submits Prospectus for committee rubric analysis Nov 10 , 2014

Minglee1! ✉ Send email                                                                      May 12, 2016

## Doctorial program

I have many of the complaints as most of collogues. I entered Walden University 2011, did very well through the course work and earned 4.0. Once I entered the doctorial program (5 stages to complete) its been one disaster after another. Assigned to a verbally abusive professor and proving derogatory statement were made through email and phone conferencing, I was transferred to another professor. Unfortunately the first abusive professor is the "head" of the department and over sees everyone. Therefore, not a lot changed except the second refused to speak with me without a committee and he is always "super" nice without productive feedback. After 3 months in the first stage, he sent me an email to move forward ....task stream had passed my prospectus with 3/5 points. Only to receive an email 4 weeks into the course 2nd stage that stated the "committee" my previous professor said I did not pass. Eventually, he gave me a U I had to take off a semester and fight to get back in. Returning 6 months later, I hired a professor on a doctorial committee in another state to review my prospectus- she did and stated there were a few errors that needed corrections . For 12 weeks the Walden professor returned my paper with "minor" problems and stated major improvements....etc. Ten days prior to the semester ending I submitted my paper, it was not returned until 5 days AFTER the course ended stating I received another U and I should rewrite my entire paper. I also have a problem with the course survey that MUST be completed 5 days prior to the course ending or you will not get a grade. I was told they are confidential, but I know for a fact that the professors do reading them prior to grading. 5 years in I have run out of money and still no degree.

syndibradley ✉ Send email                                                                   May 9, 2016

## Unfinished EdD Dissertation

Please let me know if there is in fact a class action law suit against Walden University. I too began the EdD process in 2008. When I began working on the dissertation, my initial 1st Chair person fell off the face of the earth after 2 semesters, and 2 weeks into the 3rd semester, the head of the department began asking us questions of this Chair person's whereabouts. Within the next 2 weeks, we were added to another Chair person's caseload. She didn't approve of the proposal I had already completely (nearly) established with the missing Chair person. So, I began with a completely new topic. I never received positive feedback and she refused to talk to me until I had completed the 1st section. Well, after 3 semesters with her, I requested a new Chair. Denied. So, I took a 6 month break. Upon returning, same Chair person. After 1&1/2 semesters more with her, they finally granted me another Chair person. This Chair person loved my new (3rd) topic and we worked for 18 months to finally get to the URR. The URR loved the proposal, gave feedback and I worked for 4 weeks to revise and resubmit. When I resubmitted, I was informed I had a new URR. Then 2 weeks later I was informed I had yet another new URR. This 3rd URR person finally after 33 days returned the proposal with over 300 negative comments. My Chair quit and they gave me a 4th Chair person and another new URR. I cannot do this anymore. This is ridiculous. I would love to know if there is really a class action law suit against this institution. I can be reached at syndi.bradley@yahoo.com Thanks, Bradley.

khen2011 ✉ Send email                                                                       Mar 29, 2016

## Walden University

I enrolled in a doctorate program at Walden University in 2011 and I am still working with my chair to revise and edit my project study. Each semester, I may have two to three opportunities to receive feedback from him. According to the project study guide, the committee members have 14 days to provide feedback. My chair takes all 14 days to provide feedback and the feedback is inconsistent. I contacted the advisory team and was told it often takes multiple years to complete the project study. However, when being recruited, I was told it was a 3-year program (most students complete in 3 years). Even after contacting the program director, little has changed, with the exception of upsetting the committee members. I think I was misled.

Fer2848 ✉ Send email                                                                      Mar 20, 2016

## Walden University Purposely Prolonges Degree Programs

I have many of the same complaints listed below. I enjoyed my coursework at Walden with a high grade point average.
However, after almost 2 years my proposal still is incomplete. My committee chair gives pitiful feedback, and I usually
have to request it be sent back after 14 days. When I raised concerns, nothing was done. It is unacceptable to be
spending $20,000 a year for an advanced degree when staff are not fit for helping students succeed!

kitd ✉ Send email                                                                         Mar 19, 2016

## Unresponsive Faculty and Administration

I was enrolled in Walden for two semesters. Despite have been very successful in traditional graduate programs, I was
unable to get my initial proposal approved, but never received clear rationale for the rejection. It took my first "mentor"
6 weeks to respond to me and when he finally did his communication skills were so circular that I could not understand
what he was saying. I asked for a transfer. Several months later I was assigned a new adviser, but this one was no
more responsive than the first. So - I paid for two semesters through student loans that were completely useless. I
made numerous efforts with the administration to resolve this issue, with no success whatsoever. I've had this loan on
my back for 20 years. Walden's promises are fraudulent.

hateful ✉ Send email                                                                      Dec 24, 2015

## PhD holdup Walden University

Working on PhD for years, kept having to rewrite, get approval, then told to rewrite what was all ready approved a few
versions back. Finally, after a year with one advisor and approval, I was told by a new member I would have to start
over again because it wasn't a PhD type of study. Now, I'm continuing the process and $250,000 in debt which I will
never get back in promotions, etc.
They say it costs $43,000 to get the PhD which is a lie. It also takes a long time to get 4 residencies and all of the
credits needed THEN years more for the rest of it.
Nightmarish. Was a great school until the PhD itself began, then horrible and a rip off. Biggest mistake of my life, time
and money lost with no gain. Need to finish it now, I'm stuck and cannot transfer and have to just play the waiting
game registering for one 6 credit class each semester until I'm done. (6 credits is a lot of money)
Hope this helps someone.
Jimmy

rpb250 ✉ Send email                                                                Nov 30, 2015

### I want to join Walden class action lawsuit

I would like to join this class action suit against Walden University. I have experienced the same issues. I started the DBA program in 2012 and was told it would take 2-3 years to complete due to credits received from the MBA program. The guidelines and requirements changed so many times that I have had to start over again and again. January 2015, after my chair resigned, I had to start over yet again. Now, my student loans have maxed out and I have no more money to complete the degree. I am 100K in debt, with nothing to show for it. I feel like I have wasted 3 years. I complained to the director of our program, and her solution was for me to pay to attend ANOTHER DBA Intensive and really focus on writing. What kind of answer is that? She did not speak to or address any of the issues I raised: continuous changes, wasted tuition dollars, inability to make progress through the program, inconsistencies in expectations. We are still working on the proposal 3 years later. I should be finished by now. I was misled. I am very unhappy with the results of the DBA program.

hokieskb ✉ Send email                                                              Nov 6, 2015

### Same Story

My story matches the others on this page. I completed the coursework for my Ed.D. with a 4.0 gpa. I spent approximately 7 years trying to get my dissertation completed and was simply spinning my wheels. During that time I had 3 different Committee Chairs, 2 different 2nd committee members and 2 different URR Committee members. Ever change in member brought on more and more changes in the dissertation. I finally ran out of money and had to stop. I made the comment to my last Committee Chair several times that it seemed as if Walden was simply trying to keep me in their program so they could continue collecting tuition. It is so sad to me that a institution can get away with this the way they have. Everyone's story is exactly the same. I definitely would like to be part of a class action suit against them!

bikerbabe1 ✉ Send email                                                            Sep 24, 2015

### Walden is all about money

I, too, am a Ph.D. in candidate. I, too, have completed all course work. I have been working on my proposal for at least five years and have had two committee chairs. I discovered that my last chair had not even been reading my proposal. I had to hire a private coach to assist me with my proposal. I am over $70,000 in student loans. My student loans are at their limit so we have had to take money out of our house to finance this term. I have a call into the attorneys as well. I do hope they call me soon.

jabralyn3 ✉ Send email                                                      Sep 12, 2015

### 6 Figures in Debt Thanks to Walden University

I enrolled in the Ed.D program at Walden University in 2009. Here it is, 2015 and I still do not have my Ed.D. I had advanced to the URR stage of my dissertation. During one submission, I was told that adequate progress was being made. During another submission, many negative comments were made to my proposal draft. Seemingly, this process went back and forth forever. When I finally reached the URR stage of my dissertation, would you believe there were over 100 negative comments made after it was supposedly reviewed by my primary Chair? I have the documentation to support this accusation. There's so much more to report. I was told by Walden's Financial Department that I had exhausted all of my funds causing me to opt out of the Ed.D program. Therefore, considering the small amount of financial aid I had left, it was suggested that I attend the Capstone course to obtain an Ed.S from Walden University. I exhausted so much TIME and MONEY on an Ed.D that I may not ever get the opportunity to receive. I am 6 figures in debt thanks to Walden University. Can you imagine how long it would take me to payoff a student loan of this caliber? I feel that I am a victim of an educational fraud. I'm interested in joining other past and present colleagues of Walden University in the event there's a Class Action Law Suit against Walden University. mclaurinann@gmail.com 9/12/2015

Unhappy Walden Customer ✉ Send email                                        Jun 14, 2015

### Fraud at its finest

This "school" is the most unethical, predatory online business in existence today. I was informed that my doctoral program would take on average between 3-4 years to complete barring any unforeseen life emergencies and would cost approximately $45,000. Six years of continual enrollment and almost $250,000.00 of student debt later, I am still stuck in the never ending, perpetual cycle of dissertation classes. The feedback is non-existent for these "courses" and the instructor doesn't even bother to check in to the class anymore. The discussion forums, questions for instructor, etc. are literally bare with the exception of student complaints and questions regarding feedback for dissertation drafts submitted months ago. Proactive attempts to reach out to advisors, department chairs, etc. will typically receive no response or they are forwarded with no resolve. Enrolling in Walden was unquestionably the WORST mistake that I have ever made. I am currently shopping legal counsel. THE FRAUD MUST STOP!

257.    Walden cannot claim it is unaware of these complaints. Besides responding to student

concerns on websites such as the Better Business Bureau (see, e.g., April 6, 2015 BBB page

concerning "rumored 'common' practice of Walden to delay Doctoral Students," with Walden

response of, "Walden strongly denies that there is any 'common practice' or any practice at all to

delay doctoral students."), it also responded to some of the above complaints in the Complaint

Board forum.

Walden University ✉ Send email                                    Sep 7, 2016

## Contact Walden University

At Walden University, we take the concerns and experiences of our students very seriously, and wish to hear from you if your experience did not meet your expectations, so that we can work with you to try to resolve your concerns. If you would like to discuss your specific situation, we are here to help you. If you are a current student, or attended Walden within the past year, please contact studentaffairs@waldenu.edu and provide us with your name, student ID, program of study, location, and specific details of your situation, and one of our school managers will contact you.

If you are a former Walden University student who last attended Walden more than one year ago, please contact formerWUstudent@waldenu.edu and provide us with your name, student ID, program of study, dates of enrollment, location, and specific details of your situation, and a Walden representative will contact you.

Thank you.

## MISREPRESENTATIONS MADE BY
## WALDEN TO ITS STUDENTS, AND OMISSIONS WITHHELD

258.    Walden has made and broken many promises to its students as detailed above.

259.    The Walden Student Handbook indicates that after coursework is completed, the dissertation process can be completed in 13 months.

260.    Walden's materials, website and recruiters have promised faster timelines to completion than its doctoral programs' "design" time, including the commonly promised three years to completion and dissertation processes that take only 18 months (or four/five dissertation courses).

261.    Walden also represents online "normal time to completion" and "on-time completion rates" for its courses. These timelines are false in view of Walden/Laureate's admitted "design" times for these programs.

262.    Further, given that Walden upon information and belief has a completion rate below 10% of its doctoral student population, the fact that Walden is representing *any* time to completion let alone a "normal time to completion" or "on-time completion rates" is fraudulent.

263.    Walden and Laureate also failed to disclose the "design" time of its programs to its students which conflicts with the timelines it promised students.

264.    Walden should have disclosed the actual "design" time of each program, rather than the faster, but false, times to completion it disclosed.

265.    Walden also withheld its actual completion rate of its student doctoral population from prospective and current students. Given the graduation rate was likely below 10% of the doctoral student population, Walden should have disclosed its graduation rate to incoming students.

266.    Walden also made many promises to its students through its Student Handbooks.

267.    Walden promised that its faculty would be accessible to its students. Under a section entitled "Faculty Members' Accessibility," the Handbook states:

> Walden expects faculty members to be reasonably accessible to students. The expectation of reasonable accessibility does not mean 24/7 access of faculty members to students. However, it does mean that students receive quality feedback on course submissions within a reasonable time frame

Ex. 37, 2010-2011 Handbook at 130; Ex. 36, 2013-2014 Handbook at 221.

268.    The Student Handbook also promises timelines for "Faculty Members' Feedback."

> Faculty members are to return graded classroom assignments that are submitted by the due date to students within 10 calendar days of the assignments' due dates for coursework in classrooms, and within 14 calendar days of the due date for manuscript drafts (including KAMs, theses, doctoral studies, and dissertations) in research forums. Faculty members are to provide a grade and also written, formative feedback on assignments. Assignments that are submitted late may be graded with feedback in the time frame of the instructor. Late assignments may receive minimal feedback other than the grade. The instructor is expected to give priority to assignments submitted on time.

*Id.*

269.    This promise was broken in that many doctoral students experienced delays beyond the promised 14 days, which led to increased tuition costs of the students.

270.    Further, the Handbook provides that "Faculty members are expected to be available to students outside the course discussion areas and in addition to providing substantive feedback on assignments and discussion posts." *Id.*

271.    This promise was broken to Plaintiff and the members of the Class and Subclasses in that substantive feedback was denied on many occasions. For example, once the MyDR system was implemented, doctoral students were denied anything more than the most general input until they completed the Proposal/first three chapters of the dissertation, even though doctoral students required detailed input on how the Proposal should be prepared (especially for Chapter 3, the methodology of the dissertation). The denial of feedback caused delays for the students, if not an ultimate roadblock, again resulting in additional revenue for Walden.

272.    The Handbook further promises that if a faculty member suddenly departed, Walden would restore faculty services to the students.

> Unexpected interruptions: Faculty services may be unexpectedly interrupted because of an instructor's death or prolonged ill health, or because of an instructor's discontinuation of association with the university. In such cases**, the student's associate dean/executive director, or designee, ensures that faculty services are restored to all affected students.** The associate dean/executive director or designee communicates with affected students throughout the restoration process until appropriate assignments are finalized.

Ex. 37, Excerpts, 2010-2011 Handbook at 123 (emphasis added); Ex. 36, Excerpts 2013-2014 Handbook at 214-215.

273.    This promise was repeatedly broken, in that once instructors left, Walden left it to the students to find replacements for their dissertation advisors…which would sometimes take months in which the students still paid tuition to Walden.

274.    The Handbook also describes Doctoral Committee Member Roles.

> Faculty members in Walden University doctoral programs who accept the duty of serving on a dissertation or doctoral study committee assume a dual responsibility of high importance. One part is service to their students; the other is service to the academic

> practice, discipline, and professional field to which the dissertation is related. For the first part, expectations concerning the faculty service to be performed are determined by students' needs, and by university academic policy pertaining to how these needs are to be addressed. For the second, expectations are set both by university academic policy and by policies and practice that frame acceptable work in the discipline and professional field at large.

Ex. 37 at 174; Ex. 36 at 258. Further, "Walden intends that dissertation/doctoral study committee members work as a team, directly guiding students through the proposal, research and analysis, and ultimately the final oral presentation." Ex. 37 at 174; Ex. 36 at 259.

275.     As explained above, this is not how Walden worked. For example, the MyDR application placed a wall between students and their advisers prior to completion of the Proposal. Additionally, often dissertation committee chairs and members would give inconsistent advice, sometimes advising after months, if not years, that a previously (and multiple times) approved topic needed to change, which would require students, after months/years of relying upon prior acceptance, to start over.

**DUE TO THEIR DECISIONS TO INSUFFICIENTLY ALLOCATE FUNDS TO STUDENTS WHILE MAXIMIZING MARKETING AND PROFIT, WALDEN AND LAUREATE ARE NOT EDUCATIONAL INSTITUTIONS BUT RATHER FOR-PROFIT CORPORATIONS.**

276.     Walden and Laureate are not in the business of awarding doctoral degrees. Upon information and belief, less than 10% of its doctoral students receive doctoral degrees.

277.     Further, upon information and belief, Laureate does not offer any classes so it is not an institution of higher learning.

278.     At the expense of providing a viable doctoral program, Walden maximizes its marketing and profits. As the Senate Report indicates, Walden spent only $1,574 per student on instruction in 2009. In comparison, it spent $2,230 per student on marketing and $1,915 per student on profit. Ex. 10 at 716. In other words, less than 28% of each students' tuition is spent by Walden

on each student. The remaining more than 72% is spent to bring more students to Walden, and directly to Walden and Laureate's profit. Commenting on this disparity, the Senate report found, "…Walden spends a high portion of revenue on marketing and on profit, and a relatively small amount on per student instruction..." *Id.* at 718. In fact, "The percentage of revenue Walden allocates to both marketing and profit exceeds the for-profit sector average." *Id.* at 710.

279.    The Senate report found the amount Walden spent per student on instruction was "the second lowest of the privately held companies the committee examined." *Id.* at 716.

280.    In stark contrast, public and non-profit schools spent more per student on instruction. *Id.* For example, the University of Minnesota spent $13,247 per student on instruction and University of Saint Thomas spent $11,361 per student. *Id.* at 716-717. As the Senate report emphasized, "taken as a whole, these numbers demonstrate that for-profit colleges spend significantly less on instruction than similar programs in other sectors." *Id.* at 717.

281.    With its thirst for additional profits, Walden employs a large number of recruiters: more than 500. *Id.*

282.    Given the unreasonable amount that Walden spent per student on instruction, especially in contrast with other universities, it should not be afforded protections typically reserved for actual institutions of higher learning.

**DESPITE BEING A FIDUCIARY FOR ITS DOCTORAL STUDENTS, WALDEN ACTS IN ONLY ITS AND LAUREATE'S BEST INTEREST.**

283.    Walden owed Plaintiff Thornhill and its doctoral students a fiduciary duty.

284.    Given the nature of its online university, Plaintiff Thornhill and other Walden doctoral students have limited contact with its employees. A recruiter and an employee from enrollment are typically the students initial and only contacts, who owe a duty of at least candor in view that the students will be spending years of their lives attending Walden.

285.    Walden acknowledges this duty in a video marketed to prospective students on its

Admissions page entitled "Get the Answers You Need From Our Enrollment Advisors."

Available at https://www.waldenu.edu/admissions. In that video, a Walden Enrollment Manager

admits:

> A lot of the advisors on my team are actually rolled—enrolled in graduate programs
> themselves. So what they are able to do is really relate to the student. Not only talk about
> the program but, you know, what scares them, what, you know, what motivates them
> what…all the experiences and emotions you're feeling throughout the whole process. The
> fact that the advisors are sharing that personal experience and that information with the
> students *really helps build that trust and builds that relationship* so the student feels
> comfortable.

*Id.* at 27-58 seconds (emphasis added).

286.    However, as shown in the Senate report, the employees in recruiting and enrollment

(especially when paid pursuant to number of enrolled students) had a conflict of interest in

telling students the truth as to time and tuition and conditions of the dissertation process.

287.    Further, the dissertation committee, the students' primary contacts during the final phase

of the doctoral process, are in a unique position as mentor to the doctoral students.

288.    Walden's Student Handbook explains the relationship between the dissertation committee

and their doctoral students:

> Faculty members in Walden University doctoral programs **who accept the duty** of
> serving on a dissertation or doctoral study committee **assume a dual responsibility of
> high importance**. One part is service to their students; the other is service to the
> academic practice, discipline, and professional field to which the dissertation is related.
> For the first part, expectations concerning the faculty service to be performed are
> determined by students' needs, and by university academic policy pertaining to how these
> needs are to be addressed. For the second, expectations are set both by university
> academic policy and by policies and practice that frame acceptable work in the discipline
> and professional field at large.

Ex. 37 at 174 (emphasis added); Ex. 36 at 258 (emphasis added). Further, "Walden intends that

dissertation/doctoral study committee members work as a team, directly guiding students through

the proposal, research and analysis, and ultimately the final oral presentation." Ex. 37 at 174; Ex. 36 at 259.

289.    The above shows Walden's acknowledgement of the "duty" and "responsibility" the dissertation committee has with their doctoral students, and thus admits to a fiduciary relationship.

290.    Walden, knowing the nature of the relationship between Thornhill (and its Walden doctoral students) and her dissertation advisors, assumed a fiduciary duty to the student. At least one court already found such a duty for Walden. *See Johnson v. Walden Univ*., 839 F. Supp. 2d 518, 528-29 (D. Conn. 2011).

291.    Recently, MOHE appears to have recognized a fiduciary duty between a Walden doctoral student and his Faculty Mentor arising from representations made by Walden in its materials.

> Dr. Lolas was assigned to be Mr. Mason's Faculty Mentor and Mr. Mason was enrolled in his SBSF 7100 Research Forum course on July 14, 2012. Thus, Dr. Lolas assumed the responsibility as Mr. Mason's "mentor" and "assessor" per the guidance listed in the Exhibit B: A Guide to the Knowledge Area Modules: Making the KAMs work for You, about the role of the KAM Faculty Mentor which states, *"While working on KAMs, students will find that faculty members take two distinct roles: mentor and assessor. Faculty mentors guide and advise students throughout their entire program. Students will meet their appointed mentor in the Research Forum section, either SBSF 7100 or EDUC 8800 (in The Richard W Riley College of Education and Leadership), and that person will typically stay with a student throughout the program. The mentor may even become the chair of the student's dissertation committee* (page 3)."

Ex. 57 at 2 of 10 (emphasis in original). Notably, both Walden's Guide to the Knowledge Area Modules and Handbook (for the dissertation committee) focus on "guiding" the doctoral student. *Compare id.* with Ex. 37 at 174; Ex. 36 at 259. It would appear by requiring guidance, the same fiduciary duty would arise for both dissertation committee members and KAMs faculty mentors, which makes sense as KAMs are mini-dissertations.

292.     As alleged in this complaint, Walden demonstrated fraud, self-dealing and a conflict of interest on its part in dealing with Plaintiff Thornhill and the Class.

293.     Walden owed Plaintiff Thornhill and the Class a continuing duty from recruiting, through enrollment and while in attendance (e.g., when re-enrolling each semester) as a doctoral student.

294.     Despite these duties owed, Walden and its employees misrepresented the time, costs and support that Walden would provide its doctoral students, and then failed to provide the necessary support and infrastructure to Plaintiff and the Class so that they would timely complete their degrees. Walden also failed to disclose the low (believed to be less than 10%) graduation rate for its doctoral students as well.

295.

## WALDEN'S CONNECTIONS TO MINNESOTA

296.     The crux of this action is located in Minneapolis. From its headquarters and academic offices in Minnesota, Walden made relevant decisions about what misrepresentations were contained in its webpages, other marketing materials (*e.g.*, Viewbooks), course catalogs, and other materials provided to students after they enrolled; and made relevant decisions about the academic coursework including, but not limited to, the doctoral dissertation process. This is important where for years Walden characterized its dissertation process as only taking 4-5 classes/13-18 months[40] and where it made unambiguous and uniform statements within its marketing materials such as, "Most Ph.D. students earn their degree in 4.5 years or less." Ex. 23

---

[40] See, e.g., Ex. 48, 2004-2005 Catalog at 74 (PhD in Education, 30 cr.), 90 (PhD in Public Health, 30 cr.), 91 (PhD in Health Services, 30 cr.), 99 (PhD in Human Services 30 cr.), 113 (PhD in Applied Management and Decision Sciences, 30 cr.) and 121 (PhD in Public Policy Administration, 30 cr.); Ex. 29, 2010-2011 Walden Catalog (excerpts) at 339, 345, 350; Group Ex. 11, 2012 Archived Walden Webpages (PhD in Education KAM-Based required 20 cr.; PhD in Education Mixed-Model required 20 cr.; PhD in Health Services (Community Health Education and Advocacy specialization) required 20 cr.; PhD in General Psychology required 20 cr.; PhD in Human Services required 20 cr.; PhD in Public Health (Community Health Education specialization) required 20 cr.); see also Ex. 3, 7, 8, 19.

at 6, 34-35, 39, 53, 80, 106, 114; Ex. 54 at 6, 34-35, 39, 53, 75, 79, 100, 101, 106, 114, Group Ex. 66.

297.    With its academic office in Minneapolis, it logically follows that when students attended classes virtually, the work they performed was pursuant to curricula, materials and instructions prepared in Minnesota. The never-ending curriculum that prevented Plaintiff and other doctoral students from obtaining their degrees was developed from Minnesota. Similarly, grading of work (which prevented students' from advancing through the dissertation process) took place pursuant to guidelines and instructions created in Walden's academic offices in Minnesota. The classes also were not a one-way street. Being an online university, Plaintiff interacted with Walden faculty through infrastructure developed by the academic office.

298.    Further, the goal of Plaintiff and the class in attending Walden was to obtain a doctoral degree evidenced by a diploma (a tangible item) which on its face admits to being "conferred at Minneapolis, Minnesota." Ex. 58, Walden diploma.



299.    All misrepresentations then were from materials written, compiled or approved in Walden headquarters in Minnesota, and made by employees who were authorized and instructed out of Walden headquarters in Minnesota. For example, materials concerning academic programs likely originated from Minnesota, including Course Catalogs (Exs. 24, 29 and 48), Handbooks (Exs. 36, 37) and Viewbooks (Exs. 23, 54). Further, all of Defendants' misrepresentations were of such a uniform nature and consistent theme they required coordination—which can be traced to Walden's headquarters in Minneapolis.

300.    Further, like all schools, after enrollment, approval of the contract (*i.e.,* continuing education at Walden) was decided every term *by Walden* after confirming students received the appropriate grades to stay enrolled. Such decisions were made pursuant to policies and practices that would have arisen from Minnesota.

301.    Due to the location of Walden's academic offices in Minneapolis, the state of Minnesota is also unique compared to other states where its students reside. As the Minnesota Office of Higher Education ("MOHE") stated in June 2017 when it found wrongdoing[41] on behalf of Walden against doctoral student Samuel Mason (a New Jersey resident):

> In order to operate in Minnesota, our office requires institutions to provide information to students and prospective students concerning comprehensive and accurate policies relating to student admission, evaluation, suspension, and dismissal (Minnesota Stat. 136A.65 Subd. 4(9)(i)) and our office expects those policies to be followed. Our office will not take administrative action against an institution for following its policies and procedures unless those policies and procedures are deceptive, misleading, or inaccurate.

Ex. 57 at 1. To "operate in Minnesota" (as Walden must with its headquarters and academic office in Minneapolis), Walden *must* comply with Minnesota law, even for students such as Mr. Mason who reside outside of Minnesota. *Id.*

---

[41] Because MOHE found in favor of Mr. Mason, it found Walden's procedures were "deceptive, misleading, or inaccurate." *Id.*

302.    Walden concedes this point: "…it is true that Walden is subject to Minnesota's administrative education law by virtue of its academic offices there…" Docket No. 19 at 6.

303.    Direct evidence also shows at least three states—New Jersey, Maryland, and Virginia—deferred to Minnesota on complaints by Walden doctoral students who resided in New Jersey, Maryland and Virginia, and therefore deferred to the application of Minnesota law on behalf of their residents. Ex. 59, Maryland Letter; Ex. 60, Virginia Letter and email; Ex. 61, New Jersey Letters. As the state of State Counsel of Higher Education for Virginia ("SCHEV") confirmed, it does not regulate "online education that originates outside of Virginia" and deferred decision-making to Minnesota.

> This comes to inform you that SCHEV does not regulate online education that originates outside of the Commonwealth. Walden University is an online institution that is headquartered in Minnesota. Please contact the Minnesota Office of Higher Education at 1-800-657-3866 for instructions on how to file a complaint.

Ex. 60, Virginia Letter. Even Maryland, where Walden and Laureate have a presence, deferred to Minnesota.

> Thank you for contacting the Maryland Higher Education Commission (Commission) regarding your complaint against Walden University. Unfortunately, the Commission is not the proper state agency to assist you with these concerns. By way of this letter, we are referring your complaint to the Minnesota Office of Higher Education (MOHE) which will be better able to assist you.

Ex. 59, Maryland Letter. The deferral by Maryland is especially powerful here where Walden alleges that some of the misrepresentations made to Plaintiff and other members of the class arose from Maryland. See, e.g., Doc. 24-1 at 22.

304.    Also, as stated above, MOHE is investigating Walden's doctoral programs for all of its doctoral students, regardless of where those students reside. Ex. 50, Laureate SEC Excerpt at 68-69. Such an investigation would apply Minnesota law for at least "deceptive, misleading, or

inaccurate" representations made by Walden to prospective doctoral students. See, e.g., Ex. 57 at 1.

305.    Additionally, Walden was a SARA member (along with forty-seven other states (including Minnesota and Ohio) and the District of Columbia).[42] As explained by the Attorney General's Office of Minnesota, and in response to two separate inquiries by Walden doctoral students located in Georgia and Tennessee, the consequence of Minnesota's participation in this agreement is that Walden must be "authorized" by Minnesota so that it can enroll students from other participating states. Ex. 51, Minn. Attorney General Letters. Because of this, Minnesota as the site of the "home state portal agency" under SARA has "authority to resolve complaints" that arise from the other SARA member states.

> At least 39 states[43] and the District of Columbia have signed the State Authorization Reciprocity Agreement or "SARA," including Minnesota (the state where Walden is principally located) and Georgia. These states' participation in SARA means that Walden must be authorized by Minnesota's "home state portal agency" (e.g., OHE) to continue enrolling students in other participating states (like Georgia). The home state portal agency is charged with addressing complaints from students and ensuring the school is abiding by SARA rules and policies.
>
> OHE is designated as Minnesota's "home state portal agency" under SARA. As the home-state portal agency, OHE has the authority to resolve complaints pursuant to SARA's complaint resolution guidelines (described below) and determine whether Minnesota institutions participating in SARA are abiding by SARA's rules and policies.

*Id.* The meaning: most states, including Ohio, have agreed that when it comes to complaints against online schools, the home portal should take lead.

---

[42] "The members of SARA are states, not institutions or students. Therefore, a state "joins" or becomes a "member" of SARA while a college or university "operates under" or "participates in" SARA." Ex. 62, Basic Questions About SARA (obtained from: http://nc-sara.org/content/basic-questions-about-sara#who).

[43] While this letter states at least 39 states, according to the current SARA website, 47 states plus Washington D.C. are current members. (Ex. 63, SARA states webpage, (obtained from http://www.nc-sara.org/sara-states-institutions).).

306.    While Walden contends it was no longer a SARA participant after some unidentified time

in 2016, it was a member when Plaintiff attended Walden. According to a Laureate SEC filing,

Walden's tenure with SARA appears to have ended June 2, 2016, as its renewal application was

denied both by MOHE and on appeal to MHEC, despite Walden's fight to remain a SARA

participant:

> …As of June 2015, Walden University was approved to participate in SARA, effective
> through June 2, 2016.
>
> On April 8, 2016, the MOHE notified Walden University that its renewal application to
> participate in SARA has been denied because Walden University does not have an
> institutional federal financial composite score computed by the DOE in connection with
> Walden University's participation in federal Title IV financing programs of 1.5 or higher,
> although the institutional financial composite score calculation made by Walden
> University in accordance with the DOE's published formula and based on Walden
> University's 2014 audited financial statements is 3.0. In the absence of an institution-level
> financial composite score calculated by DOE, MOHE has viewed Laureate's financial
> composite score calculated based on its global operations, which does not exceed 1.5, as
> attributable to Walden University. Both Laureate's and Walden University's composite
> scores for 2015 are currently anticipated to remain materially unchanged as their
> respective financial conditions have not materially changed from 2014.
>
> On May 6, 2016, Walden University appealed the MOHE decision to MHEC. Walden
> University and MOHE participated in an appeal hearing before MHEC on June 3, 2016.
> On June 14, 2016, MHEC informed Walden University that it affirmed MOHE's
> decision.

Ex. 64 at 220-222.

307.    Regardless as to its current SARA status, 1) Walden continues to address student

complaints from residents outside of Minnesota at MOHE and 2) other states continue deferring

complaints about Walden's doctoral programs from their residents to Minnesota. For example,

Raymond Mullins' (a resident of Virginia) complaint was forwarded from the state of Virginia to

MOHE in January 2017. Ex. 60, Virginia Ltr. Despite Mr. Mullins' complaint being filed in

2017 (months after Walden's exit from SARA), MOHE is still hearing Mr. Mullins' complaint

without objection by Walden. Further, Samuel Mason (a New Jersey resident), filed a complaint

with MOHE on June 27, 2016. Ex. 57. Although filed after June 2, 2016, Walden continued with the complaint process before MOHE and at the Minnesota Court of Appeals. *Id.;* Ex. 65 (Minn. Ct. App. Decision).

308.    Despite its SARA status, MOHE continues to hear and Walden continues to participate in complaints filed by students who are non-residents of Minnesota.


## RECENT FINDINGS BY MINNESOTA OFFICE OF HIGHER EDUCATION, APPLYING MINNESOTA LAW, AGAINST WALDEN

309.    After the filing of this action, MOHE ruled against Walden on behalf of former doctoral student Samuel Mason. Ex. 57. Mr. Mason spent almost 10 years of his life attempting to get a doctoral degree without success due to impediments put in his academic path by Walden.

310.    The MOHE order found in favor of Mr. Mason in view of his complaints against Walden. *Id.* For example, MOHE found that Walden's KAMs process was flawed, not just in view of Mr. Mason, but the entire KAMs process:

> Our office recognizes that there were attempts made by Walden University to correct the problems associated with KAMs.

*Id.* at 8 of 10. From this letter, it appears even Walden *acknowledged* the flaws in its KAMs process. *Id.* Such flaws would carry over to the dissertation process as KAMs are for all intents and purposes mini-dissertations.

311.    MOHE also commented on the flawed, "semi-structured" SBSF 7100, KAM *and* dissertation process, including the inability for Faculty Mentors to access basic information about their students:

> Walden University has "semi-structured" SBSF 7100 and KAM and dissertation tracking process. Faculty Members are not provided with proper access to student records in the Faculty Mentor system and cannot, as evidenced by many, many emails provided, accurately account for their students' status.

*Id.* at 8 of 10.

MOHE found the same flaws (e.g., a lack of "organizational framework with administrative

capabilities to provide the educational programs offered") apply to Walden's dissertation

process:

> Once students are enrolled in SBSF 7100 and assigned a Faculty Mentor, Walden
> University makes no distinction of a KAM or Dissertation-phase students in these
> courses and the faculty have no accurate way of knowing a student's KAM
> progress, which is in violation of Minn. Stat. 136A.65 subd. 4(1). Schools must
> have an organizational framework with administrative capabilities to provide the
> educational programs offered. For Mr. Mason, the lack of organizational
> framework and monitoring, combined with the auto-enrollment policy for SBSF
> 7100, has permitted him to enroll in and pay for 134 quarter credits beyond the
> required 42 KAM credit requirements (see Exhibit C). It is concerning to our
> office that Walden University does not have a [sic] an organizational framework
> with administrative quality mechanism in place to prevent a student from
> completing over 3 times the amount of credits required to satisfy a program
> requirement.

*Id.*

312.    MOHE also criticized Walden's failure to differentiate between part-time and full-time

students, which it found to be a requirement under Minnesota law:

> Our office is, also, concerned that there does not seem to be a system/disclosure in
> place to explain that part-time enrollment in the doctoral programs will increase
> the advertised SBSF 7100 Research Forum "minimum requirements"
> exponentially. If a student attends part-time for up to eight years continuously,
> then they could be automatically enrolled in between 42 and 174 (or more) SBSF
> 7100 credits. Graduate catalogues and marketing materials should distinguish
> between costs and degree requirements for part-time and full-time students. For
> this reason, Walden University is in violation of Minn. Stat. 136A.65 subd. 7,
> which states the school uses only publications and advertisements which are
> truthful and do not give away any false, fraudulent, deceptive, inaccurate, or
> misleading impressions about the school, its personnel, programs, services, or
> occupational opportunities for its graduates for promotion and student
> recruitment."

*Id.* at 8-9 of 10.

313.    In finding in favor of Mr. Mason, MOHE found Walden violated Minnesota law:

97

> Due to Walden University's overall lack of sufficient academic quality monitoring and organizational framework (violations of Minn. Stat. 136A.65 subd. 4(1)), and misleading impressions about the number of hours required to satisfy degree requirements (violations of Minn. Stat. 136A.65 subd. 4(7)), Mr. Mason was automatically enrolled in an excess of 132 credit hours of SBSF 7100.

*Id.* at 9 of 10.

314.    Of note, the Mason ruling shows how Walden defends its actions: through a personal attack against the student. In responding to Mason's complaint, Walden argued:

> Unfortunately, due to Mr. Mason's failure to make meaningful progress towards his degree in the nine years he was enrolled in the program, we do not believe that allowing him to continue in the program would be beneficial. If, however, the student's circumstances should change in the future, and he is able to provide proof that he has improved his ability to adhere to university processes and complete tasks quickly with the attention to detail required at a doctoral-level, he can request reconsideration at a later date.

*Id.* at 4 of 10.

315.    MOHE criticized Walden's unwarranted attacks on Mr. Mason:

> The statements made by Walden University in this section regarding Mr. Mason is [sic] very concerning to our office because there is no evidence provided to support it; rather there is an abundance of evidence to refute it. In particular, the statement regarding Mr. Mason's failure to make "meaningful progress" towards his degree after nine years is very inaccurate. …Because Walden had no meaningful internal controls to monitor progress for the completion of KAMs, "meaningful progress" can only be determined through faculty feedback and grading. Mr. Mason not only made "meaningful progress", he met or exceeded every expectation Dr. Lolas made of him.

*Id.* at 5 of 10.

> It is concerning to our office that Walden University would make this assertion about Mr. Mason given the lack of evidence to support the claim and the substantial amount of evidence to contrary. …

*Id.* at 6 of 10.

## CLASS ACTION ALLEGATIONS

316.    The experiences of Plaintiff at Walden were like those experienced by numerous other students attempting to navigate the dissertation process across all of Walden's doctoral disciplines.

317.    Plaintiff requests the Court certify this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

318.    In the first instance, Plaintiff seeks certification of a nationwide Class under Minnesota law, including certification of claims for fraud in the inducement under Minnesota law (First Cause of Action), unjust enrichment under Minnesota law (Second Cause of Action), breach of contract under Minnesota law (Third Cause of Action), violations of the Minnesota Uniform Deceptive Trade Practices Act (Fourth Cause of Action), Breach of Implied Covenant of Good Faith and Fair Dealing under Minnesota Law (Fifth Cause of Action) and Breach of Fiduciary Duty under Minnesota Law (Sixth Cause of Action). Thus, Plaintiff seeks to certify the following nationwide Class pursuant to Rule 23:

> Current or former students of Walden University who enrolled in and paid, within the United States, tuition for a doctoral degree program at Walden University from 1999 until the present ("Class") and did not receive full reimbursement for tuition, costs and student loans from Defendants.

319.    In the alternative, should the Court decide not to certify a nationwide class under Minnesota law, Plaintiff Thornhill seeks certification of state classes for each additional Plaintiff according to their state of residency, including certification of claims for fraud in the inducement under Ohio law (Seventh Cause of Action), unjust enrichment under Ohio law (Eighth Cause of Action), breach of contract under Ohio law (Ninth Cause of Action), Breach of Implied Covenant of Good Faith and Fair Dealing Breach (Tenth Cause of Action), violations of the Ohio Consumer Protection Act (Eleventh Cause of Action) and Breach of Fiduciary Duty (Twelfth

Cause of Action). Thus, in the alternative, Plaintiff Thornhill seeks to certify the following Ohio

Sub-Class pursuant to Rule 23:

> Current or former students of Walden University who enrolled in and paid tuition for a doctoral degree program at Walden University from 1999 until the present while residing in Ohio ("Ohio Sub-Class") and did not receive full reimbursement for tuition, costs and student loans from Defendants.

320.    Further, as discovery unfolds, additional classes or modified classes might be possible or

necessary, perhaps by doctoral program. However, as it appears Walden's fraudulent

representations and omissions were made to students of all degree programs (e.g., quicker times

to completion that conflicted with actual design times and failure to inform of abysmally low

doctoral graduation rate), a single nationwide class is best-suited for this action and places

Walden on notice of the broadest possible class that Plaintiff could move for, as contemplated by

the Federal Rules' notice-pleading standard.

321.    Numerosity: Upon information and belief, the members of the Class number in at least

the thousands. As a result, the Class is so numerous that joinder of all members in a single action

is impracticable. The members of the Class should be readily identifiable from academic records

and enrollment records of Walden. The disposition of these claims will provide substantial

benefits to the Class.

322.    Commonality: There is a well-defined community of interest and common questions of

law and fact which predominate over any questions affecting only individual members of the

Class. These common legal and factual questions, which will generate common answers which

are apt to drive the resolution of the litigation, do not vary between members of the Class. These

common questions may be determined without reference to individual circumstances and will

provide common answers. The following represent a non-exhaustive list of common questions:

> a. Whether Walden maintains institutional control over its doctoral programs;

b. Whether, with knowledge of its low doctoral completion rate, Walden promised potential and current students false timelines to completion of its doctoral program, when graduating with a doctoral degree was the exception to the rule;

c. Whether, with knowledge of its low doctoral completion rate, Walden omitted the true average annual doctoral completion/graduation rate of, on information and belief, 10% of its doctoral student population,

d. Whether, with knowledge of the "designed" lengths of time for Walden's various doctoral programs, Walden and Laureate promised potential and current students false times to completion of Walden's doctoral programs;

e. Whether, with knowledge of the "designed" lengths of time for Walden's various doctoral programs, Walden and Laureate promised potential and current students false times to completion of the dissertation process;

f. Whether, with knowledge of its low doctoral completion rate, Walden made false representations to its students about their actual chances of even completing a doctoral program at Walden;

g. Whether Walden and Laureate constructed and implemented a system which caused the dissertation process to last longer than represented so that Walden could generate additional revenue though tuition payments;

h. Whether Walden and Laureate have been unjustly enriched by their conduct at the expense of the Class;

i. Whether Walden breached its contracts with the Class;

j. Whether Walden and Laureate violated consumer protection statues by their conduct toward the Class;

k. Whether Walden owed a fiduciary duty to the Class, and

l. Whether, because of Walden and Laureate's conduct, Plaintiff and the Class are entitled to damages, restitution, equitable relief and/or other relief, and, if so, the amount and nature of such relief.

323.    Typicality: The representative Plaintiff's claims are typical of the claims of the Class.

Plaintiff and all members of the Class were injured by the same wrongful practices in which

Walden has engaged. Further, the Plaintiff and members of the Class seek relief based on the

same legal theories. There may be differences in the amount of damages sustained by each

member of the Class; however, class-wide and individual damages can be determined readily. Individual damages issues will not bar Class certification.

324.     Adequacy of Representation: Plaintiff will fairly and adequately protect and pursue the interests of the Class. Plaintiff understands the nature of the claims herein, their role in the proceedings, and have and will vigorously represent the Class. Plaintiff has retained Class counsel who are experienced in and qualified in prosecution of consumer protection class actions and other forms of complex litigation. Neither Plaintiff, nor her attorneys, have interests which are contrary to or conflict with those of the Class.

325.     Predominance and Superiority: A class action is superior to all other available methods of adjudication of this lawsuit. Because individual litigation of the claims of Class members is economically infeasible and judicially impracticable, the class action device is the only way to facilitate adjudication of Plaintiff's and the Class's claims. Further, due to the conduct of Walden, Plaintiff and members of the Class have significant debt burdens from their time at Walden and cannot afford to hire counsel to pursue their claims on an hourly-fee basis. Even assuming individual Class members could afford it, the likelihood of individual claims being pursued by the Class members is remote given the high indebtedness the students have (thus needing to work full time to pay for the damage caused by Walden) as well as fear of reprisals by Walden for students still enrolled in Walden doctoral programs. Also, while the aggregate damages sustained by the Class are in the hundreds of millions, the individual damages incurred by each member resulting from Walden's wrongful conduct are not significant enough to proceed individually under even a contingency model. Even then, the burden on the judicial system would be unjustifiable in light of the class action device. Individual members of the Class do not have significant interest in individually controlling the prosecution of separate actions and

individualized litigation could result in varying, inconsistent or contradictory judgments. Plaintiff knows of no reason that this litigation should not proceed as a class action.

326.    Manageability: A class action is manageable here, and if necessary to preserve the case as a class action, the Court itself can redefine the Class or Subclasses, create additional subclasses, or both. Further, prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants. For example, this action challenges Defendants' disclosures to students regarding how long it takes to obtain a degree and/or complete the dissertation process. Should the results of separate individual actions find differently on the same disclosures, an incompatible standard of conduct is created as Defendants do not know which of its representations are lawful and which are illegal. Further, Defendants do not disclose Walden's actual graduation rates to its students. Should Plaintiff prevail, since the actual graduation rates conflict with representations Walden made to the class, Defendants would need to disclose actual graduation rates to halt Defendants' deception (e.g., for current and prospective students), especially since even after the filing of the lawsuit, Walden continues misrepresenting the length of the dissertation process. Ex. 55 at 10-11 ("pretty typical" for psychology doctoral students to complete the dissertation in "2 years" and only requires 15-20 hours per week to meet this goal).

327.    The nature of notice to the Class is contemplated to be by direct mail upon certification of the Class or, if such notice is not practicable, by best notice possible under the circumstances including, inter alia, email, publication in major newspapers, and maintenance of a website.

## TOLLING AND ESTOPPEL

328.    Plaintiff's causes of action did not arise until Plaintiff discovered, or by the exercise of reasonable diligence should have discovered, that they were injured by Walden and Laureate's intentional and deliberate scheme. Plaintiff did not and could not have discovered the intentional scheme through reasonable diligence.

329.    The applicable statutes of limitations have been tolled by Walden and Laureate's knowing and active concealment of the material facts regarding its scheme to intentionally prolong the dissertation and theses process. Walden and Laureate kept Plaintiff and the members of the Class and Subclasses ignorant of the vital information essential to pursue their claims, without any fault or lack of diligence on the part of Plaintiff and Class and Subclass members.

330.    Walden and Laureate were and are under a continuous duty to disclose to Plaintiff and the members of the Class and Subclasses the true nature of the scheme that they have created and implemented to prolong the dissertation process. At all relevant times, and continuing to this day, Walden and Laureate knowingly, affirmatively, and actively misrepresented and concealed the true character, quality and nature of its scheme.

331.    Based on the foregoing, Walden and Laureate are estopped from relying on any statutes of limitation in defense of this action. Walden and Laureate are also estopped from relying on any statutes of limitation in defense of this action because they failed to disclose the scheme prior to accepting each tuition payment in exchange for the provision of educational services.

332.    Pursuant to the doctrines of Equitable Tolling, Equitable Estoppel, Fraudulent Concealment and the Discovery Rule, the period for bringing claims shall not be barred due to any statute of limitations or statute of repose. With respect to each cause of action asserted

herein, Plaintiff expressly pleads Equitable Tolling, Equitable Estoppel, Fraudulent Concealment and the Discovery Rule and their application thereto.

333.    All conditions precedent to the filing of this Complaint have been satisfied. This action has been filed prior to the expiration of any applicable statute of limitations or statute of repose.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Fraud in the Inducement Against Walden and Laureate

334.    Plaintiff brings this cause of action on behalf of a nationwide Class under Minnesota common law.

335.    Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

336.    Walden and Laureate made actual or implied false representations concerning the cost and length of time to get a doctoral degree, while concealing the truth from prospective and actual students.

337.    Walden and Laureate had a duty to disclose that Walden's doctoral programs were designed to take much longer than they represented.

338.    Walden and Laureate concealed and are still concealing how long Walden's doctoral programs take to complete.

339.    For example, Walden intentionally misled Plaintiff with statements that the program would take a shorter time frame, and that Plaintiff would have control over how quickly she could complete the program.

340.    Instead, at the time Plaintiff and other members of the Class were recruited and enrolled in their doctoral programs, Walden and Laureate concealed that the programs in which they enrolled were designed to take longer than disclosed.

105

341. Similar, if not identical, false representations and omissions were also made to other members of the Class about their degree programs via recruiters, in Walden marketing materials and on Walden and Laureate webpages.

342. Walden and Laureate also concealed or otherwise omitted information about the actual percentage of students who graduated with doctoral degrees from Walden.

343. Further, Walden informed prospective students and current students they would have resources available to them, when Walden knew full well that such resources would not be available.

344. These representations were material to Plaintiff and the members of the Class agreeing to attend Walden and in re-enrolling after each term.

345. Walden and Laureate were aware of the falsity of their representations, or at a minimum had an utter disregard for their truthfulness. For example, they purposefully designed Walden's doctoral programs to last a certain, longer time frame, despite telling students they would take less time.

346. Walden and Laureate intended students to rely upon these representations because they were included in marketing materials and on their websites.

347. Plaintiff and members of the Class were justified in relying upon these representations.

348. Walden and Laureate made these representations for the purpose of defrauding Plaintiff and members of the Class.

349. Plaintiff and members of the Class were injured by relying on these false representations and omissions because had Walden and Laureate been truthful about the timelines and costs for Walden's doctoral programs, as well as the annual graduation rate and resources available to them, doctoral students would not have enrolled.

350.    Plaintiff and members of the Class were harmed by incurring tuition costs; costs for books, residency and technology fees; and student loans for tuition and fees, room and board charges, costs of books and supplies and other expenses.

**SECOND CAUSE OF ACTION**
**Unjust Enrichment Against Walden**

351.    Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

352.    Plaintiff brings this cause of action on behalf of a Nationwide Class under Minnesota common law. Walden has engaged in unjust conduct, to the detriment of Plaintiff and each member of the Nationwide Class.

353.    Plaintiff and each member of the Nationwide Class provided significant value to Walden in the form of tuition payments for doctoral dissertation courses (part of which on information and belief ultimately went to Laureate in the form of profits).

354.    Walden appreciated or had knowledge of the benefit received by retaining the money paid by Plaintiff and each member of the Nationwide Class.

355.    Although Walden accepted the tuition payments and retained and received benefit therefrom, it did not provide students with the doctoral process that was promised and expected in connection with the payment of the tuition. On the contrary, Walden intentionally and deliberately used the dissertation process as a means of improperly extracting tuition and generating revenue and on information and belief eventually profit. Walden has intentionally and knowingly created and implemented a dissertation process that is fraught with inefficiencies, meant to ensure that students do not receive the timely responses and attention that they were promised. All of this is done without any honesty or transparency by Walden regarding the actual time and expense that doctoral students will incur in an effort to complete their degrees.

107

356.    This unjust conduct on the part of Walden has resulted in its doctoral students enrolling in more dissertation courses than would be necessary had Walden not acted unjustly and incurring significant additional tuition and costs (including costs for books, residency, technology fees, and student loans for tuition and fees, room and board charges, costs of books and supplies and other expenses, etc.). It has also caused certain Nationwide Class members to stop pursuing the process altogether.

357.    Despite their inequitable conduct, Walden has retained the tuition payments (including costs for books, residency, technology fees, etc.) made by Walden doctoral students pursuing dissertation coursework and the profits therefrom.

358.    As a result, Walden has been unjustly enriched, to the detriment of Plaintiff and the members of the Nationwide Class.

### THIRD CAUSE OF ACTION
### Breach of Contract Against Walden

359.    Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

360.    Plaintiff brings this cause of action on behalf of a Nationwide Class under Minnesota common law. Walden has systematically violated its contracts with Plaintiff and each member of the Nationwide Class.

361.    Plaintiff and each member of the Nationwide Class contracted with Walden to receive doctoral educational services. Implied in each contract was a covenant of good faith and fair dealing.

362.    As part of the contract, Walden promised, inter alia, that, in connection with providing doctoral educational services 1) dissertation/doctoral study committee members would work as a team, directly guiding students through the various stages of the dissertation process including

the proposal; 2) students had control over how long it would take to obtain their doctoral degree, 3) the dissertation process would take as little as 13 or 18 months or four/five dissertation classes; 4) their respective programs would be completed in the promised time, 5) the process for obtaining a dissertation chair and member would be reasonable and not burdensome, and where chairs or members have left, Walden would find replacements; 6) there would be reasonable stability in faculty member retention such that the process for obtaining a dissertation supervisory chair and member would not be repeated, much less repeated multiple times; and 7) appropriate and timely feedback (within 14 days) from their dissertation committee would be provided to students with respect to their dissertation work.

363.    Rather than provide doctoral educational services as per its contractual agreement, Walden knowingly and intentionally created and implemented a dissertation process fraught with inefficiencies, meant to ensure that students receive neither adequate resources, nor the timely responses and attention that they were promised. All of this is done without honesty or transparency by Walden regarding the actual length of time the dissertation process will take, and the expense that will be incurred by, its doctoral students to complete their degrees (if they are fortunate enough to complete their doctoral degrees). The policy implemented by Walden breaches its contracts with Plaintiff and the Nationwide Class.

364.    Plaintiff and each member of the Nationwide Class provided significant value to Walden in the form of tuition payments and fees for doctoral dissertation courses as contracted.

365.    Furthermore, Plaintiff and each member of the Nationwide Class complied with their obligations under the contract. To the extent that they did not comply with their obligations under the contract, it was solely the result of conduct engaged in by Walden.

366. The breach of contract on the part of Walden has resulted in Walden's doctoral students enrolling at Walden, enrolling in more dissertation courses than would be necessary if Walden had honored its contract and, in many instances, caused Class members to stop pursuing their education altogether because of Walden's unlawful continuing of tuition payments.

367. Despite its knowing and intentional breach of the contracts, Walden has retained the tuition payments (including costs for books, residency, technology fees, etc.) made by the members of the Nationwide Class.

368. Walden has breached its contracts for doctoral education services with Plaintiff and each member of the Nationwide Class. Walden's breach has caused damage to Plaintiff and each member of the Nationwide Class in the form of additional and unexpected tuition payments and costs (including costs for books, residency, technology fees, and student loans for tuition and fees, room and board charges, costs of books and supplies and other expenses, etc.) for doctoral dissertation courses and, in many instances, stopping the pursuit of their education altogether, which caused them to be further damaged in the amount of wasted tuition payments they made before being forced to withdraw from Walden's doctoral program.

369. Moreover, Walden has breached its contracts with Plaintiff and each member of the Class to provide doctoral educational services to them by engaging in systematic conduct such that it has failed to honor the covenant of good faith and fair dealing implied in every contract. Walden has engaged in unreasonable conduct that was entirely inconsistent with the reasonable expectations of Plaintiff and each member of the Nationwide Class. Walden has breached its contracts for doctoral education services with Plaintiff and each member of the Nationwide Class. Walden's breach has caused damage to Plaintiff and each member of the Nationwide Class in the form of additional and unexpected tuition payments (including costs for books,

residency, technology fees, etc.) for doctoral dissertation courses and, in many instances, stopping the pursuit of their education altogether, which caused them to be further damaged in the amount of wasted tuition payments they made before being forced to withdraw from Walden's doctoral program.

### FOURTH CAUSE OF ACTION
### Violation of Minnesota Uniform Deceptive Trade Practices Act §325D.44
### Against Walden and Laureate

370.    Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

371.    Plaintiff brings this cause of action on behalf of a Nationwide Class. Walden and Laureate have engaged in unfair, unlawful, and fraudulent business practices, as set forth above.

372.    Minnesota Stat. §325D.44 specifically prohibits the use of unfair or deceptive trade practices in connection with a consumer transaction. For example, Minnesota Stat. §325D.44 prohibits deceptive trade practices which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(9) advertises goods or services with intent not to sell them as advertised" and "(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."

373.    Students paying tuition so as to enroll or re-enroll each semester in an institution is a consumer transaction.

374.    By engaging in the acts and practices described in this complaint, Walden and Laureate have committed one or more acts of unfair and deceptive trade practices. For example, Walden

and Laureate represent that Walden's doctoral services 1) have characteristics that they do not have and 2) are of a particular standard, quality, or grade of which they are not. Walden and Laureate also 3) advertise Walden's doctoral services with intent not to sell them as advertised and 4) engage in conduct which similarly creates a likelihood of confusion or of misunderstanding.

375.    Specifically, Walden and/or Laureate misrepresented that: 1) dissertation/doctoral study committee members would work as a team, directly guiding students through the various stages of the dissertation process including the proposal; 2) students had control over how long it would take to obtain their doctoral degree, 3) the dissertation process would take as little as 13 or 18 months or four/five dissertation classes; 4) their respective programs would be completed in the promised time, 5) the process for obtaining a dissertation chair and member would be reasonable and not burdensome, and where chairs or members have left, Walden would find replacements; 6) there would be reasonable stability in faculty member retention such that the process for obtaining a dissertation chair and member would not be repeated, much less repeated multiple times; and 7) appropriate and timely feedback (within 14 days) from their dissertation committee would be provided to students with respect to their dissertation work.

376.    Walden and Laureate also knowingly concealed, omitted and otherwise failed to state material facts about Walden's doctoral education services that would tend to, and did, in fact, deceive students. Specifically, Walden and Laureate falsely represented the time and tuition costs of obtaining a doctoral degree, not only knowing that such representations were false, but also with no intent to offer such services to its students. Walden and Laureate also failed to disclose that they intentionally and deliberately used Walden's dissertation process as a means of improperly extracting tuition and generating revenue. Walden and Laureate further failed to

112

disclose that they knowingly created and implemented a dissertation process that is fraught with inefficiencies, meant to ensure that students do not receive the timely responses and attention that they were promised.

377. Walden and Laureate knew that the doctoral dissertation coursework was and continues to be systematically prolonged by the violations set forth herein.

378. The misrepresentations and omissions were material to Plaintiff and the members of the Class.

379. Walden and Laureate's unfair and deceptive trade practices and acts occurred and continue to occur repeatedly during the course of its business. These actions constitute unfair and deceptive trade practices.

380. Plaintiff and members of the Class relied on these representations and omissions in the course of pursuing their doctoral degrees. Furthermore, Walden and Laureate intended that Plaintiff and members of the Class would rely on the representations and omissions.

381. As a direct and proximate result of Walden and Laureate's unfair and deceptive practices and acts, Plaintiff and the Class have suffered and will continue to suffer actual damages. Had Plaintiff and the members of the Class been aware of the misrepresentations and omissions, they would not have paid tuition to Walden or incurred additional costs including costs for books, residency, technology fees, and student loans for tuition and fees, room and board charges, costs of books and supplies and other expenses, etc. for the educational services that Defendant Walden purported to provide.

## FIFTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing Against Walden

382. Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

383.     Plaintiff brings this cause of action on behalf of a Nationwide Class under Minnesota common law.  Walden has systematically violated its contracts with Plaintiff and each member of the Nationwide Class.

384.     Plaintiff and each member of the Nationwide Class contracted with Walden to receive doctoral education services.

385.     Implied in each contract was a covenant of good faith and fair dealing.

386.     Plaintiff and each member of the Nationwide Class provided value to Walden in the form of tuition payments for doctoral dissertation courses as contracted.

387.     By the scheme and conduct detailed herein, Walden has breached the implied duty of good faith and fair dealing implied in its contracts.

388.     This breach on the part of Walden has resulted in Walden doctoral students being damaged because they were required to enroll in dissertation courses that would not have otherwise been necessary, thereby necessitating substantial additional tuition payments and costs (including costs for books, residency, technology fees, and student loans for tuition and fees, room and board charges, costs of books and supplies and other expenses, etc.).  In addition, many students have been forced to stop pursuing their education.

**SIXTH CAUSE OF ACTION**
**Breach of Fiduciary Duty Against Walden**

389.     Plaintiff brings this cause of action on behalf of a nationwide Class under Minnesota common law against Walden.

390.     Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

391.     Walden owed Plaintiff and the Class a fiduciary duty from enrollment, through the dissertation process and when re-enrolling each semester.

392. Walden acknowledges such a duty exists in at least its marketing materials and Student Handbook.

393. Despite this fiduciary relationship, Walden made actual or implied false representations concerning the cost and length of time to get a doctoral degree, while concealing the truth from prospective and actual students.

394. Walden had a duty to disclose that Walden's doctoral programs were designed to take much longer than they represented.

395. Walden concealed and is still concealing how long its doctoral programs take to complete.

396. For example, Walden intentionally misled Plaintiff and the Class with statements that the program would take a shorter time frame, and that Plaintiff and the Class would have control over how quickly they would complete the program.

397. Instead, when Plaintiff and the Class were recruited, enrolled in their doctoral degrees and re-enrolled each semester, Walden concealed that the programs in which they enrolled were designed to take longer than disclosed.

398. Despite the fiduciary relationship, Walden also concealed or otherwise omitted information about the actual percentage of students who graduated with doctoral degrees from Walden.

399. Further, Walden informed prospective students and current students they would have resources available to them, when Walden knew full well that such resources would not be available.

400. These representations were material to Plaintiff and the members of the Class agreeing to attend Walden, and in continuing to re-enroll each term.

401.    In violation of the duty owed, Walden was aware of the falsity of its representations, or at a minimum had an utter disregard for truthfulness. For example, Walden purposefully designed its doctoral programs to last a certain, longer time frame, despite telling students it would take less time or withholding the fact that upon information and belief less than 10% of doctoral students would receive a doctoral degree.

402.    Walden breached the duty owed for the purpose of defrauding Plaintiff and members of the Class so that it could receive additional tuition and fee payments.

403.    Plaintiff and members of the Class were injured by Walden's actions because had Walden been truthful about the timelines and costs for Walden's doctoral programs, as well as the annual graduation rate and resources available to them, doctoral students would not have enrolled or would not have re-enrolled after each term.

404.    Plaintiff and members of the Class were harmed by incurring tuition costs; costs for books, residency and technology fees; and student loans for tuition and fees, room and board charges, costs of books and supplies and other expenses.

## SEVENTH CAUSE OF ACTION (Alternative Ohio Sub-Class)
## Fraud in the Inducement Against Walden and Laureate

405.    Plaintiff brings this cause of action on behalf of a state-wide Subclass under Ohio common law.

406.    Plaintiff Thornhill and each member of the Ohio Subclass reallege and incorporate the preceding allegations by reference as if set forth fully herein.

407.    Walden and Laureate made actual or implied false representations concerning the cost and length of time to get a doctoral degree, while concealing the truth from prospective and actual students.

116

408.    Walden and Laureate had a duty to disclose that Walden's doctoral programs were designed to take much longer than they represented.

409.    Walden and Laureate concealed and are still concealing how long Walden's doctoral programs take to complete.

410.    For example, Walden intentionally misled Plaintiff Thornhill and each member of the Ohio Subclass with statements that the program would take a shorter time frame, and that Plaintiff Thornhill and each member of the Ohio Subclass would have control over how quickly they would complete the program.

411.    Instead, at the time Plaintiff and each member of the Ohio Subclass were recruited and enrolled in their respective doctoral degrees, Walden and Laureate concealed that the programs in which they enrolled were designed to take longer than disclosed.

412.    Similar, if not identical, false representations and omissions were also made to other members of the Subclass about their degree programs via recruiters, in Walden marketing materials and on Walden and Laureate webpages.

413.    Walden and Laureate also concealed or otherwise omitted information about the actual percentage of students who graduated with doctorates from Walden.

414.    Further, Walden informed prospective students and current students they would have resources available to them, when Walden knew full well that such resources would not be available.

415.    These representations were material to Plaintiff Thornhill and each member of the Ohio Subclass agreeing to attend Walden and when re-enrolling after each term.

416.    Walden and Laureate were aware of the falsity of their representations, or at a minimum had an utter disregard for their truthfulness. For example, they purposefully designed Walden's

doctoral programs to last a certain, longer time frame, despite telling students they would take less time.

417.    Walden and Laureate intended students to rely upon these representations because they were included in marketing materials and on their websites.

418.    Plaintiff Thornhill and each member of the Ohio Subclass were justified in relying upon these representations.

419.    Walden and Laureate made these representations for the purpose of defrauding the Plaintiff Thornhill and each member of the Ohio Subclass.

420.    Plaintiff Thornhill and each member of the Ohio Subclass were injured by relying on these false representations and omissions because had Walden and Laureate been truthful about the timelines and costs for Walden's doctoral programs, as well as the annual graduation rate and resources available to them, doctoral students would not have enrolled.

421.    Plaintiff and members of the Class were harmed by incurring tuition costs; costs for books, residency and technology fees; and student loans for tuition and fees, room and board charges, costs of books and supplies and other expenses.

### EIGHTH CAUSE OF ACTION (Alternative Ohio Sub-Class)
### Unjust Enrichment Against Walden and Laureate

422.    Plaintiff Thornhill realleges and incorporates the preceding allegations by reference as if set forth fully herein.

423.    Plaintiff Thornhill brings this cause of action, in the alternative, on behalf of an Ohio Subclass under Ohio common law. Walden has engaged in unjust conduct, to the detriment of Plaintiff Thornhill and each member of the Ohio Subclass.

424.    Plaintiff Thornhill and each member of the Ohio Subclass provided significant value to Walden in the form of tuition payments for doctoral dissertation courses.

425.    Walden appreciated or had knowledge of the benefit received by retaining the money paid by Plaintiff Thornhill and each member of the Ohio Subclass.

426.    Although Walden accepted the tuition payments and retained and received benefit therefrom, it did not provide students with a doctoral process that was promised and contemplated in connection with the payment of the tuition. On the contrary, Walden intentionally and deliberately used the dissertation process as a means of improperly extracting tuition and generating revenue. Walden has intentionally and knowingly created and implemented a dissertation process that is fraught with inefficiencies, meant to ensure that students do not receive the timely responses and attention that they were promised, and creates inordinate turnover of faculty and supervisory committee chairs and members. All of this is done without any honesty or transparency by Walden regarding the actual time and expense that Walden's doctoral students will incur in an effort to complete their degrees.

427.    This unjust conduct on the part of Walden has resulted in its doctoral students enrolling in more dissertation courses than would have been necessary had Walden not acted unjustly, and in incurring significant additional tuition costs (including costs for books, residency, technology fees, and student loans for tuition and fees, room and board charges, costs of books and supplies and other expenses, etc.).  It has also caused certain Ohio Subclass members to stop pursuing the process altogether.

428.    Despite its inequitable conduct, Walden has retained the tuition payments (including costs for books, residency, technology fees, etc.) made by its doctoral students pursuing dissertation coursework and the profits therefrom.

429.    As a result, Walden has been unjustly enriched, to the detriment of Plaintiff Thornhill and the members of the Ohio Subclass.

## NINTH CAUSE OF ACTION (Alternative Ohio Sub-Class)
## Breach of Contract Against Walden

430.    Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

431.    Plaintiff Thornhill brings this cause of action, in the alternative, on behalf of an Ohio Subclass under Ohio common law.  Walden has systematically violated its contracts with Plaintiff Thornhill and each member of the Ohio Subclass.

432.    Plaintiff Thornhill and each member of the Ohio Subclass contracted with Walden to receive doctoral educational services. Implied in each contract was a covenant of good faith and fair dealing.

433.    As part of the contract, Walden promised, inter alia, that, in connection with providing doctoral educational services: 1) dissertation/doctoral study committee members would work as a team, directly guiding students through the various stages of the dissertation process including the proposal; 2) students had control over how long it would take to obtain their doctoral degree, 3) the dissertation process would take as little as 13 or 18 months or four/five dissertation classes; 4) their respective programs would be completed in the promised time, 5) the process for obtaining a dissertation chair and member would be reasonable and not burdensome, and where chairs or members have left, Walden would find replacements; 6) there would be reasonable stability in faculty member retention such that the process for obtaining a dissertation supervisory chair and member would not be repeated, much less repeated multiple times; and 7) appropriate and timely feedback (within 14 days) from their dissertation committee would be provided to students with respect to their dissertation work.

434.    Rather than provide doctoral educational services as per its contractual agreement, Walden knowingly and intentionally created and implemented a dissertation process fraught with

inefficiencies, meant to ensure that students receive neither adequate resources, nor the timely responses and attention that they were promised. All of this is done without honesty or transparency by Walden regarding the actual length of time the dissertation process will take, and the expense that will be incurred by, its doctoral students to complete their degrees (if they are fortunate enough to complete their doctoral degrees). The policy implemented by Walden unquestionably breaches its contracts with Plaintiff Thornhill and the Ohio Subclass.

435. Plaintiff Thornhill and each member of the Ohio Subclass provided significant value to Walden in the form of tuition payments and other costs for their doctoral programs as contracted.

436. Furthermore, Plaintiff Thornhill and each member of the Ohio Subclass complied with their obligations under the contract. To the extent that they did not comply with their obligations under the contract, it was solely the result of conduct engaged in by Walden.

437. The breach of contract on the part of Walden has resulted in Walden's doctoral students enrolling at Walden, re-enrolling after each term, enrolling in more dissertation courses than would be necessary if Walden had honored its contract and, in many instances, caused Ohio Subclass members to stop pursuing their education altogether because of Walden's unlawful continuing of tuition payments.

438. Despite their knowing and intentional breach of the contracts, Walden has retained the tuition payments (including costs for books, residency, technology fees, etc.) made by the members of the Ohio Subclass.

439. Walden has breached its contracts for doctoral education services with Plaintiff Thornhill and each member of the Ohio Subclass. Walden's breach has caused damage to Plaintiff Thornhill and each member of the Ohio Subclass in the form of additional and unexpected tuition payments and costs (including costs for books, residency, technology fees, and student

loans for tuition and fees, room and board charges, costs of books and supplies and other expenses, etc.) for doctoral dissertation courses and, in many instances, stopping the pursuit of their education altogether, which caused them to be further damaged in the amount of wasted tuition payments they made before being forced to withdraw from Walden's doctoral program.

440.    Moreover, Walden has breached its contracts for doctoral education services with Plaintiff Thornhill and each member of the Ohio Subclass by engaging in systematic conduct whereby it has failed to honor the covenant of good faith and fair dealing implied in every contract.  Walden has engaged in unreasonable conduct that was entirely inconsistent with the reasonable expectations of Plaintiff Thornhill and each member of the Ohio Subclass.  Walden has breached its contracts for doctoral education services with Plaintiff and each member of the Ohio Class. Walden's breach has caused damage to Plaintiff Thornhill and each member of the Ohio Subclass in the form of additional and unexpected tuition payments and other costs (including costs for books, residency, technology fees, and student loans for tuition and fees, room and board charges, costs of books and supplies and other expenses, etc.) for doctoral dissertation courses and, in many instances, stopping the pursuit of their education altogether, which caused them to be further damaged in the amount of wasted tuition payments they made before being forced to withdraw from Walden's doctoral program.

### TENTH CAUSE OF ACTION (Alternative Ohio Subclass) Breach of Implied Covenant of Good Faith and Fair Dealing Against Walden

441.    Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

442.    Plaintiff Thornhill brings this cause of action, in the alternative, on behalf of an Ohio Subclass under Ohio common law.  Walden has systematically violated its contracts with Plaintiff Thornhill and each member of the Ohio Subclass.

122

443.   Plaintiff Thornhill and each member of the Ohio Subclass contracted with Walden to obtain doctoral education services.

444.   Implied in each contract was a covenant of good faith and fair dealing.

445.   Plaintiff Thornhill and each member of the Ohio Subclass provided value to Walden in the form of tuition payments and other costs for their doctoral programs as contracted.

446.   By the scheme and conduct detailed herein, Walden has breached the implied duty of good faith and fair dealing implied in its contracts.

447.   This breach on the part of Walden has resulted in Walden doctoral students being damaged because they enrolled at Walden, re-enrolled after each term and enrolled in additional dissertation courses that would not have otherwise been necessary, thereby necessitating substantial additional tuition payments and other costs (including costs for books, residency, technology fees, and student loans for tuition and fees, room and board charges, costs of books and supplies and other expenses, etc.).  In addition, many students have been forced to stop pursuing their education

**ELEVENTH CAUSE OF ACTION (Alternative Ohio Sub-Class)**
**Violation of Ohio Revised Code §1345.02 (Ohio Consumer Protection Act)**
**Against Walden and Laureate**

448.   Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

449.   Plaintiff brings this cause of action on behalf of an Ohio Sub-Class. Walden and Laureate have engaged in unfair, unlawful, and fraudulent business practices, as set forth above.

450.   Ohio Rev. Code Ann. 1345.02(B)(2) provides "That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio Rev. Code Ann. § 1345.02(B)(2).

451. As described above, Walden and Laureate represented to prospective and current students that its doctoral programs were of a particular standard and quality, when they were not.

452. Further, the Appeals Court of Ohio found in *Malone v. Acad. of Court Reporting*, 582 N.E.2d 54, 58 (Ohio Ct. App. Dec. 31, 1990), that the OCSPA applied to professional schools.

> Defendants' contention that the Consumer Sales Practices Act is not applicable because the legislature never intended it to apply to regulated professional schools is not well taken. The statute is applicable by its own terms. The school supplied services to consumers in a consumer transaction and plaintiffs have alleged facts of unfair or deceptive acts or practices under R.C. 1345.02. *See Drexel v. Columbus Technical Institute* (Jan. 18, 1990), Franklin App. No. 88AP-271, unreported, 1990 WL 2925. Plaintiffs may also claim that defendants committed unconscionable acts or practices under R.C. 1345.03. In essence, plaintiffs are entitled to show that defendants abused the privilege of contract. Plaintiffs have stated claims for violations of both R.C. 1345.01 and 1345.23(B).

*Malone,* 582 N.E.2d at 59.

453. Ohio Revised Code ("ORC") §1345.02 specifically prohibits the use of unfair or deceptive trade practices in connection with a consumer transaction.

454. ORC §1345.03(6) prohibits suppliers from making misleading statements of opinion on which a consumer is likely to rely to the consumer's detriment.

455. By engaging in the above-described acts and practices, Walden and Laureate have committed one or more acts of unfair and deceptive trade practices as those terms are defined in at least §§1345.02(B)(2) and 1345.03(6).

456. Walden and Laureate made false and misleading statements about the nature, quality, style and model of Walden's doctoral education services. Further, the subject of the Walden PhD transaction had been supplied in accordance with previous representations made by Walden and/or Laureate to Plaintiff Thornhill and members of the Ohio Sub-Class, and those representations were not performed. Specifically, Walden and/or Laureate misrepresented that:

1) dissertation/doctoral study committee members would work as a team, directly guiding

students through the various stages of the dissertation process including the proposal; 2) students had control over how long it would take to obtain their doctoral degree, 3) the dissertation process would take as little as 13 or 18 months or four/five dissertation classes; 4) their respective programs would be completed in the promised time, 5) the process for obtaining a dissertation chair and member would be reasonable and not burdensome, and where chairs or members have left, Walden would find replacements; 6) there would be reasonable stability in faculty member retention such that the process for obtaining a dissertation supervisory chair and member would not be repeated, much less repeated multiple times; and 7) appropriate and timely feedback (within 14 days) from their dissertation committee would be provided to students with respect to their dissertation work .

457.    Walden and Laureate also knowingly concealed, omitted and otherwise failed to state material facts about Walden's doctoral education services that would tend to, and did, in fact, deceive students. Specifically, Walden and Laureate failed to disclose that they intentionally and deliberately used Walden's dissertation process as a means of improperly extracting tuition and generating revenue. Walden and Laureate further failed to disclose that they knowingly directed and implemented a dissertation process that is fraught with inefficiencies, meant to ensure that students do not receive the timely responses and attention that they were promised, and creates inordinate turnover of faculty and supervisory committee chairs and members.

458.    Walden and Laureate knew that the doctoral dissertation coursework was and continues to be systematically prolonged by the violations set forth herein.

459.    The misrepresentations and omissions were material to Plaintiff and the members of the Class.

460.    Walden and Laureate's unfair and deceptive trade practices and acts occurred and continue to occur repeatedly during the course of its business. These actions constitute unfair and deceptive trade practices, in violation of ORC §1345.02.

461.    Plaintiff and members of the Class were likely to and did rely on these representations and omissions in the course of pursuing their doctoral degrees. Furthermore, Walden and Laureate intended that Plaintiff and members of the Class would rely on the representations and omissions.

462.    As a direct and proximate result of Walden's unfair and deceptive practices and acts, Plaintiff and the Class have suffered and will continue to suffer actual damages. Had Plaintiff and the members of the Class been aware of the misrepresentations and omissions, they would not have paid tuition to Walden for the educational services that Defendant purported to provide or incurred costs for books, residency, technology fees, and student loans for tuition and fees, room and board charges, costs of books and supplies and other expenses, etc.

### TWELFTH CAUSE OF ACTION (Alternative Ohio Sub-Class)
### Breach of Fiduciary Duty Against Walden

463.    Plaintiff brings this cause of action on behalf of a statewide Class under Ohio common law against Walden.

464.    Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

465.    Walden owed Plaintiff and the Ohio Class a fiduciary duty from enrollment, through the dissertation process and when re-enrolling each semester.

466.    Walden acknowledges such a duty exists in its Student Handbook.

467.    Despite this fiduciary relationship, Walden made actual or implied false representations concerning the cost and length of time to get a doctoral degree, while concealing the truth from prospective and actual students.

468.    Walden had a duty to disclose that Walden's doctoral programs were designed to take much longer than they represented.

469.    Walden concealed and is still concealing how long its doctoral programs take to complete.

470.    For example, Walden intentionally misled Plaintiff with statements that the program would take a shorter time frame, and that Plaintiff would have control over how quickly she would complete the program.

471.    Instead, when Plaintiff was recruited, enrolled in her doctoral degree and re-enrolled each semester, Walden concealed that the program in which she enrolled was designed to take longer than disclosed.

472.    Similar, if not identical, false representations and omissions were also made to other members of the Class about their degree programs.

473.    Despite the fiduciary relationship, Walden also concealed or otherwise omitted information about the actual percentage of students who graduated with doctoral degrees from Walden.

474.    Further, Walden informed prospective students and current students they would have resources available to them, when Walden knew full well that such resources would not be available.

475.    These representations were material to Plaintiff and the members of the Class agreeing to attend Walden, and in continuing to re-enroll each term.

476.    In violation of the duty owed, Walden was aware of the falsity of its representations, or at a minimum had an utter disregard for truthfulness. For example, Walden purposefully designed its doctoral programs to last a certain, longer time frame, despite telling students it would take less time or withholding the fact that upon information and belief less than 10% of doctoral students would receive a doctoral degree.

477.    Walden breached the duty owed for the purpose of defrauding Plaintiff and members of the Class so that it could receive additional tuition and fee payments.

478.    Plaintiff and members of the Class were injured by Walden's actions because had Walden been truthful about the timelines and costs for Walden's doctoral programs, as well as the annual graduation rate and resources available to them, doctoral students would not have enrolled or would not have re-enrolled after each term.

479.    Plaintiff and members of the Class were harmed by incurring tuition costs; costs for books, residency and technology fees; and student loans for tuition and fees, room and board charges, costs of books and supplies and other expenses.


## PRAYER FOR RELIEF

 WHEREFORE, Plaintiff and members of the Class and Subclasses request that the Court enter an Order or judgment against Walden as follows:

A. Certifying this case as a class action and appointing Plaintiff and her counsel to represent the Class;

B. Awarding Plaintiff and other members of the Class damages and all other relief available under the claims alleged;

C. Awarding Plaintiff and other members of the Class pre-judgment and post

judgment interest as a result of the wrongs complained of herein;

D. Awarding Plaintiff and other members of the Class their costs and expenses in

this litigation, including reasonable attorneys' fees and other costs of litigation;

E. Awarding a trebling of damages where allowed under applicable state law;

E. Requiring Walden to disgorge the revenue earned through the

excessive doctoral dissertation coursework;

F. Enjoining Walden from engaging further unlawful conduct as described herein;

G. Awarding Plaintiff and other members of the Class restitution; and

H. Awarding such other relief as the Court deems just and proper.


## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Respectfully submitted,

PEIFFER ROSCA WOLF ABDULLAH
 CARR & KANE

By:     /s/ Paul Lesko
Paul Lesko (admitted *pro hac vice*
on October 25, 2017)
818 Lafayette Avenue
Second Floor
St. Louis, MO 63010
Telephone: (314) 833-4826
plesko@prwlegal.com

Marnie C. Lambert (SBN 0073054)
Lambert Law Firm, LLC
4889 Sawmill Road, Ste. 125
Columbus, Ohio 43235
Telephone: (614) 504-8803

Facsimile: (888) 386-3098
mlambert@mclinvestlaw.com

Alan Rosca
Peiffer Rosca Wolf Abdullah Carr & Kane
1422 Euclid Avenue, Suite 1610
Cleveland, Ohio 44115
Telephone: (216) 570-0097
Facsimile: (888) 411-0038
arosca@prwlegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2017, a copy of the foregoing was filed electronically with the Court's Case Management/Electronic Case Files (CM/ECF) docketing system. Notice of this filing will be sent by operation of the CM/ECF system. Parties may access this filing through the CM/ECF system.

/s/ Paul A. Lesko
Paul A. Lesko
*Attorneys for the Plaintiff*